UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

MARCOS A. HERRERA-AMADOR
and PILAR H. REYES,

**Civil Action No:**

**COMPLAINT**

Plaintiffs,

**JURY TRIAL DEMANDED**

-against-

THE CITY OF NEW YORK;                                    ECF Case
NEW YORK CITY POLICE DEPARTMENT,
Police Officer KEVIN LEE Shield # 7655,
Sergeant WILLIAM MATTHIES Shield # 1291,
Detective KEVIN ARIAS Shield # 152, and
Police Officer JOHN DOE 1 through 10,
Individually and in their official capacities (the
Name John Doe being fictitious, as the true
Names are presently unknown),

Defendants.

-------------------------------------------------------------------x

  Plaintiffs, MARCOS A. HERRERA-AMADOR and PILAR H. REYES by

and through their attorney, LAW OFFICE OF LAURIANO GUZMAN, JR., P.C. by

LAURIANO GUZMAN, JR., hereby brings this action under 42 U.S.C. § 1983 to

redress their civil and legal rights, and alleges as follows:

### PRELIMINARY STATEMENT

  1. This is a civil rights action in which the plaintiffs, MARCOS A.

HERRERA-AMADOR and PILAR H. REYES, seek relief for the defendants'

violations of their rights secured by the Civil Rights Act of 1871, 42 U.S.C. §

1983, by the United States Constitution, including the Fourth, Fifth and

1

Fourteenth Amendments, and by the laws and Constitution of the State of New York. Plaintiffs seek compensatory and punitive damages, an award of costs, interest and attorney's fees, and such other and further relief as this Court deems just and proper.

2.     This action has been commenced within three years after Plaintiff's claim arose by reason of the termination of the criminal prosecution in favor of the plaintiff, HERRERA-AMADOR.

## JURISDICTION AND VENUE

3.     This action is brought pursuant to 42 U.S.C. § 1983 and §1988, and the Fourth, Fifth and Fourteenth Amendments to the United States Constitution and the laws of the State of New York. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331 and §1343, this being an action seeking redress for the violations of plaintiffs constitutional and civil rights.

4.     Plaintiffs further invoke this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all state law claims and as against all parties that are so related to claims in this action within the original jurisdiction of this court that they form part of the case or controversy.

5.     Venue in this District is proper under 28 U.S.C. § 1391 (b) and (c) in that Defendant CITY OF NEW YORK is administratively located within the Eastern District of New York, and the events giving rise to this claim occurred within the boundaries of the Eastern District of New York.

## JURY TRIAL DEMANDED

6.     Plaintiffs demand a trial by jury on each and every one of their claims as pleaded herein.

## PARTIES

7.     At all times relevant to this action, Plaintiff MARCOS A. HERRERA-AMADOR (hereinafter HERRERA-AMADOR) was and is currently a resident of Kings County, New York.

8.     At all times relevant to this action, Plaintiff PILAR H. REYES (hereinafter REYES) was and is currently a resident of Kings County, New York.

9.     Defendant CITY OF NEW YORK (hereinafter CITY) is and was at all times relevant a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department The New York Police Department ( hereinafter NYPD), which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY OF NEW YORK assumes the risks incidental to the maintenance of a police force and the employment of police officers. Defendant CITY OF NEW YORK was at all times relevant herein the public employer of Defendants Police Officer KEVIN LEE (hereinafter P.O. LEE) Shield # 7655, Sergeant WILLIAM MATTHIES (hereinafter SGT. MATTHIES) Shield # 1291, and Detective KEVIN

ARIAS (hereinafter DET. ARIAS) Shield # 152 and Police Officer JOHN DOE (1 through 10).

10.     At all times relevant herein, defendant P.O. LEE was a police officer of the NYPD, acting as an agent, servant and employee of defendant CITY and in furtherance of the scope of his employment and acting under color of laws; to wit under color of statutes, ordinances, regulations, policies customs and usages of the CITY and/or Police Department.

11.     At all times relevant herein, defendant SGT. MATTHIES was a police officer of the NYPD, acting as an agent, servant and employee of defendant CITY and in furtherance of the scope of his employment and acting under color of laws; to wit under color of statutes, ordinances, regulations, policies customs and usages of the CITY and/or Police Department.

12.     At all times relevant herein, defendant DET. ARIAS was a police officer of the NYPD, acting as an agent, servant and employee of defendant CITY and in furtherance of the scope of his employment and acting under color of laws; to wit under color of statutes, ordinances, regulations, policies customs and usages of the CITY and/or Police Department.

13.     At all times relevant herein, defendants Police Officer JOHN DOE (1 through 10) were police officers of the NYPD, acting as agents, servants and employees of defendant CITY and in furtherance of the scope of their employment and acting under color of laws; to wit under color of statutes, ordinances, regulations, policies customs and usages of the CITY and/or Police Department.

4

## NOTICE OF CLAIM

14.     Plaintiffs timely filed Notice of Claim with the Comptroller of the City of New York, setting forth the facts underlying Plaintiffs claim against Defendants, CITY OF NEW YORK, et al.

15.     The City assigned a claim number to Plaintiff's case, and Plaintiffs were subjected to an examination pursuant to N.Y. Gen. Mun. L. Sec. 50-H on October 31, 2014.

16.     To date, no offer has been received by Plaintiffs, and no compensation has been offered by Defendant, CITY OF NEW YORK, ET AL., in response to their claims.

17.     This action has been commenced within three years after plaintiff, HERRERA-AMADOR'S claim arose by reason of the termination of the criminal prosecution in favor of the plaintiff, HERRERA-AMADOR.

## FACTUAL AND GENERAL ALLEGATIONS
## APPLICABLE TO ALL COUNTS

### A. Background On Marcos Herrera-Amador and Pilar Reyes

18.     Upon information and belief, HERRERA-AMADOR came to the United States in March 3, 2007 with dreams of playing major league baseball. Although he left two young children in the Dominican Republic, he knew he had to work hard to provide for them. HERRERA-AMADOR, a black Dominican male with a height of 6 foot 6 inches and a weight of approximately 250 pounds, had

made it to America on a bid from a Triple A league team (see **Exhibit A** – Photographs of HERRERA-AMADOR).

19. Upon information and belief, he met REYES while he was training for the major leagues. She supported him and he supported her, emotionally and financially.

20. When Herrera was injured, he could no longer play baseball. But he did not let that destroy his American dream for his family. He went into the metals business and as a resident alien, was in the process of becoming an American citizen. His hard work was beginning to pay off and he was making money to support Pilar Reyes, her son and his two children in the Dominican Republic.

## B. False Arrest

21. Upon information and belief, on the evening of September 2, 2013 HERRERA-AMADOR visited a social club (hereinafter CLUB) located at 4722 Junction Boulevard, Queens, New York. He entered the CLUB through the outdoor stairwell which had multiple operational security cameras and at their door, a manned security check point.

22. Upon information and belief, before entering the CLUB that evening, HERRERA-AMADOR went past the cameras and through the manned security check point where he was searched. Upon entering, he proceeded to the bar where he sat drinking a beer and talking to a female bartender, while other patrons behind him were drinking, talking and playing table games (cards or dominos). Sometime later that evening, as he sat at the bar, there was a

commotion behind him. Unbeknown to HERRERA-AMADOR, two armed men had entered the CLUB and robbed some of the patrons. As a result, patrons were shouting and running frantically toward the front door exit.

23. Upon information and belief, HERRERA-AMADOR also ran out of the CLUB, following closely behind the female bartender and out through the front door entrance.

