UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------- x

MARCOS A. HERRERA-AMADOR,                                  :
                                                           :
                              Plaintiff,                   :
                                                           :       **REPORT AND RECOMMENDATION**
              -against-                                     :       16 Civ. 5915 (NGG) (VMS)
                                                           :
POLICE OFFICER KEVIN LEE, Shield # 7655,                  :
SERGEANT WILLIAM MATHIES, Shield #                        :
1291, DETECTIVE KEVIN ARIAS, Shield #                     :
152,                                                       :
                                                           :
                              Defendants.                  :
                                                           :

--------------------------------------------------------- x

**Scanlon, Vera M., United States Magistrate Judge:**

In this civil rights action, brought pursuant to 42 U.S.C. § 1983, Plaintiff Marcos A.

Herrera-Amador ("Plaintiff") alleges that Defendants New York City Police Department

("NYPD") Officer Kevin Lee, NYPD Sergeant William Matthies and NYPD Detective Kevin

Arias ("Defendants") violated his right to be free from malicious prosecution under the United

States Constitution.[1] See ECF No. 1.[2]  Before this Court, on referral from the Honorable

---

[1] Some of Plaintiff's federal and state law claims have been dismissed.  See Dkt. Entry 11/1/2019.  Co-Plaintiff Pilar H. Reyes and Defendant City of New York have been dismissed as parties.  See id.

[2]  As a preliminary matter, this Court respectfully recommends that the District Court dismiss Defendant NYPD as a party to this action.  The New York City Charter provides that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law."  N.Y.C. Admin. Code & Charter Ch. 16 § 396.  "It is well settled that NYPD, as an agency of the City of New York, lacks independent legal existence and is therefore not a suable entity."  Davis v. City of New York, No. 07 Civ. 1395 (RPP), 2008 WL 2511734, at *6 (S.D.N.Y. June 19, 2008) ((citing Jenkins v. City of New York, 478 F.3d 76, 93 n.19 (2d Cir. 2007)).  This Court also notes Plaintiff's previously stated intention to stipulate to Defendant NYPD's dismissal from the action.  See ECF No. 16.  Although Plaintiff never filed the stipulation to Defendant NYPD's dismissal, Defendant NYPD has not answered Plaintiff's complaint, see ECF No. 15 (Defendants' answer without Defendant NYPD joining), and the

Nicholas G. Garaufis, is Defendants' motion for summary judgment.  See ECF No. 50.  For the reasons that follow, this Court respectfully recommends that the District Court grant in part and deny in part Defendants' motion.

**Preliminary Statement**

In September 2013, Plaintiff was arrested and charged with offenses related to a robbery at a gambling club.  Defendants allege that the arrest was based on a witness's identification of Plaintiff and statements about Plaintiff's involvement, but record evidence shows disputed issues of material fact regarding whether that evidence is credible, whether Defendant Officer Lee fabricated it, and whether Defendant Detective Arias omitted material information about it in police records that he created.

Defendants rely primarily on other evidence to show probable cause existed, namely a security video depicting three men walking outside and entering the club just before the robbery, one of whom Defendants allege is Plaintiff.  On review, the video—which may have been collected after Plaintiff was charged and arraigned—is unclear and does not show Plaintiff to be one of the robbers as a matter of law.  Even if the video shows Plaintiff, it does not show whether the man at issue was involved in the robbery once inside the club.   As to the possible fabrication of the eyewitness evidence, the timing of the video's collection, and what the video shows, there are strenuously contested issues of fact.

Plaintiff was never indicted on the charges on which he had been arraigned.  In August 2014, a state prosecutor moved to dismiss them, citing the People's inability to go forward with Plaintiff's case after investigation and the expiration of the time to indict.  The state court

---

parties submissions relating to the instant motion do not treat Defendant NYPD as if it were still a party in the case, see, e.g., Dkt. Entry 11/1/2019; ECF Nos. 50-59.

granted the motion, and Plaintiff, after approximately eleven months in custody, was released.

## I.    Factual Background

The following statement of facts is drawn from the parties' Local Rule 56.1 Statements and this Court's own review of record evidence.  See Defts' 56.1 Stmt, ECF No. 51; Pl's Resp. 56.1 Stmt., ECF No. 54; Defts' Reply 56.1 Stmt., ECF No. 57; Declaration of Defendants' Counsel Lucienne Pierre ("Pierre Decl.") with annexed Defendants' Exhibits A through T, ECF Nos. 52 through 52-20; Declaration of Plaintiff's Counsel Lauriano Guzman ("Guzman Decl.") with annexed Plaintiff's Exhibits 1 through 15, see ECF No. 55 through 55-16; Supplemental Declaration of Defendants' Counsel Lucienne Pierre ("Supp. Pierre Decl.") with annexed Defendants' Exhibits U through Z, see ECF Nos. 58 through 58-6[3]; Doe v. Nat'l Bd. of Podiatric Med. Exam'rs, No. 03 Civ. 4034 (RWS), 2004 WL 912599, at *4 n.4 (S.D.N.Y. Apr. 29, 2004) ("In deciding a motion for summary judgment, a district court is not constrained to rely on assertions made in a Local Rule 56.1 statement but may instead, at its discretion, perform an independent review of the record to determine how the motion for summary judgment should be decided.").  Except where otherwise noted, the facts are undisputed.  Because evidence is construed in the light most favorable to the nonmoving Plaintiff, with reasonable inferences made in his favor, where the parties allege contradictory facts, this Court will note the dispute and credit Plaintiff's version of facts if supported by the record.  See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc., 473 F.3d 450, 456 (2d Cir. 2007).

---

[3] Because all numbered exhibits cited were submitted by Plaintiff with his counsel's attestation that they are true and accurate copies, and all lettered exhibits cited were submitted by Defendants with their counsel's similar attestation, this Court will hereinafter cite to Plaintiff's numbered and Defendants' lettered exhibits without reference to the corresponding counsel declarations.  See Guzman Decl.; Pierre Decl.; Supp. Pierre Decl.

### a. The September 2013 Robbery

According to Plaintiff, sometime around midnight on September 3, 2013, Plaintiff went to a gambling club at 47-22 Junction Boulevard in Queens, New York, to watch games, play games and drink beer. See Resp. 56.1 ¶ 8; Exh. 1 at 84:3-19; Exh. B at 80:5-20. At the time, Plaintiff, who is six foot six inches tall, weighed approximately 265 pounds and had one tattoo on his left forearm of two faces, a heart and family members' initials. See Exh. A at 6:15; Exh. B at 44:3-7, 44:24-45:1, 45:12-46:21. Plaintiff's hair was cut short with more hair at the back of his head than on the sides or the front; he also had some facial hair. See Exh. G. At some point that night, Plaintiff wore Bermuda shorts, sneakers and a "blue, button down mesh baseball jersey" with the team name "Storm" and the player's number "6" emblazoned across its front. See Exh. 8 at 156:2-8; Exh. B at 47:1-19, 80:21-81:13; Exh. G. at 2.

At approximately 2:00 a.m., an armed robbery occurred at the club. See Resp. 56.1 ¶ 9. Plaintiff testified that he was sitting at the bar when the robbery began, and that he heard tables and glasses falling and a bartender say to run. See Exh. 1 at 93:3-94:8  The robbers began searching patrons, and taking and putting their property into a duffle bag. See Exh. S at 137:7-140:8. This continued until the police arrived about six minutes later, whereupon the robbers ran out of the club's rear exit. Compare Exh. Q at Tracks I, IV at 1:59:30 (showing three men entering club) with id. at Track II at 2:06:26 (showing first police arrival) and id. at Track III at 2:06:36 (perpetrators exiting rear of club). At some point, Plaintiff exited the club with other patrons. See Exh. 1 at 93:23-94:8; Exh. T at 74:4-8. Plaintiff testified that, as it was raining when he exited, he walked to an awning on the corner of Junction Boulevard and Alstyne Avenue where he hoped he could find a taxi. See Exh. 1 at 95:18-25; Exh. T at 74:4-8.

### b. Plaintiff's Initial Detention

According to Defendants, on September 3, 2013, at approximately 2:10 a.m., Defendant Officer Lee and Defendant Sergeant Matthies were responding to the robbery scene in a police vehicle with Defendant Officer Lee as the driver and Defendant Sergeant Matthies as the passenger. See Exh. 1 at 97:16-24; Exh. T at 72:9-74:15. As they were driving on Alstyne Avenue towards the Junction Boulevard corner, Defendant Sergeant Matthies saw Plaintiff walking on Alstyne Avenue and told Defendant Officer Lee to park because Plaintiff might be one of the robbers. See id. at 72:9-74:15.[4]  During his deposition, Defendant Sergeant Matthies testified that he could not recall what specific information made him think that Plaintiff might have been involved in the robbery because he did not observe any bulges in Plaintiff's waistband, weapons in Plaintiff's hands or mask on Plaintiff's face. See id. at 72:9-74:15, 75:5-76:16, 81:6-82:6. Defendant Officer Lee parked as instructed, and he and Defendant Sergeant Matthies exited their vehicle and ran toward Plaintiff, who was walking toward them. See id. at 77:17-78:6. With their guns drawn, the officers ordered Plaintiff to the ground. See Exh. 1 at 101:18-102:18; Exh. T at 72:9-74:15, 77:21-79:11; Exh. U at 39.  Plaintiff put his hands up and got down on the ground, at which point either Defendant Officer Lee or Defendant Sergeant Matthies handcuffed and searched Plaintiff. See Exh. 1 at 101:24-102:25, 107:23-108:5; Exh. T at 80:22-81:5, 86:13-16; Exh. U at 46:11-14. Although Defendants did not find a firearm, weapon, stolen property or any other robbery-related evidence during this search, see Exh. 6 at 47, and although no one had identified Plaintiff to Defendants as having been involved in the

---

[4] Although Plaintiff did not specifically testify that the corner to which he walked was Junction Boulevard and Alstyne Avenue, the record is undisputed that this was the intersection near where Defendant Officer Lee and Defendant Sergeant Matthies first encountered him. See Exh. T at 72:9-74:15.

robbery, see Exh. 7 at 9, Defendant Officer Lee handcuffed Plaintiff to a fence, Exh. 6 at 47-50.

Defendant Sergeant Matthies testified that at the time Plaintiff was handcuffed, he did not have

probable cause to believe that Plaintiff had committed a crime.  See Exh. 7 at 8-9.[5]  Defendant

Sergeant Matthies and Defendant Officer Lee left Plaintiff handcuffed to the fence to search

behind the club.  See Exh. 6 at 47-50; Exh. 7 at 8-9.