24. Upon information and belief, HERRERA-AMADOR ran outside of the CLUB in the early morning hours of September 3, 2013, to hail a cab. He got the attention of an unmarked police vehicle. P.O. LEE and SGT. MATTHIES pulled over their vehicle and parked. P.O. LEE and SGT. MATTHIES, the supervisor, exited their vehicle and HERRERA-AMADOR proceeded to approach them.

25. Upon information and belief, the two officers asked him what was going on.

26. Upon information and belief, HERRERA-AMADOR, in his limited English, informed the two officers that there was a fight at the CLUB. He then pointed toward the direction of the CLUB. Both officers seized him immediately without reasonable belief that he had committed a crime. They grabbed him and ordered him to sit on the wet concrete pavement without asking him for his name or identification.

27. Upon information and belief, one of the officers, SGT. MATTHIES, walked toward the direction of the CLUB, while P.O LEE stood guard over

HERRERA-AMADOR ensuring that he would not move. HERRERA-AMADOR tried to explain to P.O. LEE that he was not involved in the fight, but with complete indifference, P.O. LEE ordered him not to speak or look at him.

28. Upon information and belief, within minutes SGT. MATTHIES returned and without reason or provocation, forcefully threw HERRERA-AMADOR from his seated position, onto the ground, resulting in him being laid face down on the wet concrete pavement. P.O. LEE then pressed the sole of his dirty wet boot up against the back of HERRERA-AMADOR's neck forcefully positioning his face down unto the dirty wet concrete pavement rendering him unable to move. SGT. MATTHIES then grabbed HERRERA-AMADOR's arms pulling them behind his back and handcuffing his wrists. The use of excessive physical force was unreasonable and unjustified since HERRERA-AMADOR had complied with both officer's demands by neither resisting nor physically impeding them from effectuating the arrest.

29. Upon information and belief, P.O. LEE in concert with SGT. MATTHIES after arresting him, they then proceeded to unreasonably search the person of HERRERA-AMADOR including his pockets and waistband.

30. Upon information and belief, HERRERA-AMADOR arrested, remained lying prone on the wet concrete pavement until he was forcefully brought to his feet.

31. Upon information and belief, he was then taken before random CLUB patrons, still handcuffed, for identification. Despite the suggestive

8

identification procedure, none of the patrons could identify HERRERA-AMADOR. He, however, remained handcuffed and arrested without probable cause. No reasonable investigation or proper procedure was followed by P.O. LEE or Sgt. MATTHIES.

32.     Upon information and belief, HERRERA-AMADOR was then transported to the 110th precinct in Queens.

## C. Post Arrest

33.     Upon information and belief, while at the 110th precinct in Queens, the officers led HERRERA-AMADOR to the precinct basement. He was again physically searched. His shoes, belt and wedding band were removed. He was placed handcuffed in a cell.

34.     Upon information and belief, the handcuffs were placed so tight upon his wrists that they caused bruises and contusions.

35.     Upon information and belief, the following morning of September 3, 2013, HERRERA-AMADOR was taken to an interrogation room where other officers proceeded with accusatory questions about his role in the robbery at the CLUB. DET. ARIAS led the interrogation; he accused and antagonized HERRERA-AMADOR. DET. ARIAS attempted to force a confession from HERRERA-AMADOR. He threatened him with a long jail sentence if he did not cooperate. DET. ARIAS stated to HERRERA-AMADOR in sub and substance: "if

9

you don't tell me what I want to hear, when you get out of prison your son will be a grown man". HERRERA-AMADOR maintained his innocence.

36.     Upon information and belief, HERRERA-AMADOR was then fingerprinted and processed through central booking. He was charged with numerous felonies, including but not limited to the charge of armed robbery in the first degree; Penal Law §160.15 (1). The criminal complaint contained material falsehoods against HERRERA-AMADOR and the allegations and charges therein were sworn to under oath by P.O. LEE as true even though he knew them to be false. (See Exhibit B – Criminal Complaint) The robbery victims could not identified HERRERA-AMADOR as one of the robbers. The material falseness of the criminal complaint was fabricated by P.O LEE in concert with SGT. MATTHIES with knowledge and disregard for the truth to justify the arrest of HERRERA-AMADOR. The criminal complaint is devoid of any factual basis to arrest and charge HERRERA-AMADOR with armed robbery. Even assuming that HERRERA-AMADOR had entered the CLUB along with his co-defendants, there is an insufficient factual basis to reasonably infer probable cause from his   mere presence at the CLUB. He had not committed or attempted to commit any illegal acts. The defendants knew, or should have known through the exercise of reasonable care and proper police procedure, that the said investigation into this matter was flawed and incomplete.

37.     Upon information and belief, DET. ARIAS, P.O. LEE, SGT. MATTHIES and Police Officer JOHN DOE 1 through 10, the officers involved in the investigation, had video footage of the robbers entering the CLUB that night

from the CLUB's security surveillance cameras. They had video recordings of the outdoor stairwell of the early morning hours of September 3, 2013. The video footage depicted three men descending the stairwell prior to entering the CLUB. Before entering the CLUB, you can clearly see one of the males putting on gloves and placing a mask over his face as he approached the basement entrance door to the CLUB. At no time was HERRERA-AMADOR, a black male measuring 6 feet 6 inches tall weighing 250 pounds, seen on the video footage together with the two armed robbers. (See Exhibit C – Screen Shots of Video).

38.     Upon information and belief, despite this crucial exculpatory piece of evidence in the hands of the police that demonstrated that HERRERA-AMADOR was neither walking nor entering the CLUB together with the co-defendants and nor was he positively identified by any of the witnesses at the CLUB that night. P.O. LEE lied and signed a false felony complaint charging HERRERA-AMADOR with violent armed robbery he did not commit. P.O. Lee and SGT. MATTHIES lied, mislead and misrepresent the circumstances surrounding the robbery.

39.     Upon information and belief, P.O. LEE and SGT. MATTHIES acted with deliberate indifference and malice in charging HERRERA-AMADOR. He was unlawfully detained, illegally arrested, maliciously charged with criminal offenses and unlawfully imprisoned.

40.     Upon information and belief, at his criminal arraignment, HERRERA-AMADOR pleaded not guilty to the felony criminal complaint charging

11

him with violent armed robbery. The criminal court judge set bail at $50,000.00, cash or bond. His family did not have the financial resources for his bail set at arraignment.

41.     Upon information and belief, HERRERA-AMADOR was taken to one of the most violent correctional facilities in the United States, Rikers Island Correctional Facility (hereinafter "RIKERS ISLAND").

42.     Upon information and belief, immediately upon the bail being posted, the Department of Homeland Security (DHS) arrested HERRERA-AMADOR at Rikers Island. He was removed by DHS agents and taken to Hudson County Correctional Facility in New Jersey where he remained imprisoned based solely on the false violent armed robbery charges. Had the robbery charges pending against him in Queens County not been filed, there would be no reason for HERRERA-AMADOR to be imprisoned by INS for mandatory deportation charges for approximately five and half months.

43.     Upon information and belief, HERRERA-AMADOR, a resident alien at the time, faced mandatory deportation charges because of the violent armed robbery charges. His family paid an immigration attorney, $5,000.00 to represent him.

44.     Upon information and belief, after five and half months of imprisonment at Hudson County Correctional Facility he was returned to Rikers Island to face the felony armed robbery charges pending in Queens County.