### c.  Mr. Rodriguez And Mr. Alanzo's Initial Detentions

Defendant Officer Lee claims that behind the club he found (1) nonparty Edgardo

Rodriguez climbing over a fence behind the club, and (2) a duffle bag nearby on the ground

containing $9,227.00 in cash, jewelry, multiple cell phones, a loaded .40 caliber Glock pistol and

a gravity knife.  See Exh. 6 at 47-50; Exh. F at D173-74 (vouchering $9,227.00 USD found by

Defendant Officer Lee); Exh. I.  Nonparty officer Richard Mosbeck told Defendant Officer Lee

that at approximately the same time, he found (1) nonparty Juan Alanzo hiding in a shed in the

rear of 94-66 Alstyne Avenue (which is an address within 500 feet from the club), and (2) a

duffle bag containing $3,415.00 in cash in the rear of 47-16 Junction Boulevard (which is an

address within 100 feet from the club), see Exh. E; Exh. F at D238-39; Exh. H; Exh. I at D78.[6]

### d.  Nonparty Witness Mauriano Paulino's Alleged Field Identification Of Plaintiff And Mr. Rodriguez

Defendant Officer Lee alleges that roughly twenty minutes after he initially detained

Plaintiff, during a sidewalk "show up" at the incident scene, nonparty robbery witness Mauriano

Paulino positively identified Plaintiff and Mr. Rodriguez to Defendant Officer Lee as individuals

---

[5] Although Defendant Sergeant Matthies testified that Plaintiff was walking when first observed and when detained, Defendant Officer Lee offered contradictory testimony that Plaintiff was climbing a fence.  Compare Exh. T at 77:24:78:2 with Exh. U at 39:4-24.  This is an issue of material fact for a factfinder to determine.

[6] The Court determined these approximate distances using an online mapping tool.

involved in the club robbery.  See Exh. 13; Exh. V.  Although Defendant Sergeant Matthies was not present when the alleged field identification occurred, he testified at his deposition that Defendant Officer Lee told him on the scene that it had.  See Exh. 7 at 100:2-11, 143:11-23.

This alleged field identification is one of the most hotly contested claims of this litigation.  As set forth in greater detail infra, Section I.f, Mr. Paulino testified at a deposition that the alleged field identification never occurred and that he could not have made such a field identification of Plaintiff or Mr. Rodriguez because his limited observations during the incident only allowed him to identify one robber, i.e., Mr. Alanzo.  See Exh. 14 at 52:5-23, 60:2-23, 72:4-21, 76:19-24.  See also infra, Section I.f.

### e.   Arrests Of Plaintiff, Mr. Rodriguez and Mr. Alanzo

Defendant Officer Lee arrested Plaintiff, Mr. Rodriguez and Mr. Alanzo, and all three were taken to the 110th Precinct.  See Exh. E; Exh. F; Exh. G; Exh. H at D563.  Plaintiff was again searched with negative results for robbery evidence, fingerprinted and photographed.  See Exh. 1 at 109:10-11; Exh. G. at 2.  The precinct photographs show that Plaintiff was wearing a blue, button-down baseball jersey with the team name "Storm" and the player's number "6" on its front.  See id.  Defendant Officer Lee created an arrest report for Plaintiff, approved by Defendant Sergeant Matthies, which stated that Plaintiff had been "positively identified" as having been involved in the robbery.  See Exh. 7 at 12; Exh. E; Exh. H.  Defendant Officer Lee also created two arrest evidence vouchers—one for the $9,277.00 that he found and one for the $3,415.00 found by Officer Mosback.  See Exh. F.  These are the only arrest evidence vouchers in the record.

### f.   Case Investigation And Nonparty Witness Mr. Paulino Identifies Only Mr. Alanzo As One Of The Robbers, Not Plaintiff Or Mr. Rodriguez

Prior to assigning arrest numbers to Plaintiff, Mr. Rodriguez and Mr. Alanzo, Defendant

Officer Lee conferred with an Assistant District Attorney ("ADA") from the Queens County District Attorney's Office ("DAO") about the need for further investigation in connection with the three arrests, including a determination of how many of the eighteen to thirty robbery complainants—Mr. Paulino among them—would cooperate with police. See Exh. 14 at 64:4-15; Exh. H; see also Exh. F; Exh. V at 35:4-24. Defendant Detective Arias was assigned to the investigation to "enhance" Defendant Officer Lee's arrests, which meant helping Defendant Officer Lee to learn more about the crime. See Exh. 8 at 28; Exh. W at 36:3-11. Defendant Detective Arias spoke with Defendant Officer Lee that same day, but he did not speak with other police officers who had been at the incident scene. See Exh. 8 at 55:3-7, 70:13-21, 74:13-18, 75:20-22; Exh. W at 38:6-22.

Although Defendant Detective Arias had been told to interview all victims present at the precinct when he was assigned to the robbery investigation, he only interviewed Mr. Paulino; a factfinder could conclude that the narrow investigation was related to Defendant Officer Lee's allegation that Mr. Paulino had identified Plaintiff and Mr. Rodriguez as involved in the robbery. See Exh. 8 at 28, 35:20-36:10, 56:5-19, 73:20-74:7; Exh. W at 28:8-31:22, 36:21-25, 138:8-13. Mr. Paulino told Defendant Detective Arias during that interview that he could only describe one of the robbers. See Exh. 12 at 126:14-24; Exh. 14 at 72:4-21, 74:22-75:2, 76:19-24; Exh. S at 127:15-132:25, 134:2-137:6, 140:3-22; Exh. W at 36:21-25, 138:8-13. Based on Mr. Paulino's description, Defendant Detective Arias, Defendant Officer Lee, an ADA and others showed Mr. Paulino a lineup with Mr. Alanzo, and Mr. Paulino positively identified Mr. Alanzo as the one robber he could identify. See Exh. 8 at 74:19-75:19; Exh. 12 at 117:1-25, 126:14-24; Exh. S at 79:6-25, 134:16-136:4; Exh. W at 55:20-25, 67:5-11, 75:3-14, 138:8-13. Mr. Paulino was not asked to do a lineup with Plaintiff or Mr. Rodriguez. See Exh. 8 at 39:18-23, 94:14-95:2, 109:2-

6; Exh. 12 at 126:18-127:12; <u>see also</u> Exh. S at 79:10-86:14, 196:22-198:3, 202:4-208:25; Exh. W at 81:12-19, 107:8-9.  In Defendant Detective Arias's investigative reports ("DD-5s") documenting his investigative tasks and the evidence collected, Defendant Detective Arias noted Mr. Paulino's positive lineup identification of Mr. Alanzo as involved in the robbery and attached related lineup evidence collected.  <u>See</u> Exh. 9 at D40; Exh. W at 49:18-51:19. Defendant Detective Arias did not write a DD-5 documenting his interview with Mr. Paulino generally or, more specifically, that Mr. Paulino was unable to identify two of the three individuals arrested for the robbery, <u>i.e.</u>, Plaintiff or Mr. Rodriguez.  <u>Compare</u> Exh. 9 <u>with</u> Exh. 12 at 126:14-24; Exh. 14 at 72:4-21, 74:22-75:2; Exh. S at 127:15-132:25, 134:2-137:6, 140:3-22; Exh. W at 36:21-25, 138:8-13.

In the absence of any contemporaneous records created by Defendant Detective Arias about his interview of Mr. Paulino and what Mr. Paulino stated, Mr. Paulino's deposition testimony in this action provides the only written record of Mr. Paulino's version of events. According to Mr. Paulino, although he was inside the club at the time of the robbery, he was sitting and talking to a friend at a table "all the way to the back" of the crowded and poorly lit club when the robbery started.  <u>See</u> Exh. S at 127:24-128:12.  Other patrons were standing and sitting between him and the club's front entrance, such that they obstructed Mr. Paulino's view of the front of the establishment or anyone who entered.  <u>See</u> <u>id.</u> at 127:12-132:25.  Mr. Paulino testified that he learned of the robbery only when he heard noises out of the ordinary, including a man saying in Spanish:  "This is a robbery.  Everybody get down."  <u>Id.</u> at 127:15-133:25; <u>see</u> Exh. 14 at 34:5-35:24.  Mr. Paulino immediately got down on the floor with other patrons; it was only after this that Mr. Paulino was able to observe the one robber who he was later able to identify as Mr. Alanzo (whom Mr. Paulino noticed because this robber was at first wearing a

mask).  See Exh. S at 132:12-18, 134:2-23.  He described this individual as a "chunky, short" man displaying a firearm, who then took off the mask and handed the firearm to a second person whom Mr. Paulino could not see.  See id. at 134:2-136:23, 140:3-22; see Exh. 14 at 74:22-75:2. Mr. Paulino then saw the chunky, short man display a knife, search patrons and take their property.  He also heard voices that told a female bartender to help search patrons and put their property in a duffle bag.  See Exh. S at 134:17-23, 135:14-20, 136:5-140:8.  When the police arrived and the robbers fled, Mr. Paulino did not observe the robbers' escape from the club, including whether they fled together or by which door.  See Exh. 8 at 168:3-169:21; Exh. 14 at 74:1-21; Exh. E; Exh. F (arrest evidence vouchers); Exh. G; Exh. H at D563; Exh. S at 141:7-23.

### g.  Further Case Investigation And Pre-arraignment Records

On September 3, Defendant Detective Arias visited the incident scene to perform a canvas, but he did not collect or arrange to have collected DNA or fingerprint evidence while there.  See Exh. 8 at 70:13-21, 75:20-22; Exh. W at 38:6-18.  Instead, Defendant Detective Arias looked for security video locations; he wrote in a DD-5 that he discovered five location addresses where cameras appeared to be located.  See Exh. 9 at D36.  The DD-5 does not note that Defendant Detective Arias physically retrieved any security video from any of those locations, and no security video was attached to the DD-5 as evidence collected or vouchered as case evidence.  Compare id. (DD-5 documenting the canvas without evidence attachment) with id. at D40 (DD-5 documenting lineup with evidentiary attachment), D50-51 (DD-5 documenting computer check with evidentiary attachment), D52-53 (same), D54-55 (same) and D56-57 (DD-5 documenting review of NYPD laboratory report regarding firearm with evidentiary attachment); see Exh. F; Exh. W at 78:16-79:2.  Later, when Defendant Detective Arias wrote a final DD-5 after Plaintiff's arraignment recommending that the investigation be closed, his

summary of case evidence collected did not mention any video evidence collected. See Exh. 9 at D58.

### h.  Disputed Issues Of Fact Relating To Plaintiff's Arraignment

On September 4, 2013, Plaintiff was arraigned on a felony criminal complaint that Defendant Officer Lee swore against Plaintiff, Mr. Rodriguez and Mr. Alanzo. See Exh. I.  As noted supra, Sections I.d, I.f, the parties very hotly contest Defendants' statements that Mr. Paulino identified or made statements about Plaintiff's or Mr. Rodriguez's involvement in the robbery, and yet the criminal complaint was based in large part on this alleged, possibly fabricated, evidence. See Exh. 9; Exh. E; Exh. I. It is worth highlighting that Defendant Officer Lee swore in the criminal complaint that Mr. Paulino told him that Plaintiff, Mr. Rodriguez and Mr. Alanzo "entered [the club] together." Id.  Despite the oath, a factfinder could find that Defendant Officer Lee fabricated this evidence given Mr. Paulino's deposition testimony that he had been unable to see the front of the club from his location, did not see the robbers enter at all and could only identify one robber, Mr. Alanzo, from the observations he made while the robbery was in progress. See Exh. 8 at 94:15-95:2; Exh. 14 at 34:5-35:24; Exh. S at 127:15-133:25.[7]

Defendant Officer Lee also swore in the criminal complaint that Mr. Paulino told him that Plaintiff, Mr. Rodriguez and Mr. Alanzo "fled through the rear door of the location together"

---

[7] This Court notes that Defendant Detective Arias's testimony in the record corroborates Mr. Paulino's testimony in this regard, see Exh. 8 at 39:18-23, 94:15-95:2; Exh. 12 at 126:21-24, in that Defendant Detective Arias testified that Defendant Officer Lee never told him that Mr. Paulino positively identified Plaintiff, id. at 55:3-7, 74:13-18.  As noted supra, Section I.f, Defendant Detective Arias's investigative records failed to note that Mr. Paulino—the sole witness that Defendant Detective Arias interviewed and knew of—could not identify two of the three arrestees who were the subject of the robbery investigation. See Exh. 8 at 39:18-23, 94:15-95:2; Exh. 9; Exh. 12 at 126:21-24

after the robbery.  Exh. I.  Again, a factfinder could conclude that Defendant Officer Lee fabricated this evidence given Mr. Paulino's testimony that he never saw the robbers flee the club (let alone together or by what door) and that he could only identify one robber as Mr. Alanzo, and no others.  Compare id. with Exh. 14 at 74:1-21.