45.     Upon information and belief, while at Rikers Island, HERRERA-AMADOR, was faced with gang violence. He had to physically defend himself against three assaults by other prisoners.

46.     Upon information and belief, as a result of living in constant fear of violence against him, HERRERA-AMADOR suffered physically and mentally. He suffered from high blood pressure and insomnia and was seen at the clinic at Rikers Island. REYES would also visit him weekly at Rikers Island. The malicious prosecution and imprisonment of HERRERA-AMADOR had taken a toll on him. His family observed that he was physically, mentally and emotionally affected by his imprisonment.

47.     Upon information and belief, HERRERA-AMADOR was taken to criminal court fifteen times since his arrest. His wife, REYES initially retained a private criminal defense lawyer and paid him $5,000.00. HERRERA-AMADOR informed his criminal attorney that he was innocent and he insisted on litigating the criminal charges. However, when the attorney requested an additional $10,000.00 fee, REYES could not afford the additional fee. Subsequently, the private lawyer was relieved by the court because HERRERA-AMADOR was indigent. He was appointed an attorney by the court.

48.     Upon information and belief, at his court appearances, the prosecutor, unsupported by the video evidence, informed HERRERA-AMADOR's attorneys that he was guilty because he was seen on the video entering the CLUB along with his two co-defendants. HERRERA-AMADOR's attorneys were

also told by the prosecutor that they had witnesses that could identify HERRERA-AMADOR as a participant in the armed robbery. The prosecutor was aware that there was not a sole witness that could identify HERRERA-AMADOR, and that the video evidence confirmed that he was not with the two armed robbers.

49.     Upon information and belief, HERRERA-AMADOR rejected the prosecutor's initial plea bargain to a reduced felony charge with a sentence of probation and insisted on testifying before the grand jury. Subsequently, the prosecutor made a new offer to him of a misdemeanor plea with a sentence of conditional discharge. When HERRERA-AMADOR did not accept the two prior plea offers, he was finally offered by the prosecutor a plea to a violation which is not a crime, with time served. All the reduced plea offers were repeatedly rejected.

50.     Upon information and belief, every time he was brought to criminal court for grand jury action, the case was not presented. But the status of his case never changed and there was no grand jury indictment. He continued to assert his innocence throughout each of his fifteen court appearances until his eventual release six months later.

51.     Upon information and belief, on August 5, 2014, the statutory period had expired for the prosecutor to present their case to the grand jury; 180 days had lapsed. The case was dismissed with prejudice; a favorable determination on his behalf.

14

52.     Upon information and belief, HERRERA-AMADOR's immigration Removal Proceedings remain open.

53.     Upon information and belief, HERRERA-AMADOR spent a little over eleven months incarcerated because the illegal arrest that was not supported by either reasonable suspicion or probable cause. The police intentionally failed to conduct a reasonable investigation before arresting HERRERA-AMADOR. This arrest was the foundation for the failures that preceded it and added to the constitutional violations. The officers also failed to present and withheld exculpatory evidence in their possession. It was only HERRERA-AMADOR's steadfast claim to his innocence that ultimately led to the dismissal of all criminal charges with prejudice.

54.     Upon information and belief, notwithstanding that HERRERA-AMADOR had no involvement whatsoever in the crimes he allegedly committed. He was continuously held in custody from September 3, 2013 through August 5, 2014 due to the false arrest.

55.     Upon information and belief, despite HERRERA-AMADOR's release and freedom from imprisonment, he was left traumatized from the experience.

56.     Upon information and belief, as a result of HERRERA-AMADOR's imprisonment and many forced court appearances, his reputation as a good resident was greatly damaged. His business came to a halt causing him to lose eleven and half months of income and disrupting his marital life with his wife, REYES.

57. Upon information and belief, REYES suffered the loss of HERRERA-AMADOR's comfort and society throughout his imprisonment.

58. Upon information and belief, once HERRERA-AMADOR was released, he went for treatment at Woodhull Hospital in Brooklyn on three different occasions in order to address the psychiatric damage he incurred while falsely incarcerated. HERRERA-AMADOR was deeply traumatized by his imprisonment; he could not sleep; he suffered from depression and anxiety disorder and PTSD (Post traumatic stress disorder). At Woodhull Hospital the doctors recommended that he see a psychiatrist in order to combat the crippling depression and anxiety that had taken over him. He continues to receive psychiatric treatment as of the date of the filing of the Notice of Claim.

## CAUSES OF ACTION

### COUNT ONE FOR RELIEF

### 42 U.S.C. § 1981, 1983 AND THE FOURTH AMENDMENT VIOLATIONS FOR FALSE ARREST

59. Plaintiff repeats and reiterates the allegations contained in paragraphs "1" through "58" of the complaint as if fully set forth herein.

60. On or about September 3, 2013, in the County of Queens, New York, HERRERA-AMADOR was unlawfully detained, arrested, imprisoned by agents, servants and/or employees of defendant, CITY including P.O. LEE, and SGT. MATTHIES and DET. ARIAS.

61.     That the aforesaid and imprisonment was malicious, unlawful, and not based upon a warrant, probable cause, and or any other justification, and was therefore a false arrest and imprisonment.

62.     That defendant CITY, through its agents, servant and/or employees, including police defendants, P.O. LEE, SGT. MATTHIES and DET. ARIAS acted in bad faith and without probable cause in committing the aforesaid arrest and imprisonment of HERRERA-AMADOR.

63.     At the time of his unlawful arrest and imprisonment, HERRERA-AMADOR had not committed or attempted to commit any illegal act.

64.     At the time of HERRERA-AMADOR's unlawful arrest and imprisonment, the defendants knew or should have known, through the exercise of proper procedure and reasonable investigation, that the aforementioned arrest and imprisonment were false and without probable cause.

65.     That the aforesaid arrest and imprisonment was made with knowledge of and/or negligent and/or reckless disregard of the material falseness of the criminal complaint.

66.     The aforesaid false arrest and imprisonment caused HERRERA-AMADOR to suffer severe physical injuries, emotional and psychological distress, anguish, anxiety, fear, and humiliation, loss of freedom, loss of wages, legal expenses, and damage to his reputation.

67.     By reason of the foregoing, the defendants became liable to HERRERA-AMADOR in a sum of money which exceeds the jurisdiction limits of all court of lesser jurisdiction.

## COUNT TWO FOR RELIEF

## 42 U.S.C. § 1981, 1983 AND THE FOURTEENTH AMENDMENT VIOLATIONS FOR MALICIOUS PROSECUTION

68.     Plaintiffs repeat and reiterate the allegations contained in paragraphs "1" through "67" of the complaint as if fully set forth herein.

69.     On or about September 3, 2013, the defendants intentionally, knowingly, recklessly, negligently and with malice caused the commencement of a criminal prosecution against the HERRERA-AMADOR in the Criminal Court of the City of New York, County of Queens, upon the filing of an accusatory instrument without probable cause.

70.     In commencing and continuing the said malicious prosecution, defendants caused HERRERA-AMADOR to be falsely charged with acts in violation of the Penal Law of the State of New York

71.     HERRERA-AMADOR had not committed or attempted to commit any illegal acts.

72.     HERRERA-AMADOR had not given defendant CITY, its agents, servants and or employees, including defendants P.O. LEE and SGT. MATTHIES probable cause to believe that he had committed the falsely charged illegal acts.

73.     The defendants knew, or should have known through the exercise of reasonable care and proper police procedure, that the said investigation into this matter was flawed and incomplete.