Even secondary evidence as to Plaintiff is contested.  For example, Defendant Officer Lee swore in the criminal complaint that Mr. Paulino told him that, during the robbery, Mr. Alanzo "hand[ed a black] firearm [he was holding]" to Mr. Rodriguez and that "[Mr.] Rodriguez then stood by the front door."  Exh. I.  Mr. Paulino testified to the contrary:  He did not see the second robber to whom Mr. Alanzo handed the firearm, could not identify him, and never told Defendant Officer Lee or anyone that it was Mr. Rodriguez.  See Exh. 14 at 74:22-75:2; Exh. S at 127:15-135:25; see Exh. 8 at 94:15-95:2 (Defendant Detective Arias testifying that Mr. Paulino could identify one individual, who was Mr. Alanzo).

At arraignment, Plaintiff pleaded not guilty to the following four offenses brought by Defendant Officer Lee's criminal complaint:

  i.    Robbery in the First Degree, a Class B felony.  "A person is guilty of robbery in the first degree when he forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . [u]ses or threatens the immediate use of a dangerous instrument[]" or [d]isplays what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm[.]"  N.Y. Pen. L. 160.15(3)-(4).

  ii.   Criminal Possession of a Weapon in the Second Degree, a Class C felony.  "A person is guilty of criminal possession of a weapon in the second degree when . . . with intent to use the same unlawfully against another, such person . . . possesses a loaded firearm[.]"  N.Y. Pen. L. § 265.03(1)(b).

  iii.  Grand Larceny in the Third Degree, a Class D felony.  "A person is guilty of grand larceny in the third degree when he or she steals property and . . . when the value of the property exceeds three thousand dollars[.]"  N.Y. Pen. L. § 155.35(1).

  iv.   Criminal Possession of a Weapon in the Fourth Degree, a Class A misdemeanor.  "A person is guilty of criminal possession of a weapon in the fourth degree when . . . [h]e or

she possesses any . . . gravity knife[.]"  N.Y. Pen. L. § 265.01(1).

Exh. I; <u>see</u> Exh. A at 29:4-11; Exh. J; Defts' 56.1 ¶ 13.

> **i.    Issues Of Material Fact Pertaining To Whether Any Security Video Evidence Had Been Collected Or Considered Prior To Plaintiff's Arraignment**

Defendants have submitted four security videos to the Court as evidence in connection with their instant motion.  The videos depict the following:  (1) three men—one of whom is wearing a hat ("the hat-wearing man")—walking outside and entering the club just before the robbery, taken by a camera positioned in front of the men as they walked down the club's stairs ("the first security video"), <u>see</u> Exh. Q at Track IV at 1:59:30; (2) the three men at the same moment, taken by a camera positioned behind the men as they entered ("the second security video"), <u>see</u> <u>id.</u> at Track I at 1:59:30;[8] (3) the police arrival at the club in response to the robbery approximately six minutes later, <u>see</u> <u>id.</u> at Track II at 2:06; and (4) the robbers' escape from the club's back door just after the police arrived, <u>see</u> <u>id.</u> at Track III at 2:06:37.

As a preliminary matter, the parties very vigorously dispute whether any one or more of these security videos had been collected or considered prior to Plaintiff's arraignment. Defendants point out that Defendant Detective Arias testified at his deposition that although he did not physically retrieve security video himself, he watched a video with store owners during his canvas of the incident scene, and that a nonparty officer later collected it.  <u>See</u> Exh. 8 at 80:20-81:2, 169:14-21; Exh. Q; Exh. W at 53:3-13, 68:3-25, 80:12-81:2, 125:11-129:13.[9]

---

[8] This Court notes that although neither the first security video nor the second security video allows the viewer to make out the individuals' identifying characteristics very well, the first security video is slightly more informative because the camera recorded the men from the front at the moment they were closest to it.  <u>Compare</u> Exh. Q Track IV at 1:59:30 <u>with</u> <u>id.</u> Track I at 1:59:30.

[9] The record fails to show which one of the four security videos Defendant Detective Arias claims had been collected and which he viewed on the incident date.

Defendant Detective Arias's statement in this case is the only evidence offered that any video was retrieved before arraignment.  None of the records contemporaneously created by Defendant Officer Lee or Defendant Detective Arias prior to Plaintiff's arraignment—for example, the arrest report, evidence vouchers, DD-5s or criminal complaint—notes security video viewing, collection, review or possession.  See Section I.e; Section I.f; Section I.h; Exh. 9; Exh. E; Exh. F; Exh. H; Exh. I.  The contested quality of this issue is supported by Mr. Paulino's testimony that the first time he was ever shown security video was not at the precinct on the incident date but at the ADA's office three to four weeks, and possibly even months, after the incident.  See ECF No. 53 § I.A; Exh. 14 at 52:5-23, 60:2-23, 72:4-21, 76:19-24; Exh. S at 79:1-86:20, 196:22-198:25, 202:4-208:25; Exh. W at 107:7-9.[10]  When Defendant Officer Lee was shown security video at his deposition, he testified that he remembered watching it one other time, not at the precinct but at the office of the DAO.  See Exh. U at 137:8-138:8.  Defendant Officer Lee testified that he could not recollect precisely when that was, including whether it had happened after Plaintiff's case had already been dismissed (which would have been approximately eleven months after Plaintiff's arrest and arraignment and presumably in connection with Defendant Officer Lee's later testimony at hearings held in connection with Mr. Alanzo's and Mr. Rodriguez's ongoing prosecutions).  See Exh. 6 at 146:25-147:25; Exh. U at 137:8-138:8.

## j. Issues Of Material Fact Pertaining To What The Security Video Evidence May Prove

Assuming arguendo that security videos had been collected and viewed prior to

---

[10] When Mr. Paulino was asked to watch video while testifying at his deposition in this case, he was able to identify Mr. Alanzo from video footage of the incident shown to him, and said that he had "never seen" the other guys with Mr. Alanzo before and "can't recognize" them.  See Exh. S at 202:4-208:25.

Plaintiff's arraignment, the parties vigorously dispute what they show.  The focus of the dispute is the video with the three men facing forward on the stairs into the club.  See Exh. Q at Track IV at 1:59:30.  Defendants say that Plaintiff is the hat-wearing man walking outside and entering the club just before the robbery with the two other men, whom Defendants say are Mr. Rodriguez and Mr. Alanzo.  See ECF No. 53; Exh. Q at Tracks I, IV at 1:59:30.  Plaintiff argues that any identification based on the video is a disputed issue of material fact to be determined by a factfinder because, and as Defendant Sergeant Matthies and Defendant Officer Lee themselves testified at deposition: (1) the hat-wearing man in the security video is wearing a completely different shirt from the distinctive button-down baseball jersey that Plaintiff was wearing when he was detained, compare id. at Tracks I, IV at 1:59:30 with Exh. G at 2; and (2) the security video is too unclear to permit a viewer to make out the hat-wearing man's identifying characteristics for comparison to Plaintiff, i.e., his facial features, height or tattoo, see Exh. Q. See also Exh. 6 at 146:15-24 (Defendant Officer Lee testifying about the differences between the hat-wearing man's and Plaintiff's shirts), 162:6-8 (Defendant Officer Lee testifying that it is difficult to see the hat-wearing man's tattoo in the security video); Exh. 7 at 195:21-196:16 (Defendant Sergeant Matthies testifying that the video is "not very clear" and that it is difficult to "make out much" with regard to the facial features or height of the hat-wearing man); Exh. V.

Assuming arguendo that the security video shows that Plaintiff is the hat-wearing man, the parties vigorously dispute the significance of that, too.  Defendants argue that if Plaintiff walked around outside and entered the club with Mr. Alanzo and Mr. Rodriguez, then the Court must find that Plaintiff was involved in the robbery.  See ECF No. 53.  Plaintiff argues that any participation of the three men in the robbery together is an issue of material fact because, and as Defendant Detective Arias testified at deposition, the security video does not establish that the

hat-wearing man was involved in the robbery inside the club.  See Exh. 8 at 169:14-21 (Q:

"Other than you observing these three men entering the location [in the security video], you have

no idea whether [Plaintiff] was involved in the actual robbery; is that correct?" . . . A: "Yes.").

### k.  Plaintiff Is Never Indicted, And His Case Is Dismissed

In 2013, prosecutors presented Mr. Rodriguez's and Mr. Alanzo's cases to a grand jury,

which indicted them on charges related to the robbery.  See Exh. K (related records with 2013

indictment identifiers).  The record is that the grand jury did not indict Plaintiff with Mr.

Rodriguez and Mr. Alanzo and that the DAO may have never presented Plaintiff's case to a

grand jury at all.  See Exh. 10; Exh. 11; Exh. L; Defts' 56.1 ¶ 29 (stating that at the time

Plaintiff's case was dismissed, "the statutory period had expired for the prosecutor to present a

case to the Grand Jury").

On August 5, 2014, Plaintiff was still unindicted when, at a court appearance, an ADA

stated on the record that her colleague "had investigated this case.  The People cannot go

forward, therefore, we move to dismiss the docket."  See Exh. 11.  The state court granted the

motion.  See id.  Defendants argue that because the time for grand jury presentment of

Plaintiff's case had expired by this time, this was a speedy trial dismissal regardless of what the

ADA stated as the basis for the motion on the record.  See ECF No. 53.

### l.  Plaintiff's Custody In Connection With Criminal Proceeding

The following facts pertain to two of Defendants' arguments in the instant motion,

including a jurisdictional one, arising from the fact that at different times, Plaintiff was held in

state or federal custody in connection with the criminal proceeding.

In 2012, Plaintiff, who is from the Dominican Republic, was arrested by Immigration and

Customs Enforcement ("ICE") of the United States Department of Homeland Security and

charged under the Immigration and Nationality Act for remaining in the United States past the date until which he had been given authorization to remain.  See Resp. Pl. 56.1 ¶¶ 1-4, 53; Exh. 2; Exh. 3; Exh. 4 at 4, 6, 8-9, 11-12; Exh. A at 5:7-8; Exh. D.  When Plaintiff appeared in immigration court, a judge granted Plaintiff permission to petition for lawful residency in the United States through his 2010 marriage to Pilar Reyes and released Plaintiff on bond.  See Exh. 1 at 23:2-7; Exh. 3; Exh. 4 at 4, 6, 8-9, 11-12; Exh. 5.  In late 2012 or early 2013, Plaintiff filed the immigration petition, posted bond and was released from federal custody while his request to remain in the United States was being adjudicated.  See Exh. 4 at 4, 6, 8-9, 11-12; Exh. 5.