74.     The defendant CITY, its agents, servants, and/or employees, including defendants P.O. LEE, and SGT. MATTHIES, willfully, negligently and

18

wrongfully accused the Plaintiff of having committed acts in violation of the Penal Law of the State of New York.

75.    The defendant CITY, its agents, servants and/or employees, including defendant P.O. LEE, and SGT. MATTHIES, willfully, negligently and wrongfully continued to prosecute the Plaintiff for alleged violations of the Penal Law of the State of New York, even though the defendants knew or should have known of facts and circumstances that would have lead a reasonable person to conclude that the- criminal complaint, upon which said criminal prosecution was based, contained material falsehoods and was otherwise improper, and that the continued prosecution of HERRARA-AMADOR was, therefore, improper under the circumstances.

76.    On or about August 5, 2014 said criminal complaint was dismissed.

77.    As a result of malicious prosecution, HERRERA-AMADOR was caused to suffer and continues to suffer severe emotional and psychological distress, anguish, anxiety, fear and humiliation, loss of wages, legal expenses and damage to his reputation.

78.    By reason of the foregoing, the defendants became liable to the Plaintiff in a sum of money which exceeds the jurisdictional limits of all courts of lesser jurisdiction.

## COUNT THREE FOR RELIEF

## 42 U.S.C. §1983 and 1988: EXCESSIVE USE OF PHYSICAL FORCE

79.    Plaintiffs repeat and reiterate the allegations contained in paragraphs "1" through "78" of the complaint as if fully set forth herein.

80. Defendants P.O. LEE and SGT. MATTHIES were at all times relevant herein duly appointed and acting as police officers for the New York City Police Department.

81. The conduct and actions of P.O. LEE acting in concert with SGT. MATTHIES and under the color of law to wit: under the color of the statutes, ordinances, regulations, policies, customs and usage of the City and State of New York used excessive physical force to arrested HERRERA-AMADOR.

82. Defendants P.O. LEE and SGT. MATTHIES were at all times relevant herein duly appointed and acting as police officers for the New York City Police Department.

83. On September 3, 2013, in the vicinity of 4722 Junction Boulevard, Queens, New York, HERRERA-AMADOR was in a public street and had not committed any crime.

84. P.O. LEE and SGT. MATTHIES forcibly threw HERRERA-AMADOR to the ground and P.O. LEE placed his boot on the back of HERRERA-AMADOR's neck forcing his face unto the wet concrete pavement.

85. HERRERA-AMADOR had not resisted arrest nor physically impeded P.O. LEE and SGT. MATTHIES from effectuating the arrest.

86. That said actions by defendants P.O. LEE and SGT. MATTHIES were entirely unjustified by any actions of HERRERA-AMADOR and constituted an unreasonable and excessive use of force by P.O. LEE and SGT. MATTHIES.

87. P.O. LEE and SGT. MATTHIES actions were done intentionally, willfully, maliciously, with a deliberate indifference and/or with a reckless

disregard for the natural and probable consequences of their acts, was done without lawful justification or reason and was designed and did cause specific and serious physical and emotional pain and suffering in violation of HERRERA-AMADOR's rights as guaranteed 42 U.S.C. § 1983, and the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, including the right to be free from unreasonable seizure of his person and the right to be free from the use of excessive, and unreasonable, and unjustified force.

88.    The actions alleged above deprived HERRERA-AMADOR of the following rights under the United States Constitution:

a.    Freedom from the use of excessive and unreasonable force;

b.    Freedom from summary punishment.

89.    The direct and proximate result of defendants P.O. LEE's and SGT. MATTHIES' acts were that HERRERA-AMADOR suffered physical injuries as previously set forth, including bruises and contusions and was forced to endure great pain and mental suffering that ultimately traumatized HERRERA-AMADOR.

## COUNT FOUR FOR RELIEF

## MUNICIPAL LIABLILITY FOR CONSTITUTIONAL VIOLATIONS
## MONELL CLAIM AGAINST THE CITY OF NEW YORK – 42 U.S.C.§ 1983

90.    Plaintiffs repeat    and reiterate the allegations contained in paragraphs  "1" through "89" of the complaint as if fully set forth herein.

21

91.    The City of New York directly caused the constitutional violations suffered by the Plaintiffs and is liable for the damages suffered by the Plaintiffs as a result of the conduct of the defendant officers. The conduct of the defendant officers was a direct consequence of the policies and practices of the defendant, City of New York.

92.    The acts complained of were carried out by the aforementioned defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the City and NYPD, all under the supervision of ranking officers of the NYPD.

93.    The aforementioned customs, practices, procedures and rules of the City and NYPD include, but are not limited to: 1) arresting persons known to be innocent in order to meet "productivity goals"; 2) falsely swearing out criminal complaints and/or lying and committing perjury during sworn testimony to protect other officers and meet productivity goals; 3) failing to supervise, train, instruct and discipline police officers thereby encouraging their misconduct and exhibiting deliberate indifference towards the constitutional rights of persons within the officers' jurisdiction; 4) discouraging police officers from reporting the corrupt or unlawful acts of other officers; 5) retaliating against officers who report police misconduct; and 6) failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented with proper supervision.

94.    At the time of the aforementioned constitutional violations, the City and NYPD were and had been on notice of such unconstitutional conduct, customs, and de facto policies, such that the failure of the City and NYPD to take

appropriate remedial action amounted to deliberate indifference to the constitutional rights of persons with whom the police come in contact. In light of the extensive pattern of well-settled, pervasive customs and policies causing constitutional violations, documented in part *infra*, the need for more effective supervision and other remedial measures was patently obvious, but the City and NYPD made no meaningful attempt to prevent future constitutional violations.

95. The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented by the following civil rights actions and parallel prosecutions of police officers:

> a. Schoolcraft v. City of New York, 10-CV-6005 (RWS) (S.D.N.Y)(police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying     evidence and suborning perjury alleges he was arrested and    committed to a psychiatric facility in retaliation for exposing these      practices and customs);

> b. Long v. City of New York, 09-CV-6099 (AJK) (S.D.N.Y); People v. Pagan, 6416-2008 (Sup. Ct. N.Y. Co.)(officer swears out a false complaint and is convicted of falsifying police records);

> c.Taylor-Mickens v. City of New York, 09-CV-7923 (RWS) (S.D.N.Y) (police officers at 24th precinct issue four summonses to a woman in  retaliation for her lodging a complaint  with the Civilian complaint  review Board against the precinct);

> d.Lin v. City of New York, 10-CV-1936 (PGG) (S.D.N.Y) (officers arrest a person lawfully photographing an arrest of a bicyclist in Times Square and swear out criminal complaints that are contradicted by video evidence);

> e. Colon v. City of New York, 9-CV-0008 (JBW)(E.D.N.Y) (in an Order dated   November 29, 2009 denying the City's motion to dismiss on Iqbal/Twombley grounds, wherein the police officers at issued were and prosecuted for falsifying evidence, the Honorable Jack B. Weinstein wrote:

'Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration— through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department—there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.'