At the time of Plaintiff's September 3, 2013 arrest, he remained free on that federal bond. See Exh. 3; Exh. 4 at 17-18; Exh. 5; Exh. C at 141:9-23.  After Plaintiff was arraigned, he spent approximately one month in state custody before he was able to make state court bail.  See Exh. 1 at 119:3-5, 121_15-21; Exh. A at 29:1-30:23, 32:2-4; Exh. J at 6:22; Exh. M; Exh. N. Plaintiff's federal bond was revoked, and when Plaintiff was released from state custody, ICE took him into federal custody.  See Exh. M.  The revocation appears to be the result of the criminal charges commenced against Plaintiff that are being challenged in this action.  See Exh. 1 at 123:8-18, 137:14-25; Exh. A at 29:24-30:23, 32:2-22; Exh. M; Exh. N.  For example, in January 2014, at Plaintiff's first appearance before an immigration judge after the revocation of his federal bond, the judge said the following after learning about the arrest and charges against Plaintiff arising from the September 2013 incident:  "If you can get a lawyer, let the lawyer prepare everything and submit it[,]" including "the disposition of the arrest."  Exh. 4 at 14, 16, 18.  "Let me see if I can put him back on the street . . . I mean, just take a look at what happened because he got arrested."  Id. at 14, 16, 18.

In February 2014, the state court issued a writ of habeas corpus ad prosequendum

requesting Plaintiff's return to state custody to facilitate his court appearances in connection with the criminal proceeding.  See Exh. M; Exh. N; Exh. P at 2-4; see also Exh. 10; Exh. L at 2-9.[11] Plaintiff was then returned to state custody, where he remained until his August 2014 release upon the criminal proceeding's dismissal.  See Exh. 11.

## II.   Summary Judgment Legal Standards

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005).  "It is the movant's burden to show that no genuine factual dispute exists," and a court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor."  Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).  If the movant has met its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts" and, toward that end, "must come forward with specific facts showing that there is a genuine issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citation & internal quotation marks omitted).  The non-movant may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for

---

[11] At around the same time, the state court issued a warrant without bail forfeiture "for the purposes of getting [Plaintiff]" to court after federal authorities did not produce him for an appearance.  Exh. O at 3; see Exh. M.  This warrant was vacated once the writ was satisfied, and it is immaterial to this Court's analysis.  See Exh. M; Exh. P at 2-4.

summary judgment." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986).

Local Civil Rule 56.1 requires that the movant file a "short and concise statement . . . of the material facts as to which the moving party contends there is no genuine issue to be tried," and each proffered fact will be deemed admitted "unless specifically controverted by a correspondingly numbered paragraph[.]" Loc. Civ. R. 56.1(a)-(c). Each statement must be supported by a citation to admissible evidence. Id. at 56.1(d). The response by the non-moving party must be supported by a "citation to evidence which would be admissible" as required by Federal Rule of Civil Procedure 56(c). Id. A reviewing court "may not rely solely on the statement of undisputed facts[,] . . . [i]t must be satisfied that the citation to evidence in the record supports the assertion." Vt. Teddy Bear, 373 F.3d at 244 (citing Giannullo v. City. of New York, 322 F.3d 139, 143 n.5 (2d Cir. 2003)). A district court "must ask not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Simpson v. City of New York, 793 F.3d 259, 265 (2d Cir. 2015). It is not appropriate for the court to make credibility assessments or resolve conflicting versions of the events presented; these are essential questions for a jury. See id.

"The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." Holtz v. Rockefeller & Co., 258 F.3d 62, 74 (2d Cir. 2001). Local Rule 56.1 guides the court in granting summary judgment where "appropriate," i.e., where "there is no genuine issue as to any material fact," Fed. R. Civ. P. 56(c), and "the . . . admissions on file . . . show that . . . the moving party is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(e)." Holtz, 258 F.3d at 74 n.1. "If the opposing party [] fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." Giannullo, 322

F.3d at 140.  District courts have "broad discretion to determine whether to overlook a party's failure to comply with local court rules" and may "opt to conduct an assiduous review of the record."  Holtz, 258 F.3d at 73 (citation & internal quotation marks omitted).  This Court has exercised its discretion to review the record in detail.

### III.  Jurisdiction And 8 U.S.C. § 1252(g)

This Court first discusses 8 U.S.C. § 1252(g), which Defendants argue operates as a jurisdictional bar to Plaintiff's malicious-prosecution theory as it pertains to his post-arraignment deprivation of liberty.  See ECF No. 53 § I.E.  Section 1252(g) provides that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."  8 U.S.C. § 1252(g).  The United States Supreme Court has held that Section 1252(g) applies exclusively to those "three discrete actions" cited by the statute, i.e., the Attorney General's "'decision or action' to 'commence proceedings, adjudicate cases, or execute removal orders[,]'"  Reno v. Am.-Arab Anti-Disc. Comm. ("AADC"), 525 U.S. 471, 486 (1999) (emphasis in original, citing 8 U.S.C. § 1252(g)), and does not "sweep in any claim that can technically be said to 'arise from' the three listed actions of the Attorney General[,]"  Jennings v. Rodriguez, 138 S. Ct. 830, 841 (2018) (citing AADC).  This is because, as the AADC Court explained, "[i]t is implausible that [Congress's] mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings."  AADC, 525 U.S. at 482.

As one example of Section 1252(g)'s application to bar jurisdiction, in El Badrawi v. Department of Homeland Security, 579 F. Supp. 2d 249, 265-66 (D. Conn. 2008), the court found that it was without jurisdiction over a malicious prosecution claim challenging the federal

Attorney General's decision to commence removal proceedings against the plaintiff.  On the other hand, courts have declined to find that Section 1252(g) stripped them of jurisdiction over civil rights, tort and other claims challenging incidents that occurred prior to (and in some instances that arguably gave rise to) an Attorney General decision or action to commence proceedings, adjudicate cases, or execute removal orders.  See, e.g., Humphries v. Various Fed. USINS Emps., 164 F.3d 936, 944 (5th Cir. 1999) (finding no Section 1252(g) jurisdictional bar to a plaintiff's involuntary servitude claim because "we would defy logic by holding that a claim for relief somehow 'aris[es] from' decisions and actions accomplished only after the injury allegedly occurred"); Diaz-Bernal v. Myers, 758 F. Supp. 2d 106, 124-25 (D. Conn. 2010) (finding that Section 1252(g) did not strip the court of jurisdiction over plaintiffs' equal protection and Fourth Amendment claims against non-supervisory raid officers pertaining to allegedly unlawful entries and detentions occurring prior to the federal actions listed in Section 1252(g)); Argueta v. U.S. Immigr. & Customs Enf't, No. 08 Civ. 1652 (PGS), 2009 WL 1307236, at *16 (D.N.J. May 7, 2009) (finding that the court had jurisdiction over the plaintiff's claims challenging search, seizure and arrest where "the decision to commence proceedings against [the plaintiff] arose from his arrest, rather than that his arrest arose from a decision to commence proceedings").

Courts have also declined to find that Section 1252(g) stripped them of jurisdiction over civil rights, torts and other claims challenging incidents that "do not deal" with the Attorney General's decision or action to commence proceedings, adjudicate cases, or execute removal orders against a plaintiff.  Diaz-Bernal, 758 F. Supp. 2d at 125 (finding that Section 1252(g) was not a jurisdictional bar against plaintiffs' procedural due process claims pertaining to lack of access to counsel, lack of information about their rights, and because they did not deal with

Attorney General decisions or actions contemplated by the statute); see You v. Nielsen, 321 F.

Supp. 3d 451, 457 (S.D.N.Y. 2018) (holding that unlawful arrest and detention claims fell

"outside the ambit of § 1252(g)" because "[t]he question before the Court is not why the

Secretary chose to execute the removal order . . . [it] is whether the way Respondents acted

accords with the Constitution and the laws of this country"); Michalski v. Decker, 279 F. Supp.

3d 487, 495 (S.D.N.Y. 2018) (rejecting the argument that unlawful arrest and detention claims

are part and parcel of the commencement of removal proceedings because "the decision or action

to detain an individual . . . is independent from the decision or action to commence a removal

proceeding"); Escobar v. Gaines, No. 11 Civ. 994 (TJC), 2014 WL 4384389, at *3-4 (M.D.

Tenn. Sept. 4, 2014) ("Whatever [Section 1252(g)'s] definition of 'commence proceedings,'

under either set of facts alleged by the parties herein, the actions of the . . . [d]efendants which

are alleged by [p]laintiffs to be unconstitutional were not commencing removal proceedings.");

Argueta, 2009 WL 1307236, at *16 ("[I]t is fairly clear that [plaintiff] was not arrested to

commence proceedings against him, and the [g]overnment does not make this claim."); El

Badrawi, 579 F. Supp. 2d at 265-66 (finding that Section 1252(g) did not strip the court of

jurisdiction to hear plaintiff's claims challenging decisions to arrest and detain him as "separate

and discrete from the agency's decision to initiate removal proceedings against him").  Further,

El Badrawi noted that claims seeking money damages after removal decision or action do not

pose a risk of prolonging related proceedings such that they do not undermine the policies that

Section 1252(g)'s jurisdictional bar is meant to serve.  See id. at 268.

　　　Following the reasoning of these cases, the actions challenged in this case are even more

removed from the purpose of Section 1252(g) which does not strip this Court of jurisdiction over

Plaintiff's malicious prosecution claims against Defendants.  First, Plaintiff's claims arise from

allegations about municipal law enforcement officers' initiation of a state criminal proceeding, not any decision or action by the Attorney General or even supervisory federal officials to commence proceedings, adjudicate cases, or execute removal orders against Plaintiff.  See 8 U.S.C. § 1252(g).  Second, Plaintiff's claims arise from actions allegedly committed by Defendants in September 2013, when Plaintiff was out on bond and not in federal custody; in other words, Plaintiff's claims arise from events that occurred prior to Plaintiff's October 2013 return to federal custody.  See Humphries, 164 F.3d at 944; Diaz-Bernal, 758 F. Supp. 2d at 124-25.  Third, Defendants' actions contested in this case do not deal with a federal action or decision listed in Section 1252(g).  See You, Xiu Qing, 321 F. Supp. 3d at 457; Michalski, 279 F. Supp. 3d at 495; Escobar, 2014 WL 4384389, at *3-4; Diaz-Bernal, 758 F. Supp. 2d at 125; Argueta, 2009 WL 1307236, at *16; El Badrawi, 579 F. Supp. 2d at 265-66.  Fourth, as this Court discusses in the context of Plaintiff's liberty-deprivation element, see Section IV.b., infra, fact issues regarding whether Defendants' contested September 2013 actions proximately caused the later revocation of his federal bond and return to federal custody reinforce how the contested September 2013 events are distinct from the kinds of federal decision  or actions listed in Section 1252(g).  See Argueta, 2009 WL 1307236, at *16.