f. People v. Arbeedy, 6314-2008 (Sup. Ct. Kings Co.) (NYPD narcotics detective found guilty planting drugs on two innocent civilians; former undercover NYPD narcotics officer, Steve Anderson, testified that fellow narcotics officers routinely maintained a stash of narcotics to plant on innocent civilians in order to help those officers meet arrest quotas; Mr. Anderson testified concerning the NYPD's practice of "attaching bodies" to the narcotics to make baseless arrests stating: "It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators. Seeing it so much, it's almost like you have no emotion with it. The mentality was that they attach bodies to it, they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway. That kind of came to me and I accepted it – being around so long, and being an undercover"; The presiding judge, Justice Reichbach, stated "Having been a judge for 20 years, I thought I was not naïve regarding the reality of narcotics enforcement. But even the Court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly by the seeming casualness by which such conduct is employed.");

g. Bryant v. City of New York, 22011/2007 (Sup. Ct. Kings Co.)(Jury declares that NYPD officers acted pursuant to a City policy regarding the number of arrests officers were expected to make that violated plaintiff's constitutional rights and contributed to her arrest);

h. Williams v. City of New York, 06-CV-6601 (NGG) (E.D.N.Y.)(officers arrest plaintiff during a "vertical patrol" of a

24

public housing project despite evidence that he had a legitimate reason to be on premises);

i. <u>MacNamara v. City of New York</u>, 04-CV-9216(RJS)(JCF) (S.D.N.Y) (evidence of perjured sworn statements systematically provided by officers to attempt to cover up or justify unlawful mass arrests of approximately 1800 people has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

j. <u>McMillan v. City of New York</u>, 04-cv-3990 (FB)(RML) (E.D.N.Y.)(officers fabricated evidence against an African-American man in Kings County and initiated drug charges against him, despite an absence of an quantum of suspicion);

k. <u>Avent v. City of New York</u>, 04-CV-2451 (CBA) (CL) (E.D.N.Y.)(same);

l. <u>Smith v. City of New York</u>, 04-CV-1045 (RLM) (E.D.N.Y.) (same);

m. <u>Powers v. City of New York</u>, 04-CV-2246 (NGG) (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption in the NYPD);

n. <u>Nonneman v. City of New York</u>, 04-CV-10131 (JSR)(AJP) (S.D.N.Y.)(former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youths);

o. <u>Richardson v. City of New York</u>, 02-CV-3651 (JG)(CLP) (E.D.N.Y.)(officers fabricated evidence including knowingly false sworn complaints, against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

p. <u>Barry v. City of New York</u>, 01-CV-10627 (CBM) (S.D.N.Y.)(triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged the NYPD had an "unwritten but persuasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

q. <u>White-Ruiz v. City of New York</u>, 93-CV-7233 (DLC) (MHD), 983 F.Supp. 365, 380 (S.D.N.Y., 1997)(holding that the NYPD had an

"unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption"); and

r. <u>Ariza v. City of New York</u>, 93-CV-5287 (CPS), 1996 U.S. Dist. Lexis 20250 at 14(E.D.N.Y.)(police officer alleges retaliatory duty assignments and harassment in response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of policy to regulate against police officers who exposed police misconduct and a failure to train in the police department).

96.    The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints or otherwise falsifying or fabricating evidence, are further evidenced, inter alia, by the following:

a. The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system. It concluded:

Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their superiors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.[1].{...}

What breeds this tolerance is deep-rooted perception among many officers of all ranks within the Department that there is nothing really wrong with compromising the facts to fight crime in the real world. Simply put, despite devastating consequences of police falsifications, there is a persistent belief among officers that it is necessary and justified, even if it is unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get the

---

[1] Mollen Commision report, p.36

suspected criminal off the streets. This is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."[2]

b. In June 2011, in the case in New York County Supreme Court entitled People v. William Eiserman (Ind. No. 2999-2010), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, "admit[ing] to faking a marijuana case against one man and cocaine-related charges against another – and training Velasquez [officers] to falsify paperwork to sidestep legal safeguards." Supreme Court Justice Juan Merchan commented that Sgt. Eisenman's admissions "paint a picture of a police officer who has challenged and undermined the integrity of the entire system we have here."[3]

c. In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed" when, in fact, two other officers had made the arrest and handed the arrest off to Corniel. The suspect was released. [4]Moreover, Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.

That is a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

What has authorities particularly troubled is that officers historically lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

---

[2] Mollen Commission Report, pp 40-41.
[3] Melissa Grace, *NYPD Sgt. William Eiseman Pleads Guilty to Lying Under Oath in Plea Deal*, Daily News, June 27, 2011, available at http://www.nydailynews.com/news/crime/nypd-sgt-william-eiseman-pleads-guilty-lying-oath-plea-deal-article-1.129288
[4] Murray Weiss, *NYPD in a Liar Storm*, N.Y. Post, Oct. 26, 2009 available at http://www.nypost.com/p/news/local/nypd_in_a_liar_storm_qazMBEm3UNJVogv4Ndeqcl.

Their reasons could range from trying to cut down on paperwork to being lazy when filing arrest and incident reports.[5]

d. In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel. Mr. Kim was convicted of those offenses. The 109th precinct of the NYPD, which used to be under Mr. Kim's command, is also under investigation by the United States Attorney's Office for "planting drugs on suspects and stealing cash during gambling raids." The 109 th precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to the arrest. According to the Assistant United States Attorney Monica Evans, members of the 109 th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[6]

e. In December 2009, two officers from the 81 st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from Internal Affairs Bureau. As explained in the New York Post:

The officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct. Sometime later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes. [Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30 cuffed him, but they claimed that they had seen him selling the bogus butts to two people, according to sources. Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.

To complete ruse, the undercover cop was processed at the station house so as not to tip off Stukes and Tirado about the sting...

[P]olice sources said [this action] stem[s] from Precinct commanders caving to the pressure of top brass to make themselves look better.

"There's pressure on the cops from the bosses and they're getting pressured from headquarters," a police source told The Post.

---

[5] Id.

[6] John Marzulli, *Claims of Corruption in Queens Precinct Put precinct Crooked Cop's Sentencing on Hold*, N.Y. Daily News, June 20, 2008, available at http://www.nydailynews.com/news/crime/claims-corruption-queens-precinct-put-crooked-sentencing-hold-article-1.296352.

The officers were indicted for felony perjury, filing a false report and filing a false instrument.[7]

f. In early 2010, the City settled a civil rights lawsuit wherein one Officer Sean Spencer falsely arrested and accused a 41-year-old grandmother of prostitution, promising to pay the woman $35,000. In Court documents, Caroline Chen, the attorney representing the City in the case, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense."[8]

97. Furthermore, the existence of the aforesaid unconstitutional customs and policies, specifically with regard to "productivity goals," may be further inferred from the following:

a. Deputy Commissioner Paul J. Browne has repeatedly admitted that NYPD commanders are permitted to set "productivity goals."[9]

b. An NYPD transit lieutenant was captured on tape telling officers to make more arrests to meet a captain's order and do more work if they want overtime assignments. "All they care about is ... summonses and arrests and 250s," Lt. Janice Williams said, using police jargon for the NYPD Stop, Question and Frisk reports. She added, "'The bottom line is everybody's individual activity is being looked at." Later in the recording made during a roll call in 2010 at Transit District 34 in Coney Island - she said only officers with "good productivity" will get the opportunity to work overtime. She also said Capt. James Sheerin wanted every officer to make at least one arrest per month - up from the previous order of one every three months - because crime had spiked and arrest totals were lower than other transit districts. "He wants everyone to get in the mindset that there's no more collar a quarter," Williams said.[10]

---

[7] Id.