## IV.  Malicious Prosecution Claim

### a.  Relevant Law

"[Section 1983] creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." City of Okla. City v. Tuttle, 471 U.S. 808, 816 (1985).  There are two essential elements to any claim raised under § 1983: "[i] the defendant acted under color of state law," which Defendants concede here; "and [ii] as a result of the defendant's actions, the plaintiff suffered a denial of h[is] federal statutory rights, or h[is]

23

constitutional rights or privileges." <u>Annis v. Cnty. of Westchester</u>, 136 F.3d 239, 245 (2d Cir. 1998).

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law." <u>Frost v. N.Y.C. Police Dep't</u>, 980 F.3d 231, 242 (2d Cir. 2020) (<u>quoting</u> <u>Manganiello v. City of New York</u>, 612 F.3d 149, 160–61 (2d Cir. 2010)). "To establish a malicious prosecution claim under New York law, a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." <u>Id.</u> To sustain a federal malicious prosecution claim, a plaintiff must also show a post-arraignment deprivation of liberty that rises to the level of a constitutional seizure. <u>See</u> <u>Singer v. Fulton Cnty. Sheriff</u>, 63 F.3d 110, 116 (2d Cir. 1995).

### b. Deprivation Of Liberty

This Court finds that there is no genuine issue of material fact as to whether Plaintiff suffered a liberty deprivation as a result of Defendants' contested September 2013 events. At a minimum, Plaintiff suffered the deprivation of detention from September 4, 2013, through October 19, 2013, in state custody. See Exh. M. Defendants have not presented contrary evidence to demonstrate a genuine issue of material fact on this element. This Court thus finds that Plaintiff's evidence of his state custody prompted by September 2013 events during the period he was unable to make state court bail meets the liberty-deprivation element of malicious prosecution. <u>See</u> <u>Johnson v. Knorr</u>, 477 F.3d 75, 84 (3d Cir. 2007) (holding that detention of individual until he could make bail constituted a deprivation of liberty for the purpose of a

24

malicious prosecution claim); see also Rhem v. Malcolm, 527 F.2d 1041, 1044 (2d Cir. 1975) (finding that the constitutional rights of poor people "may not be sacrificed" because they cannot afford bail).

Plaintiff argues that Defendants caused a much longer deprivation from that initial state custody. Plaintiff's evidence is that prior to entering state custody at the time of his September 4, 2013, arraignment, he had been released on federal bond and was not detained in federal custody. See Section I.l. In fact, the immigration judge appears to have believed that September 2013 events were the sole cause of the federal bond revocation during Plaintiff's immigration court appearance. See Exh. 4. This may give rise to a claim for damages for the period through August 2014. See Jenkins v. N.Y.C. Police Dep't, No. 13 Civ. 3405 (KPF), 2015 WL 4660899, at *6-7 (S.D.N.Y. Aug. 6, 2015) (denying defendants' summary judgment motion on plaintiff's malicious prosecution claim alleging that fabrications proximately caused the plaintiff's parole revocation); Zahrey v. City of New York, No. 98 Civ. 4546 (DCP) (JCF), 2009 WL 1024261, at *3 (S.D.N.Y. Apr. 15, 2009) ("The court agrees it would be a reasonable inference that it was foreseeable to [d]efendants that, when allegedly coercing [a witness against the plaintiff], such testimony would be used to incarcerate [the plaintiff], whether pursuant to an initial bail hearing or after trial."); Hernandez v. Wells, No. 01 Civ. 4376 (MBM), 2003 WL 22771982, at *4 (S.D.N.Y. Nov. 24, 2003) (finding that "a reasonable jury could conclude that [the defendant correction officer] lied about the assault and that his false account played a pivotal role in subjecting [the plaintiff] to police custody and the [Division of Parole's] parole hold"); id. at *11 ("A reasonable jury could conclude that [the plaintiff's] incarceration resulted from [the defendant correction officer's] claim that [the plaintiff] punched him; if [the plaintiff] had not been arrested and charged with assault, his parole may not have been revoked based on the

alleged assault.").[12]  The Court finds Plaintiff's theory persuasive as to a reasonable

interpretation of events such that on this record, a factfinder must determine causation as to the

state and federal custody.

### c.  Initiation Of A Criminal Proceeding

#### i.  Relevant Law

"Under New York law, police officers can initiate prosecution by filing charges or other

accusatory instruments[]" such as criminal court complaints.  Cameron v. City of New York, 598

F.3d 50, 63 (2d Cir. 2010) (citations omitted).  "[A] defendant initiates a prosecution 'by creating

material, false information and forwarding that information to a prosecutor or by withholding

material information from a prosecutor.'"  Aguirre v. City of New York, No. 15 Civ. 6043

(PKC), 2017 WL 4236552, at *9 (E.D.N.Y. Sept. 22, 2017) (quoting Costello v. Milano, 20 F.

Supp. 3d 406 415 (S.D.N.Y. 2014)).  The definition of false evidence includes "material

omissions [which] render an otherwise true statement false."  Morse v. Fusto, 804 F.3d 538, 548

(2d Cir. 2015); see Bridgeforth v. City of New York, No. 16 Civ. 273 (WHP), 2018 WL

3178221, at *7 (S.D.N.Y. June 28, 2018); Gomez v. City of New York, No. 16 Civ. 1274 (NGG)

(LB), 2017 WL 1034690, at *8 (E.D.N.Y. Mar. 16, 2017) ("To the extent that the [o]fficer

[d]efendants misled the [s]tate [p]rosecutors by omitting pertinent information about the unduly

suggestive photo array, that evidence may be considered 'false.'").

Applying these standards, courts have denied summary judgment and found that "a jury

---

[12] Although not at issue on the instant motion, this Court notes that triable fact issues about the causal relationship between September 2013 events and revocation of Plaintiff's federal bond are also relevant to damages.  See Underwood v. City of New York, No. 14 Civ. 7531 (RRM) (PK), 2018 WL 1545674, at *3 n.3 (E.D.N.Y. Mar. 28, 2018) (noting that although an unlawful false arrest is not made lawful by the later discovery of an active warrant, damages will be limited to the period between the unlawful detention until the later discovery of the warrant).

could find [defendant officers to have] played a role in initiating [a] prosecution" by virtue of forwarding records they created or other evidence to prosecutors containing false content or omitting information material to making such false information clear, even though the officers did not sign criminal complaints.  See Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997) (finding fact issue on initiation element from defendant officer's preparation of an allegedly false confession forwarded to prosecutors); Aguirre, 2017 WL 4236552, at *9 (collecting cases).  Generally, "the chain of causation need not be considered broken" if a defendant police officer "could reasonably foresee that his misconduct [would] contribute to an independent [prosecutorial] decision that results in a deprivation of liberty."  Higazy v. Templeton, 505 F.3d 161, 177 (2d Cir. 2007) (citation & internal quotation marks omitted); see Zahrey v. Coffey, 221 F.3d 3d 342, 352 (2d Cir. 2000).   In other words, "in malicious prosecution actions alleging that a police officer provided false information to a prosecutor, what prosecutors do subsequently has no effect whatsoever on the police officer's initial, potentially tortious behavior."  Cameron, 598 F.3d at 63.  This entails "no requirement that an officer have direct contact with the prosecutor" for his false evidence to meet the initiation element of a malicious prosecution claim.  Israel v. City of New York, No. 16 Civ. 6809 (PGG), 2018 WL 11219076, at *7 (S.D.N.Y. Sept. 29, 2018) (quoting Maldonado v. City of New York, No. 11 Civ. 3514 (RA), 2014 WL 787814, at *6 (S.D.N.Y. Feb. 26, 2014) (quotation omitted)).  Courts weighing whether an officer can be said to have initiated a criminal proceeding by approving police records with false information generally have held that this may show malicious prosecution liability on a failure-to-intervene theory.  See Israel, 2018 WL 11219076, at *7; Aguirre, 2017 WL 4236552, at *9.

Courts have found the initiation element satisfied as to defendant detectives where they

created investigative reports likely to be sent to prosecutors that omitted known facts material to charges—for example, because the omitted facts, had they been included, potentially negated probable cause.  See Dufort v. City of New York, 874 F.3d 338, 343-45, 355 n.7 (2d Cir. 2017) (finding that although defendant detectives' failure to include information in their DD-5 investigative forms that a witness was unable to facially identify plaintiff did not constitute a due process violation—because the witness testified at trial she could not identify plaintiff and plaintiff was acquitted, "claims for pretrial detention based on . . . withheld evidence are evaluated as malicious prosecution claims under the Fourth Amendment"); Nzegwu v. Friedman, No. 14-1481-cv, 605 F. App'x 27, 31 (2d Cir. Apr. 1, 2015) (finding that officers "could nevertheless be liable [for malicious prosecution] if they withheld pertinent information from the prosecutor, or misrepresented it"); Newson v. City of New York, No. 16 Civ. 6773 (ILG) (JO), 2019 WL 3997466, at *9 (E.D.N.Y. Aug. 23, 2019) ("Where an officer causes the prosecution to initiate or continue criminal charges without disclosing evidence that would negate probable cause, the officer may be liable for malicious prosecution."); Kemp v. Lynch, 275 A.D.2d 1024, 1025 (4th Dep't 2000) (affirming plaintiff's malicious prosecution verdict against defendant officer based upon the defendant's failure to reveal investigative facts to prosecutors that could be considered Rosario or Brady material).

### ii. Defendant Officer Lee And Defendant Detective Arias Initiated A Criminal Proceeding That Was Not Attenuated By The ADA's Actions

#### 1. Defendant Officer Lee

Defendant Officer Lee initiated a criminal proceeding against Plaintiff with his sworn criminal complaint.  See Section I.h; Espada v. Schneider, 522 F. Supp. 2d 544, 554 (S.D.N.Y. 2007); see also Manganiello, 612 F.3d at 163; Mitchell v. Victoria Home, 434 F. Supp. 2d 219,

227 (S.D.N.Y. 2006) (finding that officers can be shown to have initiated criminal proceedings by, inter alia, signing felony complaints).