[8] John Marzulli, *Brooklyn cops charged with barging into sting operation, arresting a fellow officer* ,N.Y. Daily NewsJ uly 30,2010,available at

http://www.nydailynews.com/new-york/brooklyn-cops-charged-barging-sting-operation-arresting-fellow-officer-bogus-charges-article-1.204251

[9] Jim Hoffer NYPD Officer claims pressure to make arrests WABC TV Eyewitness News, March 2, 2010, available at http://abc13.com/archive/7307336/ ("Police Officers like others who receive compensation are provided productivity goals and they are expected to work").

[10] Rocco Parascandola, *NYPD Lt. Janice Williams captured on tape pushing for more busts but brass says there's no quotas*, N.Y. Daily News, March 3, 2011.

c. NYPD Officer Adil Polanco has asserted that his command, the 41st Precinct, regularly requires officers to make at least "one arrest and twenty summonses" per month. P.O. Polanco's allegations were confirmed by an audiotape obtained by the media. The contents of the tape reveal that these quotas are enforced through coercion and threats of job loss; to wit, a patrol supervisor at the 41st Precinct is overheard saying: "If you think one and 20 is breaking your balls, guess what you'll be doing. You're gong (sic) to be doing a lot more, a lot more than what they're saying." The tape also reveals that another patrol supervisor chimed in and told the officers: "next week, 25 and one, 35 and one, and until you decide to quit this job and go to work at Pizza Hut, this is what you're going to be doing till (sic) then."[11]

d. The New York Daily News obtained and published two internal memos which were posted inside the roll-call room at the NYPD's 77th Precinct. The memos specifically instructed officers about the "number of tickets to give drivers for cell phone, seat belt, double-parking, bus stop, tinted windows and truck route violations" that they were expected to issue. The memos remained posted for several weeks inside the roll-call room until the media began inquiring.[12]

e. Responding to a query from a civilian who was cited on consecutive days in November of 2009 for allegedly occupying more than one seat on the New York City subway, the officer responded: "Recently we've been told to write tickets instead of give warnings for this type of thing." The officer explained that they needed to meet quotas.[13]

f. In December of 2010 and in response to the pressure from their supervisors to issue baseless summonses pursuant to the policy and practice of quotas, police officers at the 79th Precinct considered organizing a so-called "daylong summons boycott." As one officer at the precinct explained, "Nobody feels this is right, asking us to write summonses just to meet a quota."[14]

g. In response to the planned summons-boycott at the 79th Precinct on December 13, 2010, Deputy Chief Michael Marino marched into the

---

[11] Id.

[12] James Fanelli, Cops at Brooklyn's crime-ridden 77th Precinct told to meet quotas for moving violations, memos say, N.Y. Daily News, Nov. 8, 2010.

[13] Tom Namako and Kirsten Fleming, *Nightime Riders in Big Sit Fit*, The New York Post. December 26, 2009, available at http://nypost.com/2009/12/26/nighttime-riders-in-big-sit-fit/.

[14] Rocco Parascandola, *Irate cops at the 79th Precinct in Bedford-Stuyvesant threaten boycott over quotas*, N.Y. Daily News, Dec. 12, 2010, available at http://www.nydailynews.com/news/crime/irate-cops-79th-precinct-bedford-stuyvesant-threaten-boycott-quotas-article-1.474648.

precinct at roll call with a deputy inspector and read officers the riot act. "Just try it," a police source quoted Marino as saying. "I'll come down here and make sure you write them." Marino also vowed to transfer people, like he did when he was the commanding officer of the 75th Precinct in East New York.[15]

h. Capt. Alex Perez, the second in command at the NYPD's 81st Precinct, testified in a civil matter before a Brooklyn Supreme Court jury that officers are likely to get poor performance ratings if they have few arrests, conceding that that arrest numbers are a factor in evaluating an officer's performance.[16] Ultimately, the jury in that case judged that the police and a policy "regarding the number of arrests officers were to make that violated plaintiffs constitutional rights and contributed to her arrest."[17]

i. The New York City Office of Collective Bargaining concluded that officers in Brooklyn's 75th Precinct were required to issue four parking tickets, three moving violation citations; three "quality-of-life" summonses, make one arrest and two stop-and-frisks each month. Arbitrator Bonnie Siber Weinstock ruled that the NYPD maintained an illegal "summons quota for traffic violations in the precinct and by penalizing officers for failing to meet the stated number of traffic citations." She ordered the city to cease and desist from the practice.19[18]

j. Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the northern Bronx, was investigated for ordering officers to make a certain number of arrests each month. According to The New York Daily News: The incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said. 'You can't make the nine collars a month, then we'll all have to go our separate ways," Creighton told the officers,

---

[15] Rocco Parascandola, *Deputy Chief Michael Marino threatens cops at the 79'th Precinct who want to go on summons strike* , N.Y. Daily News, Dec. 15,2010, available at http://www.nydailynews.com/new-york/deputy-chief-michael-marino-threatens-cops-79th-precinct-summons-strike-article-1.472513

[16] William J. Gorta, *Brooklyn Mom's Suit. Targets NYPD Arrest Quotas*, N.Y. Post, Feb. 15,.2011, at 6, available on Westlaw at 2011 WLNR 2986205; see also Oren Yaniv,
*Capt. Links Arrests, Evaluation of Cops*, N.Y. Daily News, Feb. l5, 2011, at 20, also available on Westlaw at 20 WLNR 2986205.

[17] Oren Yaniv, *Court rules that cops do use quotas; woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News. Feb. 19, 2011; available at http://www.nydailynews.com/news/crime/court-rules-cops-quotas-woman-injured-2006-arrest-settles-75-000-article-1.134856

[18] *New York City Ticket Quota Confirmed, Denied,* The Newspaper.Com, January 21, 2006, available at http://thenewspaper.com/rlc/news.asp?ID=914; *see also,* Kirsten Cole. *NYPD's Bogus Little Secret: Parking ticket Quotas- Agents Often Caught Citing You For Violations You Didn't Commit*, WCBSTV.com, August 14, 2007, *available at* http://wcbstv.com/topstories/parking.ticket.blitz.2.246533.html.

according to an internal complaint obtained by The News. Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said.

Creighton then told the cops to finagle the times of arrests so any overtime was paid for by a federally funded anti-drug program, the complaint states. Unbeknownst to Creighton, one officer had his NYPD radio switched on so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and Schuylerville and taped by the 911 dispatcher.[19]

98. The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the failure to supervise, train, instruct, and discipline police officers, encouraging their misconduct, and exhibiting deliberate indifference towards the constitutional rights of persons with whom officers come into contact are further evidenced, inter alia, by the following:

a. With respect to Fourth Amendment violations, in <u>Ligon v. City of New York</u>, 2013 WL 628534 (Feb. 14, 2013), Judge Scheindlin found that plaintiffs challenging allegedly unconstitutional policies and practices of the NYPD had shown "a clear likelihood of proving deliberate indifference under any of the prevailing ways of framing that standard," including failure to train and constructive acquiescence.[20] Judge Scheindlin specifically rejected the NYPD's argument that broad, general remedial measures taken in 2012, such as an instructional video on stop and frisk, was meaningful action rebutting a finding of deliberate indifference.

b.The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states: In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate than the devastating consequences of corruption itself. As a result, its corruption control ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted - especially a Department that needs the public's confidence and partnership to be effective. A weak and

---

[19] Allison Gendar *NYPD captain allegedly caught in arrest quota fixing*, The New York Daily News, November 14, 2007, available at http://www.nydailynews.com/news/crime/nypd-captain-allegedly-caught-arrest-quota-fixing-article-1.256006.
[20] Id. at *34.