## 2. Defendant Detective Arias

There is a fact issue as to whether Defendant Detective Arias initiated the criminal proceeding against Plaintiff.  As discussed supra, Sections I.d-e, Defendant Officer Lee alleges that he arrested Plaintiff after Mr. Paulino identified Plaintiff as one of the robbers, which Defendant Officer Lee documented in the arrest report he created stating that Plaintiff was "positively identified."  See Exh. E.  Then, as discussed supra, Section I.f, after Defendant Detective Arias was assigned to "enhance" Defendant Officer Lee's arrests of Plaintiff, Mr. Rodriguez and Mr. Alanzo for the robbery with further investigation, Defendant Detective Arias elected to talk to only one witness, Mr. Paulino.   A factfinder could plausibly infer that Defendant Detective Arias made the election to interview only Mr. Paulino, to the exclusion of potentially thirty other individuals as his assignment directed, as a result of Defendant Officer Lee's allegation that it was Mr. Paulino who had positively identified Plaintiff.  If so, the factfinder could just as plausibly conclude that Defendant Detective Arias's failure to write a DD-5 noting that Mr. Paulino had professed an inability to make the identification was an omission of fact which the DAO would have found material to the credibility and reliability of Defendant Officer Lee's allegation that Mr. Paulino's positive identification of Plaintiff supported probable cause to charge Plaintiff.  See Section I.f; Exh. 9; Dufort, 874 F.3d at 343-45, 355 n.7; Nzegwu, 605 F. App'x at 31; Manganiello, 612 F.3d at 163; Newson, 2019 WL 3997466, at *9; Kemp, 275 A.D.2d at 1025; compare Exh. 8 at 39:18-23, 55:3-7, 74:13-18, 94:15-95:2; Exh. 12 at 126:21-24 with Exh. 9 (DD-5s).[13]

_____

[13] Defendant Detective Arias also argues that this Court should grant him summary judgment

### 3.  Independent Prosecutorial Decision

As a general matter, law enforcement officers who initiate a criminal proceeding on the basis of fabricated evidence are not insulated from malicious prosecution liability under Section 1983 when prosecutors later rely upon that evidence; this is because defendant officers "cannot hide behind the decision of the DA to prosecute when it was defendants who allegedly fed" false evidence that influenced prosecutorial assessments.  Blake v. Race, 487 F. Supp. 2d 187, 211 (E.D.N.Y. 2007); see Dufort, 874 F.3d at 352 (reversing summary judgment for defendant officers on plaintiff's malicious prosecution claim, finding that officers were not insulated by prosecutorial decisions given fact questions as to prosecutors' knowledge about the limited nature of witness identification evidence and the suggestive manner in which it had been procured); Higazy, 505 F.3d at 177 ("[A] defendant cannot rely on the alleged existence of a superceding cause when that subsequent decision-maker has been deceived by the defendant's actions.") (citation omitted); Douglas v. City of New York, 595 F. Supp. 2d 333, 342 (S.D.N.Y.

---

because Plaintiff never pleaded a malicious prosecution claim against him.  See ECF No. 53 § III.  This Court finds this argument unavailing.  Defendant Detective Arias has never suggested a lack of clarity about Plaintiff bringing a malicious prosecution claim against him before and, "[o]n summary judgment, the Court's analysis is focused on the sufficiency of the evidence and not the sufficiency of the pleadings."  Derisme v. Hunt Leibert Jacobson P.C., 880 F. Supp. 2d 339, 354 (D. Conn. 2012) (collecting cases).  In any event, Plaintiff's complaint sufficiently alleges a malicious prosecution claim against Defendant Detective Arias.  Certain malicious prosecution claim paragraphs plainly make their material allegations against him as one of the collective Defendants.  See ECF No. 1 ¶¶ 68-78.  Plaintiff's malicious prosecution claim also "repeats and reiterates" paragraphs 1 through 67 of the complaint "as if fully set forth herein," and certain of those paragraphs making allegations about Defendant Detective Arias specifically and also as one of the "police" or "officers involved in the investigation" pertinent to the malicious prosecution claim.  See id. ¶ 68; see, e.g., id. ¶¶ 12, 33-38; Melvin v. Cnty. of Westchester, No. 14 Civ. 2995 (KMK), 2016 WL 1254394, at *19 (S.D.N.Y. Mar. 29, 2016) (finding that defendants had reasonable notice of the basis of claim from the complaint's express incorporation of the previous paragraphs' relevant allegations); Lane's Floor Coverings, Inc. v. Ardex, Inc., No. 95 Civ. 4078 (CPS), 1996 WL 19182, at *4 (E.D.N.Y. Jan. 4, 1996) (finding cause of action that incorporated previous complaint paragraphs in full "place[d] the defendant on sufficient notice" of the claim at issue).

2009) (noting that prosecutorial decisions do not shield a police officer from malicious prosecution liability where the officer "is accused of providing false information to a prosecutor that influences a decision whether to prosecute") (citation & internal quotation marks omitted); see also Jones v. City of Chicago, 856 F.2d 985, 994 (7th Cir. 1988) ("[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision.").

Despite this case law, Defendants argue that the prosecutorial decision to charge Plaintiff is an intervening cause that defeats their responsibility for initiating the criminal proceeding. This Court disagrees because Defendants provided to prosecutors the evidence allegedly provided by Mr. Paulino and omitted information about its limitations, and even possibly, its fabrication.  See Sections I.d, I.f, I.h; Dufort, 874 F.3d at 352; Blake, 487 F. Supp. 2d at 211.

Plaintiff also argues that the prosecutors' charging decisions cannot discharge Defendants' responsibility for the criminal proceeding because Defendants' investigation of the robbery was so poor.  See ECF No. 56 § I.A.  For example, in support of this argument, Plaintiff submits an expert report exhibit stating that standard police practice in this case would have been to interview as many robbery witnesses and victims as possible and to document those interviews in detailed reports instead of what Defendant Detective Arias did, which was to interview only Mr. Paulino without documenting his statements about not being able to identify any robber except for Mr. Alanzo.  See Exh. 15 ¶ 48.  Although this Court's rejection of Defendants' attenuation argument does not rest on Plaintiff's failure-to-investigate argument and evidence,[14]

---

[14] The parties dispute whether the Court may consider the expert report that Plaintiff submitted in connection with his argument about the sufficiency of Defendants' investigation.  This Court does not resolve the question because its analysis and recommendations do not rely on Plaintiff's

it notes that Plaintiff may at least be correct that, had Defendants performed additional investigative tasks and/or documented their investigative work better, the parties might have been able to answer certain issues of material fact more easily in this action.[15]

### iii. Defendant Sergeant Matthies

Although Plaintiff's record shows that Defendant Sergeant Matthies approved Defendant Officer Lee's arrest report, this does not show that Defendant Sergeant Matthies initiated the criminal proceeding against Plaintiff.  See Israel, 2018 WL 11219076, at *9; Aguirre, 2017 WL 4236552, at *9; Costello, 20 F. Supp. 3d at 419 (finding the initiation requirement not satisfied where officer assisted in arresting plaintiff but had not been involved in the decision to prosecute him, for example by "signing a charging instrument, discussing plaintiff's prosecution with the [DAO]" or otherwise).  Initiating a criminal proceeding could, under certain circumstances, give rise to failure-to-intervene liability which "derives meaning from the underlying violation," i.e., malicious prosecution.  See Lin v. Cnty. of Monroe, 66 F. Supp. 3d 341, 361 n.8 (W.D.N.Y. 2014) (collecting cases).  This is not the case here.  As a preliminary matter, Plaintiff has conceded Defendant Sergeant Matthies's insufficient involvement in challenged events "through silence" by failing to address the issue in his opposition brief.  In re UBS AG Secs. Litig., No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *11 (S.D.N.Y. Sept.28, 2012) (finding that a party "concedes through silence" arguments by its opponent that it fails to address); see ECF No. 56 §

---

failure-to-investigate theory.  See Exh. 15.  The use or exclusion of the report at trial is to be resolved by the trial judge.

[15] For example, this Court notes that the security video (which Defendant Detective Arias claims to have watched on the date of his investigation) depicts the hat-wearing man touching the club-entrance railing various times, see Exh. Q at Tracks I, IV at 1:59:30, Yet, Defendant Detective Arias did not collect or arrange the collection of DNA or fingerprint evidence from the incident scene, which Plaintiff's expert suggests was a departure from standard police practice, see Section I.g, Exh. 8 at 70:13-21, 75:20-22; Exh. 15 ¶¶ 24, 26, 29, 46; Exh. W at 38:6-18.

I.A; Cole v. Blackwell Fuller Music Publ'g, LLC, No. 16 Civ. 7014 (VSB), 2018 WL 4680989, at *7 (S.D.N.Y. Sept. 28, 2018) ("Numerous courts have held that a plaintiff's failure to address an issue in its opposition raised by its adversary amounts to a concession or waiver of the argument."); Gortat v. Capala Bros., Inc., No. 07 Civ. 3629 (JLG), 2010 WL 1423018, at *11 (E.D.N.Y. Apr. 9, 2010) (considering an argument waived when it was not made in opposition brief). Waiver aside, the record does not support a failure-to-intervene malicious-prosecution liability theory against Defendant Sergeant Matthies given his testimony that Defendant Officer Lee told him that he arrested Plaintiff on the basis of a positive witness identification for which Defendant Sergeant Matthies had not been present. See Exh. 7 at 100:2-11, 143:16-23. This witness was presumably Mr. Paulino, but the record does not show that Defendant Sergeant Matthies knew that Defendant Officer Lee's arrest report was false on this point. See Exh. 7 at 100:2-11, 143:16-23. Plaintiff has likewise conceded through silence Defendant Sergeant Matthies cannot be liable for malicious prosecution on any alternative supervisory liability theory. See ECF No. 56 § I.A; Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003).

### d. Favorable Termination

"[T]he 'favorable termination' element of a § 1983 malicious prosecution claim is satisfied only by a disposition consistent with that required at common law, i.e., one that 'affirmatively indicate[s] the innocence of the accused.'" Scott v. City of New York, No. 16 Civ. 834 (NGG) (ST), 2020 WL 208915, at *6 (E.D.N.Y. Jan. 14, 2020) (quoting Lanning v. City of Glen Falls, 908 F.3d 19, 27 (2d Cir. 2018)).

Defendants argue that the ADA's explanation on the record for moving to dismiss Plaintiff's case—that the People investigated and could not go forward, see Exh. 11— demonstrates that the charges were dismissed on speedy trial grounds. See ECF No. 53 § I.B. If

a factfinder finds this true, the Second Circuit held in <u>Murphy v. Lynn</u>, 118 F.3d 938, 950 (2d

Cir. 1997), that this can constitute "a termination favorable to the accused" in connection with a

a Section 1983 claim, particularly where, as here, the underlying record suggests that prosecutors

did not overlook the grand jury presentment deadline but allowed it to expire.  <u>See</u> <u>Lanning</u>, 908

F.3d at 27, 27 n.6 (citing <u>Murphy</u> with favor); <u>Ziming Shen v. City of New York</u>, No. 16-2780-

cv, 725 F. App'x 7, 15 (2d Cir. Feb. 9, 2018) (finding that malicious prosecution plaintiff

"clearly satisfies the favorable termination element" because "the charges against him were

dismissed on speedy trial grounds, and under New York law, a speedy trial dismissal constitutes

favorable termination") (<u>citing</u> <u>Rogers v. City of New York</u>, 303 F.3d 155, 160 (2d Cir. 2002));

<u>Alvarez v. Peters</u>, No. 19 Civ. 6789 (EK), 2020 WL 1808901, at *1 n.5 (E.D.N.Y. Apr. 9, 2020)

(finding that speedy trial dismissal is a favorable termination under Section 1983); <u>Scott</u>, 2020

WL 208915, at *7 (same); <u>Nelson v. City of New York</u>, No. 18 Civ. 4636 (PAE), 2019 WL

3779420, at *12 (S.D.N.Y. Aug. 9, 2019) (same); <u>Blount v. City of New York</u>, No. 15 Civ. 5599

(PKC) (JO), 2019 WL 1050994, at *4-5 (E.D.N.Y. Mar. 5, 2019) (same); <u>see also</u> <u>Cordova v.</u>