poorly resourced anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority - which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[21]

c. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

d. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in Colon v. City of New York, 09-CV-00008 (E.D.N.Y.), in which he noticed a "widespread... custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, NYPD Commissioner Raymond Kelly acknowledged, "When it happens, it's not for personal gain. It's more for convenience."[22]

e. In a recent instance, NYPD officer Lieutenant Daniel Sbarra was involved in 15 suits against the city resulting to date in over $1.5 million in settlement payments, was the target of 5-10 Internal Affairs investigations, and was the subject of at least 30 complaints filed with the Civilian Complaint Review Board. Not only have Commissioner Kelly and the NYPD failed to meaningfully discipline or control officer Sbarra – they promoted him to the rank of Lieutenant four months after he lost 20 days of vacation upon pleading guilty to Internal Affairs charges relating to an unconstitutional search. This shows, at best, deliberate indifference towards the constitutional rights of citizens with whom Sbarra comes into contact, and further demonstrates tacit approval, condonement, and/or encouragement of unconstitutional policies, customs, and practices.[23]

f. Regarding defendant City's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a City agency,

---

[21] Mollen Commission Report, pp. 2-3, available at pp. 2-3, available at
http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commissiono/%20-%20NYPD.pdf.
[22] Loren Yaniv and John Marzuli, *Kelly Shrugs Off Judge Who Slammed Cops*
, New York Daily News, December 2, 2009, available at
http://www.nydailynews.com/news/crime/police-commissioner-kelly-shrugs-judge-slammed-cops-article-1.433710.
[23] Rocco Parascandola et al, *Repeated Charges of Illegal Searches, Violence, Racial Profiling, Racial Slurs and Intimidation Against Lt. Daniel Sbarra and his Team Have Cost the City More Than $1.5 Million in Settlements* , N.Y. Daily News, May 19, 2013, available at
http://www.nydailynews.com/new-york/brooklyn/lt-daniel-sbarra-team-finest-article-1.1348075.

allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[24] When it does, however, Commissioner Kelly controls whether the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s). Since 2005, during Kelly's tenure, only one quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[25] As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[26]

99.     The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct, are further evidenced, inter alia, by the following:

a. In a suit filed in 2012, Officer Craig Matthews alleged that he was systematically retaliated against for speaking to his precinct commanders

---

[24] In 2006, out of more than 10.000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%). In 2007, out of more than 11,000 allegations that were fully investigated the CCRB substantiated only (about 5%). See, CCRB Jan.-Dec. 2007 status Report at p. 19, available at http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf. Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted de facto policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories inter alia sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrate by themselves or fellow officers, supervisors and/or subordinates.

[25] Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009 at A19.

[26] Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

about the pressure that the NYPD's illegal quota system placed on officers.[27]

b. In Griffin v. City of New York, 880 F. Supp.2d 384 (E.D.N.Y. 2012), Judge Dearie denied the city's motion to dismiss retaliation claims against a former NYPD detective who, after reporting a fellow officer's misconduct to the NYPD Internal Affairs Bureau, found the word "rat" written multiple times on his locker and faced other repercussions from fellow police officers that his supervisors failed to address.[28]

c. Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

d. In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

e. Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence is reinforced every day in every way."

100.    The existence of the above-described de facto unlawful policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officers and officials of the NYPD and the City, including without limitation, Commissioner Kelly.

101.    The actions of Defendants, resulting from and taken pursuant to the above-mentioned de facto policies and/or well-settled and widespread customs and practices of the City, are implemented by members of the NYPD engaging in

---

[27] Al Baker, *Bronx Police Precinct Accused of Using Quota System* , N.Y. Times, Feb. 24, 2012, available at http://www.nytimes.com/2012/02/24/nyregion/lawsuit-says-bronx-police-precinct-uses-quota-system.html?_r=0.

[28] Id at 389-92. See also Joseph Goldstein, Officers, Exhorted to Report Corruption, Still Fear Retaliation, N.Y. Times, June 25, 2012, available at
http://www.nytimes.com/2012/06/25/nyregion/new-york-police-officers-face-retaliation-for-reporting-corruption.html?partner=rss&emc=rss&pagewanted=all.

systematic and ubiquitous perjury, both oral and written, to cover up federal law violations committed against civilians by either themselves or their fellow officers, supervisors and/or subordinates. They do so with the knowledge and approval of their supervisors, commanders and Commissioner Kelly who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testifying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves, fellow office supervisors and/or subordinates against those civilians.

102. All of the foregoing acts by defendants deprived Plaintiffs of their federally protected rights, including, but limited to, the constitutional rights enumerated herein.

103. Defendant City knew or should have known that the acts alleged herein would deprive Plaintiffs of their rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

104. Defendant City is directly liable and responsible for the acts of Defendants, as it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to

enforce the rules and regulations of the City and NYPD, and to require compliance with the Constitution and laws of the United States.

105. Despite knowledge of such unlawful de facto policies, practices, and/or customs, these supervisory and policy-making officers and officials of the NYPD and the City, including Commissioner Kelly, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead approve and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effects of said policies, practices and/or customs or the constitutional rights of persons in the City of New York.

106. The aforementioned City policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned City policies, practices and/or customs, Defendants felt empowered to arrest HERRERA-AMADOR without probable cause and then fabricate and swear to a false story to cover up their blatant violations of Plaintiffs' constitutional rights. Pursuant to the aforementioned City policies, practices and/or customs, the officers failed to intervene in or report Defendants' violations of Plaintiffs' rights.

107. Plaintiffs' injuries were a direct and proximate result of the defendant, City and the NYPD's wrongful de facto policies and/or well-settled and

widespread customs and practices and of the knowing and repeated failure of the defendant, City and the NYPD to properly supervise, train and discipline their police officers.

108. As a result of the foregoing, Plaintiffs was deprived of their liberty, endured psychological and emotional injury, humiliation, costs and expenses and suffered other damages and injuries.

## COUNT FIVE FOR RELIEF

## SUPERVISORY LIABILITY

109. Plaintiffs repeat and reiterate the allegations contained in paragraphs "1 through "108" of the complaint as if fully set forth herein.

110. Defendant, police SGT. MATTHIES was at all times relevant herein duly appointed and Police officer of the New York City Police Department with the rank of sergeant and specifically assigned to the scene of the robbery.

111. At all times mentioned herein, defendant police SGT. MATTHIES acted under color of the law, to wit, under the color of the statues, ordinances, regulations, policies, customs and usages of the City and State of New York.

112. Defendant police SGT. MATTHIES was at the relevant times supervisory officer on scene at 4722 Junction Boulevard, Queens, New York with responsibility for the investigation of the robbery incident that occurred inside the CLUB at the aforementioned address. The sergeant was responsible for the supervision of all the officers during the investigation of the robbery.

113.    Upon information and belief, P.O. LEE and SGT. MATTHIES were the responding officers, conspired to lie, mislead and misrepresent the circumstances surrounding the robbery.

114.    The aforementioned police sergeant failed to supervise his subordinate police officer and this resulted in excessive use of force upon HERRERA-AMADOR.

115.    The aforementioned police sergeant had personal knowledge that use of force had been used by his subordinate because he not only acquiesced in the conduct of his subordinate but also conspired to present a false account of the details of HERRERA-AMADOR's participation in the robbery. The aforementioned defendant police sergeant's indifference to the rights of HERRERA-AMADOR by failing to act properly to investigate the robbery incident contributed to the violation of both HERRERA-AMADOR and REYES' civil rights.