<u>City of Alberquerque</u>, 816 F.3d 645, 652 (10th Cir. 2016) (stating that district courts may

consider the circumstances of a particular speedy trial dismissal to determine whether it

constituted a favorable termination).   For example, the DAO timely presented Mr. Rodriguez

and Mr. Alanzo's related cases to the grand jury in 2013, <u>see</u> Exh. 12; Exh. 13, before waiting

nearly a year to say that the People could not go forward with Plaintiff's case after investigation,

<u>see</u> Exh. 11.  <u>See</u> <u>Murphy</u>, 118 F.3d at 950-51 (citing that on such facts speedy trial dismissal

was prima facie evidence of favorable termination that could be rebutted with evidence of a

legitimate non-merits-based explanation for the failure to proceed).[16]

---

[16] "The return of No True Bill by a grand jury is a termination in the plaintiff's favor."  <u>Phillips</u>

A jury could also find that the DAO's motion to dismiss Plaintiff's case was an admission that Plaintiff was entitled to prevail cast as a speedy trial problem because the colloquy on the record suggests insufficient evidence and, "[a]fter all, a lack of sufficient evidence in a criminal case entitle[s the accused], as a matter of law, to a judgment of acquittal." McKenzie v. City of New York, No. 17 Civ. 4899 (PAE), 2019 WL 3288267, at *15 (S.D.N.Y. July 22, 2019); see Virgil v. City of New York, No. 17 Civ. 5100 (PKC) (SMG), 2019 WL 4736982, at *7 (E.D.N.Y. Sept. 27, 2019) ("Without sufficient evidence, [the civil rights p]laintiff reverts back to his presumptive state of innocence.").[17]

This Court finds without merit Defendants' suggestion that, although Plaintiff rejected all plea offers over the course of his prosecution, Plaintiff's brief consideration of plea offers on two occasions without rejecting them out of hand is evidence against him. See Defts' 56.1 ¶¶ 23-24; Fed. R. Evid. 408. To the contrary: An individual who finds himself defending against a malicious prosecution would also reasonably fear under the circumstances that he runs a related, frightening and potentially consequential risk of wrongful conviction and possible deportation; indeed, a malicious prosecution claim permits damages for such emotional distress. See N.Y. Pattern Jury Instr.--Civil 3:50; see also Halberstadt v. N.Y. Life Ins. Co., 194 N.Y. 1, 7 (N.Y.

---

v. DeAngelis, 571 F. Supp. 2d 347, 356 (N.D.N.Y. 2008); see Sankar v. City of New York, 867 F. Supp. 2d 297, 311 (E.D.N.Y. 2012). The record on the motion does not establish whether Plaintiff's case was or was not presented to a grand jury with Mr. Alanzo's and Mr. Rodriguez's cases in 2013.

[17] This Court disagrees with Defendants that Plaintiff has conceded that the dismissal was on speedy trial grounds due to a complaint allegation stating that "[u]pon information and belief" the statutory period for grand jury presentment had expired at the time. See ECF No. 58 § I.B. "[A] complaint is not evidence," Capital One Nat. Ass'n v. 48-52 Franklin, LLC, No. 12 Civ. 3366 (LGS), 2014 WL 1386609, at *9 (S.D.N.Y. Apr. 8, 2014), and a jury may consider whether the record shows that Plaintiff's case was abandoned due to insufficient proof, see Kern v. Wal-Mart Stores, Inc., 804 F. Supp. 2d 119, 128 (W.D.N.Y. 2011) ("The complaint, of course, is just an initial pleading and is not evidence.").

1909) (noting that in many malicious prosecution cases the substantial injury for which damages are recovered "may be that inflicted upon the feelings"); Avildsen v. Prystay, 204 A.D.2d 154, 155-56 (1st Dep't 1994)).  This Court thus finds the fact that Plaintiff did not refuse to hear plea offers extended to him immaterial as to whether the dismissal of his case was a favorable termination.

### e.  Probable Cause

#### i.  Relevant Law

"Because lack of probable cause is an element of a malicious prosecution claim, the existence of probable cause is a complete defense to a claim of malicious prosecution." Stansbury v. Wertman, 721 F.3d 84, 94-95 (2d Cir. 2013) (citation & quotation omitted).  "The probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases."  Id. at 95 (citation omitted).  "Probable cause, in the context of malicious prosecution, has also been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." Id.; see Posr v. Ct. Officer Shield No. 207, 180 F.3d 409, 417 (2d Cir. 1999) (warning against "conflat[ing] probable cause to arrest with probable cause to believe that [the plaintiff] could be successfully prosecuted.  Only the latter kind of probable cause is at issue with respect to the malicious prosecution claim."); see also Spagnuolo v. Howell, No. 18-3180-cv, 814 F. App'x 614, 617 (2d Cir. May 14, 2020) (citing the higher malicious prosecution probable cause standard in its discussion of federal Section 1983 and state law claims); Walsh v. City of New York, No. 17-2432-cv, 742 F. App'x 557, 562 (2d Cir. Aug. 3, 2018) (same); Tuccillo v. Cnty. of Nassau, No. 17-2300-cv, 723 F. App'x 81, 82 (2d Cir. May 25, 2018) (same); Keith v. City of New York, No. 14-4788-cv, 641 F. App'x 63, 67 (2d Cir. Mar. 7, 2016) (same).

Probable cause for the purposes of a malicious prosecution claim is measured "at the time the prosecution was initiated." Nash v. Cnty. of Nassau, No. 16 Civ. 2148 (JFB) (AYS), 2019 WL 1367159, at *7 (E.D.N.Y. Mar. 26, 2019) (quoting Drummond v. Castro, 522 F. Supp. 2d 667, 678 (S.D.N.Y. 2007)); see Rothstein v. Carriere, 373 F.3d 275, 292 (2d Cir. 2004) (holding that the existence or nonexistence of probable cause in a malicious prosecution suit is determined at the time the prosecution was initiated); Carson v. Lewis, 35 F. Supp. 2d 250, 263 (E.D.N.Y. 1999) (stating that probable cause to prosecute "is assessed in light of the facts known or reasonably believed at the time the prosecution was initiated"). In cases with a grand jury indictment, a presumption of probable cause arises which a plaintiff must overcome; where the plaintiff was not indicted, there is no such presumption.[18] See Stansbury, 721 F.3d at 95.

### ii. Disputed Issues Of Material Fact Preclude Finding Probable Cause As A Matter Of Law

#### 1. Mr. Paulino's Contested Positive Identification Of Plaintiff

As discussed supra, Sections I.d, I.f, I.h, the record contains disputed issues of material fact for a jury to decide regarding whether, as Defendant Officer Lee has claimed, Mr. Paulino ever identified or made statements about Plaintiff as an individual involved in the robbery either

---

[18] Although it is well settled that a plaintiff has the evidentiary burden to rebut the presumption of probable cause in malicious prosecution cases where the plaintiff was indicted by a grand jury, some courts have held that in the absence of such a presumption in cases where the plaintiff was never indicted, the defendant bears the burden to prove "the existence of probable cause as an affirmative defense." Fobbs v. City of New York, No. 15 Civ. 6736 (PKC), 2017 WL 2656207, at *6 (S.D.N.Y. June 19, 2017) (quoting Drummond, 522 F. Supp. 2d at 678 (citing Broughton v. State, 37 N.Y.2d 451, 458 (1975)); see Mitchell v. City of New York, 841 F.3d 72, 76 (2d Cir. 2016) (holding that where "an arrest is not made pursuant to a judicial warrant, the defendant in a false arrest case bears the burden of proving probable cause as an affirmative defense") (quoting Dickerson v. Napolitano, 604 F.3d 732, 751 (2d Cir. 2010)); Mason v. Town of New Paltz Police Dep't, 103 F. Supp. 2d 562, 565 (N.D.N.Y. 2000) (holding that federal and state law hold that defendants have the burden to prove justification for extrajudicial arrest or imprisonment). This Court need not decide that question because regardless of whether this burden lies with Plaintiff or Defendants, it finds disputed issues of material fact on the subject of probable cause.

at the scene, in a lineup or at any other time during the investigation and prosecution.  See Sorrell v. Cnty. of Nassau, 162 F. Supp. 3d 156, 167, 170 (E.D.N.Y. 2016) (finding that evidence that witness did not identify plaintiff as assailant created a triable issue of material fact on malicious prosecution probable cause element); Ostroski v. Town of Southold, 443 F. Supp. 2d 325, 339 (E.D.N.Y. 2006) (finding that evidence that plaintiff did not resist arrest created a disputed issue of material fact as to whether defendant officers had probable cause to prosecute plaintiff for that charge).   If a factfinder concludes that the Mr. Paulino evidence was fabricated, then it should be set to one side and other evidence that had been collected and reviewed by the time of Plaintiff's arraignment assessed for probable cause "independent of the allegedly fabricated [Mr. Paulino] evidence." Davis v. City of New York, No. 15 Civ. 5900 (LGS), 2017 WL 1184287, at *4 (S.D.N.Y. Mar. 28, 2017) (collecting cases); see Morse v. Spitzer, No. 07 Civ. 4793 (CBA) (RML), 2012 WL 3202963, at *6 (E.D.N.Y. Aug. 3, 2012) (denying motion to reconsider summary judgment dismissal of malicious prosecution claim despite evidence that defendant officers had lied to grand jury and fabricated evidence, other evidence independent of that false evidence showed "untainted probable cause").   Here, Defendants argue that summary judgment should be granted, even assuming arguendo that the Mr. Paulino evidence was fabricated, because the Court can find independent probable cause from the security video evidence in the motion record.  This Court disagrees.  As noted infra, Section IV.e.ii.2, this Court finds an issue of material fact as to whether the security video had been collected at the time of Plaintiff's arraignment.  As a result, this Court finds that the security video cannot now be called independent evidence available at the relevant time from which to perform a probable cause analysis.  As noted infra, Section IV.e.ii.3, this Court finds issues of material fact as to what the security video shows.  As a result, this Court finds that the security video cannot independently

establish probable cause for Plaintiff's prosecution as a matter of law even if the evidence of Mr. Paulino's identification were set aside.

### 2.    Contested Timing Of Security Video Evidence Collection

Defendants argue that if prosecutors viewed security video prior to Plaintiff's arraignment and drew their own independent conclusions from that security video about probable cause to charge Plaintiff, it becomes immaterial whether Defendants themselves lacked probable cause, and they are entitled to summary judgment. See ECF No. 53. As the relevant moment for the probable-cause inquiry is "the time the prosecution [against Plaintiff] was initiated[,]" Nash, 2019 WL 1367159, at *7 (quoting Drummond, 522 F. Supp. 2d at 678); see Rothstein, 373 F.3d at 292; Carson, 35 F. Supp. 2d at 263, this Court finds that this record does not entitle Defendants to summary judgment on this basis. As discussed supra, Sections I.i, I.j, there are disputed issues of material fact regarding whether the security-video evidence was collected prior to Plaintiff's arraignment and, if so, which security video that was. By extension, the record does not establish whether, as Defendants claim, prosecutors viewed any of the security video prior to Plaintiff's arraignment. See Section IV.c.ii.3. These triable issues of fact preclude summary judgment in favor of Defendants on their probable cause argument. See Gomez, 2017 WL 1034690, at *6; see also Cardoza v. City of New York, 139 A.D.3d 151, 162-63 (1st Dep't 2016) ("In fact, the issue submitted to the jury on the malicious prosecution claim was framed by the court in its charge as whether plaintiff had established 'that at the time the prosecution was initiated, the defendants . . . did not have probable cause to believe that [plaintiff] was guilty of the crime[s charged] and that the defendants acted maliciously.'") (emphasis in original).