116.    That by reason of the foregoing, defendant CITY is liable to the Plaintiffs.


## COUNT SIX FOR RELIEF

### ASSAULT AND BATTERY
### COMMON LAW CLAIM


117.    Plaintiffs repeat and reiterate the allegations contained in paragraphs "1" through "116" of the complaint as if fully set forth herein.

118.    Defendants P.O. LEE and SGT. MATTHIES acting in concert inflicted the torts of assault and battery upon HERRERA-AMADOR. The acts and

39

conduct of P.O. LEE and SGT. MATTHIES were the direct and proximate cause of injury and damage to HERRERA-AMADOR and violated his statutory and common law rights as guaranteed by the laws and constitution of the State of New York. P.O. LEE and SGT. MATTHIES committed acts of battery against HERRERA-AMADOR which included throwing him to the ground and putting his boot on the back of HERRERA-AMADOR's neck to push his face unto the wet concrete pavement.

119. Defendants P.O. LEE's and SGT. MATTHIES' acts constituted an assault upon HERRERA-AMADOR in that P.O. LEE and SGT. MATTHIES intentionally attempted to injure HERRERA-AMADOR or commit a battery upon him, and further that P.O. LEE's and SGT. MATTHIES' acts represented a grievous affront to HERRERA-AMADOR.

120. Defendants P.O. LEE's and SGT. MATTHIES' acts constituted a battery upon HERRERA-AMADOR in that the above described bodily contact was intentional, unauthorized, and grossly offensive in nature.

121. The actions of defendants P.O. LEE and SGT. MATTHIES were intentional, reckless, and unwarranted, and without any just cause or provocation, and defendant P.O. LEE and SGT. MATTHIES knew, or should have known, that his actions were without consent of HERRERA-AMADOR.

122. The injuries sustained by HERRERA-AMADOR were caused wholly and solely by reason of the conduct described, and HERRERA-AMADOR did not contribute thereto.

123. As a direct and proximate result of the foregoing, HERRERA-AMADOR was subjected to great physical and emotion pain and humiliation, was deprived of his liberty, and was otherwise damaged and injured.

124. That CITY is responsible for the excessive physical force used by P.O. LEE and SGT. MATTHIES because it occurred while he was acting in the scope of his employment and while he was executing his duties as a New York City police officer.

125. As a result of the assault and battery and unwarranted physical force used against HERRERA-AMADOR, he suffered bruises and contusions and physical pain.

## COUNT SEVEN FOR RELIEF

### PENDANT CLAIM OF *PRIMA FACIE* TORT

126. Plaintiffs repeat and reiterate the allegations contained in paragraphs "1" through "125" of the complaint as if fully set forth herein.

127. That by their actions, as set forth above, defendants P.O. LEE and SGT. MATTHIES inflicted harm upon HERRERA-AMADOR without excuse or justification, out of the excessive use of physical force.

## COUNT EIGHT FOR RELIEF

### *RESPONDEAT SUPERIOR*

128. Plaintiffs repeat and reiterate the allegations contained in paragraphs "1" through "127" of the complaint as if fully set forth herein.

129.   The conduct of Defendants P.O. LEE, SGT. MATTHIES, DET. ARIAS and P.O. JOHN DOE 1 through 10 occurred while they were on duty, in and during the course and scope of their duties and functions as New York City Police Officers and while they were acting as agents and employees of the Defendant City of New York. Defendant City of New York is liable to Plaintiffs under the law doctrine of *respondeat superior*.

## COUNT NINE FOR RELIEF

### NEGLIGENT SUPERVISION, RETENTION AND TRAINING

130.   Plaintiffs repeat   and reiterate the allegations contained in paragraphs  "1" through "129" of the complaint as if fully set forth herein.

131.   Defendant CITY OF NEW YORK, negligently trained, retained and supervised defendants P.O. LEE, SGT. MATTHIES, DET. ARIAS and P.O. JOHN DOE (1 through 10). The Defendant CITY OF NEW YORK knew or should have known of the acts or conduct by P.O. LEE, SGT. MATTHIES, DET. ARIAS and P.O. JOHN DOE (1 through 10). The acts and conduct of the defendants were the direct and proximate cause of injury and damage to Plaintiffs and violated their statutory and common law rights as guaranteed by the laws and constitution of the State of New York.

132.   As a result of the foregoing, HERRERA-AMADOR was deprived of his liberty, was subject to rape, physical and emotional pain and suffering, and was otherwise damaged and injured.

## COUNT TEN FOR RELIEF

## 42 U.S.C. § 1983 and PENDANT CLAIM BY REYES' LOSS OF CONSORTIUM

133.   Plaintiffs repeat   and reiterate the allegations contained in paragraphs "1" through "132" of the complaint as if fully set forth herein.

134.   At all times relevant to this action, REYES was and is the lawful spouse of HERRERA-AMADOR and as such is entitled to the comfort, enjoyment, society and services of her spouse.   By reason of the foregoing wrongful and negligent acts by the Defendants, REYES was deprived of the comfort, enjoyment of the services and society of her spouse, guaranteed to Reyes under the laws and constitution of the State of New York and can be adjudicated in this litigation under the Court's supplementary jurisdiction. Moreover, the aforesaid injuries and damages were caused solely and proximately by the negligence of the Defendants. Defendants caused REYES to suffer loss of consortium, loss of society, affection, assistance, and conjugal fellowship all to the detriment of their marital relationship.

## PRAYER FOR RELIEF

Plaintiffs request the following relief jointly and severally as against all of the Defendants:

a.   Award Plaintiffs compensatory damages in the amount to be determined by a jury;

b.   Award Plaintiffs damages in the amount to be determined by a jury;

c.  Award costs and interest and Attorney's fees pursuant to 42 U.S.C.
§ 1988;

d.  Award cost of suit pursuant to 42 U.S.C. § 1920 and 1988; and

e.  The convening and paneling of a jury to consider the merits of the
claims herein;

f.  Award such other and further relief as this Court may deem
appropriate and equitable as may be required in the interest of
justice.

Dated: Bronx, New York
October 24, 2016

Respectfully submitted:
Law Office of Lauriano Guzman, Jr., P.C.

*/s/ Lauriano Guzman, Jr.*

By: LAURIANO GUZMAN, JR. (3330)
*Attorney for Plaintiffs,*
*Marcos A. Herrera-Amador*
*and Pilar H.Reyes*
2565 Frisby Avenue
Bronx, New York  10461
T: (718) 892-8200
F: (718) 892-8203
E: guzmanesq@aol.com

Civil Action No:_____

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
=================================================

MARCOS A. HERRERA-AMADOR and
PILAR H. REYES,

                                        Plaintiff,

        - against -

THE CITY OF NEW YORK;
NEW YORK CITY POLICE DEPARTMENT,
Police Officer KEVIN LEE Shield #7655,
Sergeant WILLIAM MATTHIES Shield #1291,
Detective KEVIN ARIAS Shield #152 and
Police Officer JOHN DOE 1 through 10,
Individually and in their official capacities
(the name JOHN DOE being fictitious, as the names
are presently unknown),

                                        Defendants.
=================================================

## COMPLAINT

=================================================

**LAW OFFICE OF LAURIANO GUZMAN, JR., P.C.**
Attorney for **MARCOS A. HERRERA-AMADOR and
PILAR H. REYES**
2565 Frisby Avenue
Bronx, New York 10461
(718) 892-8200
E: guzmanesq@aol.com

=================================================