### 3.    Contested Evidentiary Significance Of Security Video Evidence

Where probable cause is alleged to reside in video evidence, courts should consider that

video evidence submitted in connection with a party's summary judgment motion to determine whether material fact issues exist.  See Scott v. Harris, 550 U.S. 372, 380 (2007).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the [video] record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Id.  On the other hand, if the video evidence does not conclusively resolve material fact issues, summary judgment based on that evidence alone is not appropriate.  See Hulett v. City of Syracuse, 253 F. Supp. 3d 462, 482 (N.D.N.Y. 2017) (stating that "while the video evidence submitted by the parties will certainly be considered and carefully reviewed at this juncture, Scott is best understood to permit the summary adjudication of a plaintiff's civil rights claim only in those exceptional cases where the video evidence in the record is sufficient to 'blatantly contradict[ ]' one party's version of events"); Zachary v. City of Newburgh, No. 13 Civ. 5737 (VB), 2016 WL 4030925, at *8 (S.D.N.Y. July 25, 2016) ("Although the video evidence casts significant doubt on plaintiff's version of the events in the strip search room, a reasonable juror could [still] credit plaintiff's account."); Rasin v. City of New York, No. 14 Civ. 5771 (ARR) (CLP), 2016 WL 2596038, at *7 (E.D.N.Y. May 4, 2016) ("The parties have testified to two different stories, and the video evidence is not so conclusive as to determine this factual dispute as a matter of law."); Mack v. Howard, No. 11 Civ. 303-A (RJA), 2014 WL 2708468, at *3 (W.D.N.Y. June 16, 2014) (declining to grant summary judgment where the "case boil[ed] down to two credible interpretations of the same video").

The parties hotly dispute what the security video evidence shows.  Defendants argue that the hat-wearing man in the video is Plaintiff and that one of the other men in the video is Mr. Alanzo.  See ECF No. 53.  Plaintiff argues that the video evidence does not show him to be the

40

hat-wearing man.  See ECF No. 56.  This Court has carefully reviewed all video evidence

submitted on the record and finds that the videos do not clearly show the hat-wearing man's

facial features, height and tattoo to "blatantly contradict[]" Plaintiff's contention that he is not

the hat-wearing man.  Scott, 550 U.S. at 380; see Rasin, 2016 WL 2596038, at *7; Mack, 2014

WL 2708468, at *3.  In addition, the hat-wearing man in the video is wearing a solid-colored T-

shirt that is completely different from the button-down jersey with the phrase "Storm 6"

emblazoned on it that Plaintiff was wearing when detained twenty minutes later (and that he was

photographed in at the precinct).  Compare Exh. Q at Tracks I, IV at 1:59:30; Exh. R with Exh.

G.  Defendant Sergeant Matthies and Defendant Officer Lee themselves testified at their

depositions that they also found the security video unclear and inconclusive on this point.  See

Exh. 7 at 195:21-196:16 (Defendant Sergeant Matthies testifying that the video is "not very

clear" and that it is difficult to "make out much" with regard to the facial features or height of the

hat-wearing man); Exh. 6 at 146:15-24 (Defendant Officer Lee testifying about the differences

between the hat-wearing man's and Plaintiff's shirts); Exh. V; Exh. 6 at 162:6-8 (Defendant

Officer Lee testifying that it is difficult to see the hat-wearing man's tattoo in the video evidence

for the purposes of comparison against Plaintiff's).  In summary, there are "two credible

interpretations" of the security video for a factfinder to resolve with respect to whether the hat-

wearing man is Plaintiff.  See Mack, 2014 WL 2708468, at *3 (denying summary judgment

where the "case boil[ed] down to two credible interpretations of the same video").

Assuming arguendo that the video evidence conclusively established Plaintiff to be the

hat-wearing man, this would still be insufficient to show probable cause that Plaintiff committed

the offenses for which he was charged.  See Minott v. Duffy, No. 11 Civ. 1217 (KPF), 2014 WL

1386583, at *7 (S.D.N.Y. Apr. 8, 2014) (finding insufficient probable cause to arrest the plaintiff

from evidence that he entered and remained inside a bank with an individual who attempted to cash a forged check there).  Under New York law, "mere presence at the scene of . . . criminal activity does not itself constitute probable cause."  People v. Ortiz, 103 A.D.2d 303, 306 (2d Dep't 1984), aff'd, 64 N.Y.2d 997 (1985); see People v. Pelchat, 62 N.Y.2d 97, 107 (N.Y. 1984) (dismissing indictment because criminal defendant's "presence at the scene of arrest, standing alone, would not support" it); People v. Martin, 32 N.Y.2d 123, 124-25 (N.Y. 1973) (finding no probable cause to arrest the criminal defendant "for merely being in the company" of two individuals at the time they committed a narcotics transaction without evidence that the criminal defendant engaged in any overt criminal activity himself).  Defendant Detective Arias himself testified at his deposition that even if Plaintiff were the hat-wearing man, the security video did not establish Plaintiff's actual involvement in the robbery.  See Exh. 8 at 169:14-21 (Q: "Other than you observing these three men entering the location [in the security video], you have no idea whether [Plaintiff] was involved in the actual robbery; is that correct?" . . . A: "Yes.").  Although Defendants as the summary judgment movants carry the burden of demonstrating the absence of a material fact issue, see Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011), their submission does not address the security video's shortcomings in this regard, see ECF No. 53 § I.C.

### f.  Malice

"[M]alice does not have to be actual spite or hatred, but means only that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served."  Bertuglia v. City of New York, 133 F. Supp. 3d 608, 634 (S.D.N.Y. 2018) (citation & internal quotation marks omitted); see Fobbs, 2017 WL 2656207, at *6.  Because a "lack of probable cause generally creates an inference of

malice[,]" <u>Boyd v. City of New York</u>, 336 F.3d 72, 78 (2d Cir. 2003) (citation omitted); <u>see</u>

<u>Berry v. Marchinkowski</u>, 137 F. Supp. 3d 495, 536 (S.D.N.Y. 2015) (noting that "a jury may

infer malice from the absence of probable cause"), "once an issue of fact exists with regard to the

possible lack of probable cause, the element of malice becomes an issue of fact as well[,]"

<u>Brandon v. City of New York</u>, 705 F. Supp. 2d 261, 274 (S.D.N.Y. 2010).  Given this Court's

finding that disputed issues of material fact preclude summary judgment for Defendants on the

probable-cause element, it likewise finds that a jury resolving those issues in Plaintiff's favor

could infer malice.

**V.      Qualified Immunity**

A valid qualified immunity defense can foreclose malicious prosecution liability under §

1983 if the prosecution is supported by "arguable probable cause." <u>Betts v. Shearman</u>, 751 F.3d

78, 83 (2d Cir. 2014).  This may be true even where actual probable cause is lacking because

"[a]rguable probable cause exists if officers of reasonable competence could disagree on whether

the probable cause test was met." <u>Dufort</u>, 874 F.3d at 354.

In sum, the record is rife with issues of material fact including (1) whether the Mr.

Paulino evidence is credible, <u>see</u> Sections I.d., I.f, I.h, IV.c.ii.3, IV.e.ii.1; (2) whether the security

video had been collected and reviewed at the time of Plaintiff's arraignment, <u>see</u> Sections I.i,

IV.e.ii.2; and (3) what the security video shows, <u>see</u> Sections I.j, IV.e.ii.3.  This Court cannot at

this juncture determine whether "the factual circumstances gave rise to arguable probable cause."

<u>Charles v. City of New York</u>, No. 11 Civ. 2783 (AT), 2014 WL 1284975, at *7 (S.D.N.Y. Mar.

31, 2014).  In other words, the factfinder must resolve these disputes before the Court can

perform a qualified-immunity analysis from a totality of established facts.  <u>See</u> <u>Stansbury</u>, 721

F.3d at 89-93 (noting that probable cause is evaluated on all evidence in its totality); <u>Thomas v.</u>

43

City of New York, No. 14 Civ. 7513, No. 16 Civ. 4224 (ENV) (VMS), 2019 WL 3491486, at *7

(E.D.N.Y. July 31, 2019) (adopting magistrate judge's report and recommendation, finding that

"[e]ven if reasonable officers could disagree as to the significance of [certain genuinely disputed]

evidence, because the record does not establish [other disputed material facts], . . . a finding of

arguable probable cause is precluded"); Clark v. City of New York, No. Civ. 210 (ENV) (ST),

2016 WL 11469535, at *5 n.6 (E.D.N.Y. July 22, 2016) ("[H]aving failed to show an objectively

reasonable basis for probable cause [for the contested offense, the defendant officers] cannot rely

on a qualified immunity defense."); id. (citing Boyce v. Fernandes, 77 F.3d 946, 948 (7th Cir.

1996) (Posner, J.) ("Where the only issue bearing on immunity is whether the [officer] had

probable cause to make the . . . arrest that is challenged . . . the dispositive question is simply

whether the defendant had probable cause[.]")).

### VI. Conclusion

For the foregoing reasons, this Court respectfully recommends to the District Court that

Defendants' motion for summary judgment be granted in part and denied in part as follows:

1. The summary judgment motion should be granted as it pertains to Defendant
NYPD.  See n. 2.

2. The summary judgment motion should be granted as it pertains to Plaintiff's
federal § 1983 malicious prosecution claim against Defendant Sergeant
Matthies.  See Section IV.c.iii.

3. The summary judgment motion should be denied as it pertains to Plaintiff's
federal § 1983 malicious prosecution claims against Defendant Officer Lee
and Defendant Detective Arias.  See Sections III-IV.

4. The summary judgment motion for qualified immunity should be denied as it
pertains to Plaintiff's federal § 1983 malicious prosecution claims against
Defendant Officer Lee and Defendant Detective Arias.  See Section V.

In summary, the parties' remaining triable claims and defenses are: (1) Plaintiff's federal § 1983

malicious prosecution claims against Defendant Officer Lee and Defendant Detective Arias; and

(2) Defendant Officer Lee's and Defendant Detective Arias's qualified immunity defenses.

**VII.    Objections**

A copy of this report and recommendation is being provided to the parties via ECF. Any written objections to this report and recommendation must be filed with the Clerk of the Court within fourteen (14) days of service.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72(b).  Any requests to extend time to file objections must be directed to the District Judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections within fourteen (14) days will preclude further review of this report and recommendation either by the District Court or the Court of Appeals.  See Thomas v. Arn, 474 U.S. 140, 145 (1985) ("[A] party shall file objections with the district court or else waive right to appeal."); Caidor v. Onondaga Cnty., 517 F.3d 601, 604 (2d Cir. 2008).

Dated:  Brooklyn, New York
            February 20, 2021

*Vera M. Scanlon*
_____
VERA M. SCANLON
United States Magistrate Judge