16-CV-5915 (NGG) (VMS)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MARCOS A. HERRERA-AMADOR,

                                        Plaintiff,

                -against-

Police Officer KEVIN LEE Shield # 7655 and
Detective KEVIN ARIAS Shield # 152,

                                        Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW, QUALIFIED IMMUNITY, A NEW TRIAL AND REMITTITUR

*HON. SYLVIA O. HINDS-RADIX*
*Corporation Counsel of the City of New York*
*Attorney for Defendants Lee and Arias*
*100 Church Street*
*New York, New York 10007*

*Of Counsel: Brian Francolla and Mary Sherwood*
*Tel: (212) 356-3527/2425*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ........................................................................................................... iii

PRELIMINARY STATEMENT ...................................................................................................... 1

RELEVANT PROCEDURAL HISTORY ....................................................................................... 1

EVIDENCE PRESENTED AT TRIAL ........................................................................................... 2

COMPARISON OF THE EVIDENTIARY RECORD BETWEEN SUMMARY JUDGMENT AND TRIAL ................................................................................................................................. 14

STANDARDS OF REVIEW .......................................................................................................... 16

ARGUMENT .................................................................................................................................. 17

POINT I: THE INTERVENING EXERCISE OF INDEPENDENT JUDGMENT BY ADA SHORTT TO PURSUE THE PROSECUTION OF PLAINTIFF BROKE THE CHAIN OF CAUSATION BETWEEN DEFENDANTS' CONDUCT AND PLAINTIFF'S CLAIM OF MALICIOUS PROSECUTION ........................................................................... 17

POINT II: DEFENDANT ARIAS DID NOT INITIATE THE PROSECUTION  ...................... 20

POINT III: THERE WAS PROBABLE CAUSE FOR PLAINTIFF'S PROSECUTION .......... 23

POINT IV: DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY ......................... 26

POINT V: NO REASONABLE JUROR COULD BELIEVE THAT PLAINTIFF WAS NOT PART OF THE ARMED ROBBERY ........................................................................... 31

POINT VI: THE JURY'S DAMAGE AWARDS MUST BE SET ASIDE AS UNSUPPORTED BY THE RECORD AND THE LAW, OR, REMITTED ............................................................. 32

CONCLUSION: ............................................................................................................................. 39

## TABLE OF AUTHORITIES

**Cases**                                                                                              **Pages**

Alfaro v. Wal-Mart Stores, Inc.,
    210 F.3d 111 (2d. Cir. 2000) ...................................................................................................16

Amore v. Novarro,
    624 F.3d 522 (2d Cir. 2010)...................................................................................................27

BMW of N. Am. V. Gore,
    517 U.S. 559 (1996).................................................................................................................38

Brady v. Wal-Mart Stores, Inc.,
    531 F.3d 127 (2d Cir. 2008) ............................................................................................16,31

Byrd v. Blue Ridge Rural Electric Cooperative, Inc.,
    356 U.S. 525 (1958).................................................................................................................32

Cash v. County of Erie,
    654 F.3d 324 (2d Cir. 2011) ...................................................................................................16

Collado v. City of N.Y.,
    396 F. Supp. 3d 265 (S.D.N.Y. 2019)................................................................................ 35-37

Cronin v. St. Lawrence,
    08 CV 6346 (VB), 2012 U.S. Dist. LEXIS 15743 (S.D.N.Y. Jan. 13, 2012) .............................16

Dufort v. City of New York,
    874 F.3d 338 (2d Cir. 2017)........................................................................................17,18,22

Dupree v. Younger,
    143 S. Ct. 1382 (2023)............................................................................................................13

Earl v. Bouchard Transp. Co.,
    917 F.2d 1320 (2d Cir. 1990)............................................................................................ 32-33

Ferebee v. City of New York, No. 15-CV-1868 (PAC),
    2017 U.S. Dist. LEXIS 104783 (S.D.N.Y. Jul. 6, 2017) .........................................................18

Figueroa v. Mazza,
    825 F.3d 89 (2d Cir. 2016)......................................................................................................27

Gasperini v. Center for Humanities, Inc.,
    518 U.S. 415 (1996).................................................................................................................32

**<u>Cases</u>**                                                                                                          **<u>Pages</u>**

<u>Gonzalez v. City of New York</u>, No. 02 Civ. 4055 (BSJ) (KNF),
    2005 U.S. Dist. LEXIS 20645 (S.D.N.Y. Sept. 16, 2005)......................................18

<u>Guzman v. Jay</u>,
    303 F.R.D. 186 (S.D.N.Y. 2014) .........................................................................32,33

<u>Harlow v. Fitzgerald,</u>,
    457 U.S. 800 (1982).................................................................................................26

<u>Herrera-Amador v. Lee</u>, 16 Civ. 5915 (NGG) (VMS),
    2021 U.S. Dist. LEXIS 34312 ........................................................................ passim

<u>Herrera-Amador v. New York City Police Dep't</u>, 16-CV-5915 (NGG) (VMS),
    2021 U.S. Dist. LEXIS 132981 ....................................................................... passim

<u>Hicks v. City of New York</u>,
    232 F. Supp. 3d 480 (S.D.N.Y. 2017)......................................................................18

<u>Kirsch v. Fleet St. Ltd.</u>,
    148 F.3d 149 (2d Cir. 1998)...............................................................................32,33

<u>Malley v. Briggs</u>,
    475 U.S. 335 (1986)............................................................................................26,27

<u>McKay v. City of New York</u>, 13 Civ. 2948 (JGK),
    2014 U.S. Dist. LEXIS 101898 (S.D.N.Y. July 24, 2014) ......................................27

<u>Munafo v. Metropolitan Transp. Auth.</u>,
    381 F.3d 99 (2d Cir. 2004).......................................................................................32

<u>Newton v. City of N.Y.</u>,
    171 F. Supp. 3d 156 (S.D.N.Y. 2016).................................................................. 33-34

<u>Nimely v. City of New York</u>,
    414 F.3d 381 (2d. Cir. 2005) ...................................................................................17

<u>Ortiz v. Jordan</u>,
    562 U.S. 180 (2011)..................................................................................................14

<u>Philip Morris USA v. Williams</u>,
    549 U.S. 346 ............................................................................................................37

<u>Raedle v. Credit Agricole Indosuez</u>,
    670 F.3d 411 (2d Cir. 2012) .....................................................................................17

**Cases**                                                                                          **Pages**

Santulli v. Moy, No. 18-CV-122 (NGG) (VMS),
    2019 U.S. Dist. LEXIS 126915 (E.D.N.Y. Jul. 29, 2019) ......................................................17

Saucier v. Katz,
    533 U.S. 194 (2001) ..........................................................................................................27

Shu-Tao Lin v. McDonnell Douglas Corp.,
    742 F.2d 45 (2d Cir. 1984) ...............................................................................................33

Simpson v. Town of Warwick Police Dep't,
    159 F. Supp. 3d 419 (S.D.N.Y. Feb. 16, 2016) .................................................................23

Smalls v. Collins,
    10 F.4th 117 ...........................................................................................................34,35,37

Smith v. Wade,
    461 U.S. 30 (1983) ............................................................................................................36

State Farm Mut. Auto. Ins. Co. v. Campbell,,
    538 U.S. 416 (2003) ..........................................................................................................37

Tesser v. Board of Educ.,
    190 F. Supp. 2d 430 (E.D.N.Y. 2002) ..........................................................................17,32

Tierney v. Davidson,
    133 F.3d 189 (2d Cir.1998) ...............................................................................................27

Townes v. City of New York,
    176 F.3d 138 (2d Cir. 1999) ..............................................................................................18

Ullah v. Office of Dist. Attorney, 07 Civ. 2687 (DAB) (GWG),,
    2009 U.S. Dist. LEXIS 61607 (S.D.N.Y. July 20, 2009) ..................................................27

## PRELIMINARY STATEMENT

Defendants respectfully submit that the extent of evidence presented at trial resolved several factual disputes in favor of defendants that had prevented the Court from resolving this matter during the summary judgment phase.  Additionally, the evidentiary record fails to support any finding of punitive damages against the defendants.  At a minimum, should the jury's liability verdict be upheld in some form, the damage award still remains excessive. Accordingly, defendants respectfully submit that: (1) the intervening actions by the assigned prosecutor severed any chain of causation between plaintiff's malicious prosecution claim and the actions of the defendants; (2) defendant Arias did not initiate plaintiff's prosecution; (3) there was probable cause for plaintiff's prosecution; (4) at a minimum, the defendants are entitled to qualified immunity; (5) no reasonable juror, absent an exercise in total speculation, could believe that plaintiff was not involved in the armed robbery based upon the evidentiary record adduced at trial; and (6) even if the jury's verdict were to be upheld in some fashion, the damage award was excessive and there was no legal basis to award punitive damages.

## RELEVANT PROCEDURAL HISTORY

On February 20, 2021, the Honorable Vera M. Scanlon issued a Report and Recommendation granting in part and denying in part defendants' motion for summary judgment.  Herrera-Amador v. Lee, 16 Civ. 5915 (NGG) (VMS), 2021 U.S. Dist. LEXIS 34312. By Memorandum and Order, dated July 15, 2021, this Court adopted that Report and Recommendation.  Herrera-Amador v. New York City Police Dep't, 16-CV-5915 (NGG) (VMS), 2021 U.S. Dist. LEXIS 132981.  At the conclusion of the summary judgment process, left for trial were only plaintiff's claims of malicious prosecution against defendants retired Police Officer Kevin Lee and retired Detective Kevin Arias.

The parties selected a jury on July 31, 2023, with trial beginning that same day. On August 3, 2023, the jury returned a verdict for plaintiff.  Specifically, the jury found for plaintiff on his claim of malicious prosecution against both defendants awarding plaintiff $300,000 in compensatory damages, $200,000 in punitive damages against defendant Lee and $500,000 in punitive damages against defendant Arias for a total of $1,000,000.  Judgment was formally entered against the defendants on September 1, 2023.

## EVIDENCE PRESENTED AT TRIAL

<u>The  Robbery and Police Response</u>:

On September 3, 2013, at approximately 2:00 a.m., three men committed an armed robbery of an illegal gambling establishment located at 47-22 Junction Boulevard in Queens, New York.  <u>See</u> Trial Transcript, annexed to the Declaration of Brian Francolla, dated September 29, 2023 ("Francolla's Decl."), as Ex. A, pp. 103: 5 – 106: 1.  Several of the patrons managed to exit the rear of the club at the onset of the robbery.  <u>Id.</u> at 369: 6 – 370: 22.  Someone called 911 and reported a robbery at gunpoint.  <u>Id.</u> at 52: 7 – 56: 12.  In response to that call, Central Dispatch relayed to police personnel in the area that there was a robbery in progress at a commercial establishment.  <u>Id.</u>  The address that was initially provided to police personnel was 42-77 Junction Boulevard which was a mistake.  <u>Id.</u>  Defendant Lee and non-party Sergeant Matthies responded to the call and initially headed towards the incorrect address.  <u>Id.</u>  In the process, they were informed by other responding police personnel of the correct address (47-22 Junction Boulevard) as well as the fact that the perpetrators of the armed robbery were reported to have fled through the rear of the location.  <u>Id.</u>  Knowing the area surrounding 47-22 Junction Boulevard, defendant Lee and Sergeant Matthies proceeded to Alstyne Avenue.   <u>Id.</u> at 57: 10 – 58: 8.  They proceeded to that specific block since, in their minds, if a perpetrator had fled out of

2

the rear of 47-22 Junction Boulevard then the only realistic exit point for escape would have been somewhere along Alstyne Avenue.  Id.  Alstyne Avenue is largely a residential area and by the time defendant Lee and Sergeant Matthies arrived there, it was quite dark and raining heavily.  Id. at 59: 12 – 60: 11.

The Apprehension of Plaintiff, Edgardo Rodriguez and Juan Alonzo:

While driving down Alstyne Avenue, the first person defendant Lee and Sergeant Matthies encountered was plaintiff.  Id. at 60: 12 – 70: 20.  He was observed in the vicinity of 9464 Alstyne Avenue.  Id.  Upon seeing plaintiff, Defendant Lee immediately exited the vehicle, drew his firearm and flashlight and ordered plaintiff to the ground.  Id. at 70: 21 – 75: 6.  The parties dispute what plaintiff was doing immediately prior to this interaction.  Plaintiff claims he was just standing on the street in an effort to hail a cab.  Id. at 434: 22 – 442: 17.  Defendant Lee testified that plaintiff was in the process of climbing over the fence of a residential property heading in the direction of Alstyne Avenue.  Id. at 60: 12 – 70: 20.  Both sides agree, however, that, when plaintiff was initially stopped, he was by himself on Alstyne Avenue near the intersection of Alstyne Avenue and Junction Boulevard.  Id. at 60: 12 – 70: 20; 434: 22 – 442: 17.  Plaintiff complied with defendant Lee's directions and was handcuffed and frisked for weapons.  Id. at 70: 21 – 75: 6.  Sergeant Matthies remained with plaintiff while defendant Lee continued his search for suspected perpetrators.  Id.

Within several minutes and in close proximity to where plaintiff was stopped (literally one house over at 9466 Alstyne Avenue), defendant Lee observed a second individual who was emerging towards Alstyne.  Id. at 75: 7 – 84: 2.  This individual, later identified as Edgardo Rodriguez, was specifically observed climbing the fence of a residential property heading in the direction of Alstyne Avenue while carrying a duffel bag.  Id.  The duffel bag was

discovered to contain approximately $9,000 in cash, assorted jewelry, multiple cell phones and a loaded gun.  See Criminal Court Complaint, Plaintiff's Ex. 13,[1] annexed to Francolla's Decl. as Ex. B, p. 3.  Mr. Rodriguez was handcuffed and both he and plaintiff were escorted to police vehicles parked in the vicinity of where both men were initially stopped near the corner of Alstyne and Junction Boulevard.  See Trial Transcript, Francolla's Decl., Ex. A, at pp. 75: 7 – 84: 2.

The third perpetrator, ultimately identified as Juan Alonzo, was found by non-party Police Officer Mosback hiding in the shed of a residential property also located on Alstyne Avenue.  Id. at 92: 2 – 94: 20.  The address of the residential property was 9466 Alstyne – the same address that Mr. Rodriguez was stopped in front of and the property next door to where plaintiff was stopped.  See Defendant Lee's Memobook, Defendants' Ex. J, annexed to Francolla's Decl. as Ex. C, p. 4.  Police Officer Mosback recovered a mask from Mr. Alonzo.  Id.
Identifications of Plaintiff, Mr. Rodriguez and Mr. Alonzo:

After police responded to the robbery, the patrons of the illegal gambling establishment who were robbed began to exit from the front of the location.  See Trial Transcript, Francolla's Decl., Ex. A, at pp. 84: 3 – 94: 20; 168: 15 – 175: 25.   Shortly thereafter, they were made aware of the fact that police had individuals in custody.  Id.  In response, the patrons, in mass, ran towards the area where the individuals were stopped, near the intersection of Alstyne Avenue and Junction Boulevard.  Id.  At this point, only plaintiff and Mr. Rodriguez were in custody as Mr. Alonzo had not yet been found.  Id.  Defendant Lee was in the vicinity of the intersection when the crowd arrived.  Id.  He immediately heard the crowd generally identify

---

[1] The first exhibit name for exhibits cited herein consists of how the exhibit was referred to at trial while the second simply refers to how it is annexed hereto.

plaintiff and Mr. Rodriguez as the perpetrators ("those are the guys").  Id.  He also spoke to two members of the crowd – Mauriano Paulino and another man identified simply as being heavy set – who identified both men as well.  Id.  The crowd was gone by the time Mr. Alonzo was taken into custody so he was not identified on scene.  Id.  Mr. Paulino subsequently identified him via a lineup procedure conducted at the 110th Precinct.  Id. at 143: 18 – 146: 14; 168: 15 – 175: 25.

Relevant timeline of the events described to date:

- The three perpetrators entered the illegal gambling establishment through the front door at 1:57:35 a.m. (Surveillance Video, Defendants' A5: 57:36);[2]

- Someone called 911 to report the robbery at 1:58:31 a.m. (NYPD Event Chronology, Defendants' G, annexed to Francolla's Decl. as Ex. D, p. 1);

- The three perpetrators exited the illegal gambling establishment through the back door at 2:06:37 a.m. (Surveillance Video, Defendants' A4: 6:37);

- Nobody entered or exited the front of the illegal gambling establishment from 2:00 a.m. until 2:06:27 a.m. which is when police personnel first arrived on scene (Surveillance Video, Defendants' A3: 6:26);

- Said police personnel entered the illegal gambling establishment at 2:06:44 a.m. (Surveillance Video, Defendants' A3: 6:44);

- The first patron exited the front of the illegal gambling establishment at 2:07:10 a.m. (Surveillance Video, Defendants' A3: 7:10);

---

[2] It is defendants' understanding that the Court has copies of the video footage in question, however, in an abundance of caution we will provide a copy of same along with a courtesy copy of defendants' moving papers.

- At 2:10 a.m. Defendant Lee first observed plaintiff and immediately detained him (Defendant Lee's Memobook, Defendants' Ex. J, Francolla's Decl., Ex. C, p. 4.);

- Surveillance video never depicts plaintiff leaving the front of the illegal gambling establishment with the patrons nor did he claim at trial that he exited through the rear (Surveillance Video, Defendants' A3 compared with Trial Transcript, Francolla's Decl., Ex. A, at pp. 434: 22 – 442: 17; 485: 1 – 489: 3);

- At 2:14:08 a.m., the patrons, in mass, started running towards the corner of Alstyne Avenue and Junction Boulevard (Surveillance Video, Defendants' A3: 14:08); (Trial Transcript, Francolla's Decl., Ex. A, at pp. 168: 15 – 175: 25);

- At 2:18 a.m. Defendant Lee first observed Mr. Rodriguez and immediately detained him (Id. at 168: 15 – 175: 25;

- At 2:20 a.m. Defendant Lee noted that plaintiff was identified as part of a show up identification (Id.);

- At 2:21 a.m. Defendant Lee noted that Mr. Rodriguez was identified as part of a show up identification (Id.);

- At 2:30 a.m. Police Officer Mosback found Mr. Alonzo in the shed at the rear of the residential property located at 9466 Alstyne Avenue (Defendant Lee's Memobook, Defendants' Ex. J, Francolla's Decl., Ex. C, p. 4);

- At 9:50 p.m. Mariano Paulino identified Mr. Alonzo via the lineup procedure (Lineup Report, Plaintiff's Ex. 14, annexed to Francolla's Decl. as Ex. E, p. 1).

<u>Communication between defendant Arias and defendant Lee regarding Plaintiff's arrest</u>:

Defendant Arias testified that he never asked defendant Lee if anyone arrested had been identified at the scene.  <u>See</u> Trial Transcript, Francolla's Decl., Ex. A, p. 281: 9-16.  He

further did not ask defendant Lee the basis for plaintiff's arrest.  Id.  While defendant Lee did not remember the specifics of their communication that day, his testimony certainly did not contradict defendant Arias nor did he testify that the two likely would have discussed the basis for plaintiff's arrest.  Id. at p. 124: 9-19.

Communication with Mariano Paulino:

As noted, supra, defendant Lee testified that Mr. Paulino and another unidentified man identified plaintiff and Mr. Rodriguez as two of the perpetrators of the armed robbery via show up identifications that occurred at 2:20 a.m. and 2:21 a.m. respectively.  Id. at pp. 84: 3 – 94: 20; 168: 15 – 175: 25.  Mr. Paulino testified as part of the instant lawsuit that he never made any such identifications.  Id. at pp. 378: 18 – 386: 6.  Mr. Paulino instead testified that he only identified Mr. Alonzo on scene.  Id.  Specifically, Mr. Paulino testified that he and a friend told defendant Lee only that Mr. Alonzo was one of the robbers  Id.

Defendant Arias briefly interviewed Mr. Paulino shortly after he was assigned to assist in the investigation on the morning of September 3, 2013.  Id. at pp. 258: 5 – 286: 16; 295: 5 – 297: 24.  Specifically, he began his tour that day at 8:27 a.m., and briefly interviewed Mr. Paulino at some point prior to 10:00 a.m.  Id.  Mr. Paulino told him that the three robbers were a chunky guy with bushy hair, a smaller guy and a tall guy.  Id.  Mr. Paulino further told him that he only got a good look at one guy.  Id.  Mr. Paulino testified that he did not remember having a conversation with defendant Arias about identifying anyone other than Mr. Alonzo.  Id. at p. 388: 18-20.

Assistant District Attorney ("ADA") Gregory Radwan was assigned to assist in the investigation as the "riding ADA."  Id. at pp. 496: 2 – 505: 22.  He responded to the 110th Precinct on September 3, 2013, where he interviewed both Mr. Paulino and defendant Lee.  Id.

Those interviews occurred prior to ADA Radwan drafting the criminal court complaint that was ultimately filed against plaintiff, Mr. Rodriguez and Mr. Alonzo.  Id.  The substance of the criminal court complaint was drafted based upon both of those interviews.  Id.  Defendant Lee signed the criminal court complaint.  See Criminal Court Complaint, Plaintiff's Ex. 13, annexed to Francolla's Decl. as Ex. B.  Defendant Lee, in relevant part, swore to the following facts that he learned from speaking with Mr. Paulino:

- 1) Three men entered the location together;[3]

- 2) The man he later learned to be Juan Alonzo was holding a black firearm, had a mask on the top of his head and told everyone to get down;

- 3) The man he later learned to be Juan Alonzo placed said firearm to the head of complainant Milaydi Ramirez, handed her a duffel bag and told her to gather everyone's valuables inside of said bag;

- 4) The man he later learned to be Juan Alonzo handed the firearm to one of the other robbers;

- 5) The man he later learned to be Juan Alonzo lowered his mask, displayed a knife and began approaching patrons on the floor and going through their pockets; and

- 6) Complainant Milaydi Ramirez approached Mr. Paulino and removed his phone and a sum of money from his pockets (id.).

---

[3] To the extent the criminal court complaint indicates that Mr. Paulino identified the robbers by name, the record is clear he did not know any of their names and that reflection is simply the ADA connecting the relevant dots.

Although Mr. Paulino denied telling defendant Lee any of the factual statements attributed to him in the charging document (see Trial Transcript, Francolla's Decl., Ex. A, p. 387: 1-16), he confirmed that each of these events did, in fact, occur.  Id. at pp. 400: 20 – 406: 19.  Defendant Lee was not present for the robbery and had no way of knowing how things transpired.  Nowhere in any of the paperwork generated by ADA Radwan did he note any inconsistencies between what Mr. Paulino said to him directly and what defendant Lee claimed Mr. Paulino had said to him on scene.  See Intake Bureau Crime Report, Plaintiff's Ex. 12, annexed to Francolla's Decl. as Ex. F.

After plaintiff, Mr. Rodriguez and Mr. Alonzo were arraigned on September 4, 2013, ADA Timothy Shortt spoke with Mr. Paulino approximately three to five times.  See Trial Transcript, Francolla's Decl., Ex. A, pp. 506: 4 – 509: 5.  ADA Shortt testified that Mr. Paulino told him that he observed the three robbers come in the door together.  Id.  During this conversation, ADA Shortt showed Mr. Paulino the surveillance video and asked him if it fairly and accurately depicted the three men he described to which Mr. Paulino said, "yes."  Id.  Mr. Paulino further admitted at trial that, when he viewed the same surveillance video during his deposition, he also identified the three men who walked down the stairs together as "the robbers" Id. at p. 407: 9-20.  According to ADA Shortt, Mr. Paulino further told him everything that occurred during and after the robbery including: that the three robbers ran out the back door; that police were called; that he went upstairs after police responded; that he and the other patrons ran around the corner from the entrance; that when he got around the corner he encountered defendant Lee and other police officers; and that during that encounter he said he recognized two of the men they had in custody at that point – plaintiff and Mr. Rodriguez – as having committed the robbery.  Id. at pp. 506: 4 – 509: 5.

Regarding Mr. Paulino's account of his meetings with ADA Shortt, he confirmed at trial that the two met approximately a month after the robbery.  Id. at pp. 391: 9 – 397: 12. Mr. Paulino testified that during that meeting they discussed the robbery and viewed the surveillance video together.  Id.  Mr. Paulino testified, however, that, when ADA Shortt asked him if he could identify anyone else in the video, he responded that he could not since he only saw one person.  Id.

In addition to describing the events in question, Mr. Paulino also explained to ADA Shortt that, during the prosecution, he felt that he was being intimidated by the defendants in the criminal case.  Id. at pp. 409: 1 – 416: 10; 509: 15 – 510: 22.  Specifically, he reported to ADA Shortt that people had been approaching him and telling him not to testify as a result of which he was concerned for his safety.  Id.  Mr. Paulino subsequently reached out to ADA Shortt a second time by text message in 2016 to tell him that a few friends had reached out to him warning that a guy that came out of jail was looking for him.  Id.  Mr. Paulino testified during his deposition – which was read into the record – that he felt threatened in 2014 as a result of having spoken with police about what happened.  Id.  He further confirmed that he reached out to ADA Shortt by text message in December of 2016 expressing concern that someone was looking for him in connection with what happened.  Id.  After expressing concern about being threatened at least twice for having cooperated with police, Mr. Paulino met with plaintiff's counsel at their office approximately one month after the most recent threat.  Id.  During that meeting, Mr. Paulino testified that he was told by plaintiff's counsel that he *had testified* against someone who was not involved in the robbery – alluding of course to plaintiff.  Id.  Mr. Paulino testified that this was the first time he heard anything along those lines and that hearing it made him feel guilty as a result.  Id.  These perceived threats, as well as the declaration from plaintiff's counsel

10

that Mr. Paulino had testified against an innocent man, all preceded the only testimony on record where Mr. Paulino denies having identified plaintiff to defendant Lee and ADA Shortt.

Recovery of the surveillance video:

      On September 3, 2013, at 10:15 a.m., Defendant Arias and his partner, Detective Atkinson, arrived at the incident location in order to canvass for video.  Id. at pp. 297: 25 – 311: 25; 348: 11 – 349: 21.  Earlier that morning, defendant Arias observed all three individuals who had been arrested in connection with robbery.  Id.  At the incident location, he and his partner viewed surveillance video that showed the three robbers canvasing the location before entering together while Mr. Alonzo put on a mask.  Id.  Having already viewed the three men in custody for the robbery, defendant Arias formed an opinion that they were the same three men who actually perpetrated it.  Id.  The same video defendant Arias viewed at the incident location was obtained by his partner, Detective Atkinson, and brought back to the 110th Precinct that same day.  Id.  A copy of the video was given to ADA Radwan prior to plaintiff's arraignment.  Id. at pp. 496: 2 – 505: 22.  ADA Radwan noted his receipt of the video in the Intake Crime Report he prepared and also included it in the folder associated with the prosecution.  Id. at pp. 496: 2 – 505: 22.  That folder was then provided to ADA Shortt who received it within a day or two.  Id.  When ADA Shortt received the file, the surveillance video was inside of it.  Id.

Comparison between Plaintiff and the man in the hat:

      Plaintiff denied that he was the man in the hat shown committing the robbery with Mr. Rodriguez and Mr. Alonzo.  Id. at pp. 471: 11 – 484: 25.  However, he did confirm the following similarities between himself and the perpetrator on the date of the robbery: 1) they had the same hairline; 2) they both, amazingly, had the same sort of mark on the back of their heads just below their hairlines; 3) plaintiff had an indentation in his hair in the same place the man in

the hat was wearing his hat; 4) they were wearing identical looking sneakers; 5) they both had a small tattoo on their inner left forearm in the exact same spot; 5) they both had facial hair; and 6) they were both very large men.  Id.  Additionally, while plaintiff refused to confirm same, a comparison of how he looked in the mugshot with the man in the hat depicted in the video showed that both were wearing the same length shorts and that both happened to stand with their feet pointing outward in exactly the same way.  Id.  To the extent plaintiff was wearing a different shirt in his mugshot compared to what the man in the hat was wearing in the video, plaintiff acknowledged that it looked like the man in the hat was wearing two shirts.  Id.

No evidence of Plaintiff leaving the club in the way that he claimed:

Plaintiff testified that he left with a female bartender after he heard her say, "run." Id. at 434: 22 – 442: 17; 485: 1 – 489: 3.  He claims they ran up stairs that lead out to the street through the front of the building.  Id.  Once outside on the street, in the front of the building, plaintiff claims he went left.  Id.  Surveillance video definitively contradicted plaintiff's testimony.  Id.  Specifically, surveillance video captured the front of the building from an hour or so before the robbery began until just short of an hour after the robbers fled out the back.  Id.  Despite plaintiff's testimony to the contrary, at no point during that two hour period is plaintiff seen exiting the front of the building.  Id.  If plaintiff had fled the building in the manner he claimed, the surveillance footage would have necessarily captured it.  Id.  Nobody, including plaintiff, could explain how he would have been able to exit the front of the location when he claims he did, but not be seen on the surveillance video.  Id., generally via the entire trial transcript.

To the contrary, Mr. Paulino testified that there were only two paths in or out – the front door and the back door.  <u>Id.</u> at pp. 360: 2 – 366: 1; 400: 4 – 401: 8.[4]  Of all the witnesses who testified, Mr. Paulino was by far the most familiar with the layout of the location and according to him, there was no third point of entry/exit.  <u>Id.</u>  In fact, none of the witnesses who entered the location were able to confirm the existence of some third point of entry/exit, including the plaintiff.  <u>Id.</u>, generally via the entire trial transcript.  This third point of entry/exit only came up at trial via the questions from plaintiff's counsel – to which no witness provided an affirmative response that it in fact exists – and his speculative arguments on summation.  Specifically, as to the latter point, plaintiff's counsel argued in summation that "[i]t is more than reasonable to assume that there's some kind of stairway inside that building that takes you from that basement upstairs."  <u>Id.</u> at p: 586: 12-15.  He continued his speculation on this point by telling the jury "it is logical to believe that you can get from the basement to the upstairs without having to go outside the building."  <u>Id.</u> at p: 586: 22-24.  There is absolutely zero evidence in the trial record, or any record associated with this case, that this mysterious point of entry/exit actually exists let alone that plaintiff used it on the night in question.  Moreover, there was also no evidence adduced at trial to even suggest, let alone establish, that if someone used this third point of entry/exit – assuming it existed – then they would not have been captured by the surveillance footage.  Last, whether this mysterious third point of entry/exit actually existed would not be a difficult question to answer yet, in the ten years since this incident occurred, nobody has been able to do so in the affirmative or apparently even tried.

---

[4] Contrary to plaintiff's claims, Mr. Paulino also testified that there was only one bartender working that night who remained inside the location for the duration of the robbery until police personnel arrived on scene.  <u>Id.</u> at pp. 404: 5 – 405: 21.  This female bartender was named Miladyi Ramirez.  <u>Id.</u>

## COMPARISON OF THE EVIDENTIARY RECORD BETWEEN SUMMARY JUDGMENT AND TRIAL

In <u>Dupree v. Younger</u>, the Court held "[f]actual challenges depend on, well, the facts, which the parties develop and clarify as the case progresses from summary judgment to a jury verdict." <u>Dupree v. Younger</u>, 143 S. Ct. 1382, 1388 (2023). The Court further held, "once the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary-judgment motion." <u>Id.</u> (quoting <u>Ortiz v. Jordan</u>, 562 U.S. 180, 184 (2011).

Here, Magistrate Judge Scanlon, in her Report and Recommendation granting in part and denying in part defendants' motion for summary judgment, highlighted several disputed issues of fact that prevented her from recommending that summary judgment be granted in full. First, there was an issue of fact regarding why plaintiff was stopped. <u>Herrera-Amador</u>, 2021 U.S. Dist. LEXIS 34312, *6-7. Specifically, the Court cited to Sergeant Matthies' deposition testimony wherein he testified that he did not recall what specific information made him think that plaintiff was involved in a robbery at the time he was initially detained. <u>Id.</u> This testimony is no longer part of the operative record since Sergeant Matthies did not testify at trial.

Second, Magistrate Judge Scanlon noted that there were issues of fact relating to plaintiff's arraignment which focused on distinctions between what defendant Lee reported in the criminal court complaint having learned from Mr. Paulino and what Mr. Paulino claims he told defendant Lee. <u>Id.</u> at *15-18. As noted <u>supra</u>, there is no longer any dispute that the events listed in the criminal court complaint all, in fact, occurred. Putting aside the names – which Mr. Paulino did not know – there is no dispute that the three robbers entered the front of the location together, exited the rear of it together and while inside one of the three handed a gun he was holding to another.

The third issue of fact that the Court noted at the summary judgment stage was whether any video had been collected or considered prior to plaintiff's arraignment. The record before the Court at the summary judgment stage did not include any testimony or declaration from ADA Shortt or any consideration of the Intake Crime Report prepared by ADA Radwan. All that was before the Court on this issue at the summary judgment stage was the testimony of defendant Arias who did not contemporaneously document the recovery of the video which ultimately rendered his testimony that it was recovered on September 3, 2013 insufficient to resolve the issue of fact. Id. at *18-21. In light of the testimony from ADA Shortt and the consideration of the Intake Crime Report prepared by ADA Radwan, plaintiff can no longer dispute whether the surveillance video was recovered prior to his arraignment.

The fourth issue of fact is what the surveillance video actually showed vis a vis plaintiff. Id. at *21-23. At the summary judgment stage, the Court relied on plaintiff's blanket denial that he was the man in the hat as well as the opinion testimony from defendant Lee and Sergeant Matthies as to what could be seen in the surveillance video. Id. Regarding the former point, plaintiff confirmed during trial the numerous similarities between himself and the man in the hat – confirmation that was not obtained during his deposition where he simply denied that it was him. Id. Regarding Sergeant Matthies' opinion testimony, he did not testify at trial so his prior statements that the video was "not very clear" and that it was difficult to "make out much" with regard to the facial features or heigh of the hat wearing man are no longer part of the operative record. Id. Regarding defendant Lee's testimony, it was simply that plaintiff was wearing a different shirt in his mugshot than the man in the hat is shown wearing in the surveillance video. Id.

The Court further relied on testimony from defendant Arias that, in his opinion, the security video did not establish that the hat-wearing man was involved in the robbery inside the club. Id. at *23. At trial, defendant Arias' testimony as to this issue was simply that he could not say at the time of his deposition that "plaintiff was part and parcel of the robbery that occurred on September 3, 2013," which is both markedly different and also understandable considering he was not present for it. See Trial Transcript, Francolla's Decl., Ex. A, pp. 341: 23 – 346: 5. Defendant Arias did not, however, testify that the video did not establish that the three men shown entering together were the three men who robbed the illegal gambling establishment.

## STANDARDS OF REVIEW

When a plaintiff is "fully heard on an issue during a jury trial" and fails to present a "legally sufficient evidentiary basis to find for the [plaintiff] on that issue," a court is empowered to grant defendant judgment as a matter of law. Fed. R. Civ. P. 50; Cash v. County of Erie, 654 F.3d 324, 333 (2d Cir. 2011). When a jury's finding of liability is not supported by evidence at trial, a court should not hesitate to grant defendant judgment as a matter of law. See, e.g., Cronin v. St. Lawrence, 08 CV 6346 (VB), 2012 U.S. Dist. LEXIS 15743 (S.D.N.Y. Jan. 13, 2012).

While the court must "give deference to all credibility determinations and reasonable inferences of the jury" the Court may set aside a verdict when there is "such a complete absence of evidence supporting it that the jury's finding could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it]." Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 133 (2d Cir. 2008) (internal quotation marks and citation omitted). The court may also enter judgment under Rule 50 if a controlling rule of law entitles a defendant to such relief. See Alfaro v. Wal-Mart Stores, Inc., 210 F.3d 111, 115-16 (2d. Cir. 2000).

"A motion for a new trial, pursuant to Rule 59, may be granted when the district court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." Tesser v. Board of Educ., 190 F. Supp. 2d 430, 440 (E.D.N.Y. 2002) (citation omitted). In making this determination, the Court may weigh the evidence itself and "need not view the evidence in the light most favorable to the verdict winner." Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 418 (2d Cir. 2012). Indeed, the Court may grant a new trial even where the evidence adduced at trial was sufficient to support the jury's verdict. See Nimely v. City of New York, 414 F.3d 381, 392 (2d. Cir. 2005).

## ARGUMENT

### POINT I

### THE INTERVENING EXERCISE OF INDEPENDENT JUDGMENT BY ADA SHORTT TO PURSUE THE PROSECUTION OF PLAINTIFF BROKE THE CHAIN OF CAUSATION BETWEEN DEFENDANTS' CONDUCT AND PLAINTIFF'S CLAIM OF MALICIOUS PROSECUTION

"As a general rule, once a criminal Defendant has been formally charged, the chain of causation between the officer's conduct and the claim of malicious prosecution is broken by the intervening actions of the prosecutor, thereby abolishing the Officer's responsibility for the prosecution." Santulli v. Moy, No. 18-CV-122 (NGG) (VMS), 2019 U.S. Dist. LEXIS 126915, *10-11 (E.D.N.Y. Jul. 29, 2019). "[W]hen a plaintiff pursues a claim of malicious prosecution against police officers based on an unlawful arrest, the intervening exercise of independent judgment by a prosecutor to pursue the case usually breaks the chain of causation unless the plaintiff can produce evidence that the prosecutor was misled or pressured

17

by the police." Dufort v. City of New York, 874 F.3d 338, 352 (2d Cir. 2017) (citing Townes v. City of New York, 176 F.3d 138, 147 (2d Cir. 1999)).

In Dufort, the Second Circuit rejected the instant argument because there was a question of fact as to whether the District Attorney's office was aware of the limited nature of the identification testimony that formed the basis for probable cause. Id. at 352. Additionally, in Hicks v. City of New York, 232 F. Supp. 3d 480 (S.D.N.Y. 2017), the court held that the chain of causation was broken when a prosecutor examined a victim that was subjected to suggestive identification procedures at a *pre-trial hearing* and decided to continue prosecution. Hicks v. City of New York, 232 F. Supp. 3d 480, 491 (S.D.N.Y. 2017); See also, Ferebee v. City of New York, No. 15-CV-1868 (PAC), 2017 U.S. Dist. LEXIS 104783, at *19 (S.D.N.Y. Jul. 6, 2017) (holding that an officer that failed to disclose a plaintiff's prescription to an ADA was not "likely to influence a jury's decision" because Plaintiff would have produced that evidence at trial."); Gonzalez v. City of New York, No. 02 Civ. 4055 (BSJ) (KNF), 2005 U.S. Dist. LEXIS 20645, at *23 (S.D.N.Y. Sept. 16, 2005) (holding that a plaintiff's malicious prosecution claim failed because plaintiff did not present any evidence that the ADA would have chosen not to prosecute plaintiff if the ADA saw the withheld video evidence) .

Here, Magistrate Judge Scanlon, in her Report and Recommendation, rejected this argument based upon the evidentiary record before her which, construed in the light most favorable to plaintiff, established that defendants omitted information about the limitations and/or fabrication of Mr. Paulino's identification of plaintiff from the prosecution. Herrera-Amador, 2021 U.S. Dist. LEXIS 34312, at *43 ("This Court disagrees because Defendants provided to prosecutors the evidence allegedly provided by Mr. Paulino and omitted information about its limitations, and even possibly, its fabrication.").

Absent from the evidentiary record at the summary judgment stage, however, was any admissible evidence from ADA Shortt relevant to this issue. At trial, ADA Shortt testified that he did not speak with defendant Arias prior to plaintiff's arraignment nor was it conveyed to him that Mr. Paulino told defendant Arias that he could only identify one person. See Trial Transcript, Francolla's Decl., Ex. A, pp. 514: 18 – 515: 7. When asked whether his decision to prosecute plaintiff would have been impacted had that information been conveyed, he answered, "[n]o, because I would have wanted to interview Mr. Paulino, speak with other witnesses and view the video and make my own determination if there was evidence to let me proceed." Id. There is no dispute that within a month of the incident ADA Shortt independently interviewed Mr. Paulino along with other witnesses and also viewed the surveillance video. Further, there is no dispute that after doing so, ADA Shortt proceeded with the prosecution for ten additional months until the charges were ultimately dismissed for reasons he explained at trial. Mr. Paulino testified at trial that when he spoke to ADA Short within a month of the robbery, he told him the same thing he told defendant Arias – he could only identify one person, Juan Alonzo.

Accordingly, there are only two versions of events that the jury could have credited. First, the jury could have credited ADA Shortt's recitation of his communication with Mr. Paulino. Under that scenario, there is no longer a question as to whether the information omitted by defendant Arias was something that, had it been conveyed to ADA Shortt, would have influenced his decision to prosecute plaintiff. ADA Shortt testified, in no uncertain terms, that knowing the omitted information from defendant Arias would not have impacted his decision to proceed with the prosecution of plaintiff in light of his own interviews of Mr. Paulino and other witnesses as well as his own review of the surveillance video. The second version of events the jury could have credited is Mr. Paulino's recitation of his communication with ADA

19

Shortt.  Under that scenario, Mr. Paulino told ADA Shortt the same thing he told defendant Arias.  Thus, even under this version of events – as implausible as it may be considering the totality of the evidentiary record – defendant Arias' omission of information had no impact on the decision of whether to proceed with the prosecution since ADA Shortt was independently aware of the limited nature of Paulino's identification testimony which formed the basis of probable cause. Even knowing Paulino's supposedly limited identification testimony, ADA Shortt still met with Paulino at least three times.

Under either scenario, ADA Shortt's intervening actions severed the chain of causation between defendants' alleged conduct and plaintiff's claim of malicious prosecution. For that reason, plaintiff's malicious prosecution claim fails as a matter of law.

## POINT II

### AT A MINIMUM, DEFENDANT ARIAS DID NOT INITIATE PLAINTIFF'S PROSECUTION AS A MATTER OF LAW

Defendants submit that plaintiff's malicious prosecution claim against defendant Arias fails for the same reasons as his malicious prosecution claim generally.  Regarding plaintiff's malicious prosecution claim, this Court appropriately instructed the jury in relevant part as follows:

> "The first point is that the defendant initiated or continued criminal proceedings against Mr. Herrera Amador. A defendant is responsible for initiating or continuing criminal proceedings if they required a prosecutor to prosecute; gave the prosecutor, directly or indirectly, information which the defendant knew to be false, including through filing a felony or misdemeanor complaint with such false information, or withheld information that a reasonable person would realize might affect the prosecutor's determination of whether to prosecute. A defendant cannot be said to have commenced a criminal proceeding simply because he fairly and truthfully disclosed to the prosecutor all matters within his knowledge that a reasonable person would believe would be important to the question of plaintiff's guilt or innocence. If,

> however, you find that the defendants gave the prosecutor information that the defendant knew to be false or distorted the process by which the plaintiff's prosecution was pursued, the defendant is responsible for initiating the prosecution."

(Docket Entry #123, p. 7).

At the outset, at no point has plaintiff alleged, in a pleading or otherwise, that defendant Arias initiated his prosecution by forwarding information he knew to be false to the prosecutor. In that regard, there is no dispute in the evidentiary record that defendant Arias did not forward any information to the prosecutor let alone information he knew to be false. Instead, he has remained a defendant in this matter due to plaintiff's sole allegation that he "withheld information that a reasonable person would realize might affect the prosecutor's determination of whether to prosecute." The information in question was the statement from Mr. Paulino that he could only identify one of the perpetrators of the robbery.

As an initial matter, there is nothing in the evidentiary record at trial to establish that defendant Arias would have known that the information he received from Mr. Paulino in any way undermined the basis for probable cause to arrest and prosecute plaintiff. Specifically, defendant Arias testified at trial that he did not ask defendant Lee the basis for plaintiff's arrest or whether plaintiff had been identified by anyone on scene. He further testified that he was not made aware of the basis for plaintiff's arrest, including whether and to what extent he had been identified on scene. Defendant Lee testified that he did not recall the substance of his conversations with defendant Arias on September 3, 2013, and, at a minimum, did not state affirmatively that he conveyed the basis for plaintiff's arrest to defendant Arias or that, generally, the two would have discussed the issue that day. Mr. Paulino's testimony at trial further supports the absence of any such conversation between defendants Arias and Lee. Mr. Paulino was asked whether he had any conversation with defendant Arias about identifying anyone other than Juan

Alonzo and in response, stated "[n]ot that I remember."  See Trial Transcript, Francolla's Decl., Ex. A, at p. 388: 18-20.  The only argument to the contrary came from plaintiff's counsel during his summation.  Despite no evidence to support the assertion, he argued to the jury that the conversation between defendants Lee and Arias about why plaintiff was arrested definitely happened.  Id. at 592.  He further argued that there is no plausible explanation for why that discussion would not have occurred – an argument which ignores defendant Arias' limited role in the investigation as well as the fact that the defendants other than Alonzo had already been identified such that nothing further in that regard was needed from him in connection with their arrests.  Id.

Magistrate Judge Scanlon addressed this issue at the summary judgment stage based upon the evidentiary record before her and held that a factfinder could plausibly conclude that defendant Arias' failure to convey this information to the prosecutor "was an omission of fact which the DAO would have found material to the credibility and reliability of Defendant Officer's Lee's allegation that Mr. Paulino's positive identification of Plaintiff supported probable cause to charge Plaintiff."  Herrera-Amador, 2021 U.S. Dist. LEXIS 34312, at *41-42. In adopting Magistrate Judge Scanlon's Report and Recommendation, Your Honor held that "[a] reasonable jury could find that Detective Arias conducted a selective and targeted investigation by only interviewing one witness and failing to record that witness's professed inability to reliably identify any suspects other than Alanzo, and that his view of the scene was obstructed in significant respects."  Herrera-Amador, 2021 U.S. Dist. LEXIS 132981, *15 (citing Dufort, 874 F.3d at 353 ("The 'initiation' requirement is met when the plaintiff can establish that police officers forwarded statements to a prosecutor without sharing that the statements were suspect")).

As noted in more detail, <u>supra</u>, the analysis at the summary judgment stage was devoid of any admissible evidence regarding what ADA Shortt knew and whether the omitted information in question would have been deemed material to the credibility and reliability of the identification evidence such that it would have influenced the prosecution.  <u>See</u> <u>Simpson v. Town of Warwick Police Dep't</u>, 159 F. Supp. 3d 419, 426 n.2 (S.D.N.Y. Feb. 16, 2016) (holding that an omission stating that a victim did not mention details about the perpetrator's height and hairstyle is "not material" because the victim later identified them in a lineup).  If Mr. Paulino is credited by the jury, ADA Shortt independently knew about the omitted information and chose to proceed with the prosecution notwithstanding.  If ADA Shortt is credited by the jury, nothing would have changed had he known about what Mr. Paulino said to defendant Arias.  Under either scenario, however, there is no longer any basis to conclude that defendant Arias can be said to have initiated the prosecution of plaintiff by failing to forward to the prosecution the specifics of his conversation with Mr. Paulino.

### POINT III

### THERE WAS PROBABLE CAUSE FOR PLAINTIFF'S PROSECUTION AS A MATTER OF LAW

Regarding probable cause to prosecute, this Court appropriately charged the jury as follows:

> Probable cause to prosecute exists when, at the time the proceeding was initiated, the officer has knowledge of facts or circumstances which are collectively of such weight and persuasiveness as to convince an officer of ordinary intelligence, judgment, and experience, that it is reasonably likely that the person charged could be successfully prosecuted. In other words, probable cause exists when a prudent officer would believe that the person charged could be successfully prosecuted. Because the existence of probable cause is analyzed from the perspective of a reasonable officer, the actual subjective beliefs of the officer are irrelevant to the determination of probable cause. Once the officer's knowledge

is sufficient that a reasonable officer would conclude the person can be successfully prosecuted, the officer is not required to explore or eliminate every theoretically plausible claim of innocence. Further, an officer may have probable cause even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information.

(Docket Entry #123, p. 7).

Plaintiff's counsel conceded on summation that defendant Lee had a basis to stop and detain plaintiff. See Trial Transcript, Francolla's Decl., Ex. A, at p. 589. He further conceded – specific citations to the record regarding these concessions are set forth in **POINT IV**, infra – that defendant Lee very well may have believed that plaintiff was identified at the scene as a perpetrator of the armed robbery (even if he actually was not) due to the chaotic and hectic circumstances he was faced with in the immediate aftermath of the crime. He argued, however, that defendant Lee's belief was based upon a misunderstanding that he either later knew was wrong or that he would have known was wrong had he investigated further. In that regard, defendants note that plaintiff's counsel did not argue that defendant Lee's belief, even if mistaken, was unreasonable. Specifically, in describing the interaction between Mr. Paulino and defendant Lee on the street, plaintiff's counsel conceded that "it is entirely possible that the little episode could have been misunderstood or misinterpreted at the point and given an idea of two people." Id. at p. 631. He further argued that "even if Lee had genuinely and honestly thought he had gotten an ID at the scene, he knows at the precinct later that morning there's a problem, that Paulino said I can only identify one guy, the chunky guy, which the officers realize is likely to be Alanzo." Id. In sum, plaintiff's argument to the jury was that there was a valid stop and a valid arrest, but that the basis for the arrest was undermined later that morning at the precinct when Mr. Paulino said to defendant Arias I can only identify one guy. At a minimum, plaintiff

argued that Mr. Paulino's statement should have prompted further investigation prior to arraignment the following day.

Defendants agree with plaintiff that his stop, detention and an arrest are all valid and lawful. Defendants submit, however, that there is nothing in the evidentiary record to support the argument that defendant Lee later received some indication that his initial belief was mistaken. Moreover, there was no legal basis that required him to conduct any further investigation on the date in question assuming doing so was even possible. As noted, supra, other than speculation from plaintiff's counsel, there is no basis in the trial record to conclude that defendant Lee was ever made aware of the conversations between defendant Arias and Mr. Paulino. To the extent defendant Lee was present for the lineup procedure during which Mr. Paulino identified Juan Alonzo, it was his understanding that that procedure was necessary only because Mr. Alonzo, unlike plaintiff and Mr. Rodriguez, had not yet been identified as a perpetrator – not because he was the only person who Mr. Paulino claimed he could identify. Mr. Paulino's testimony at trial supports this conclusion since, according to him, their communications at the 110th Precinct were solely limited to the lineup procedure.

For defendant Arias, he did not know the specifics of why plaintiff was arrested – such that whatever Mr. Paulino told him could not have undermined it. After arriving at the 110th Precinct, he saw plaintiff in the holding cells. Shortly thereafter, he located, observed and obtained surveillance video that showed someone who appeared virtually identical to plaintiff perpetrating an armed robbery. Putting together his observation of plaintiff in the holding cell with what he saw on the surveillance video, he formed the belief that plaintiff was one of the perpetrators.

Last, ADA Shortt, who had access to the same information that defendants Lee and Arias collectively had access to, also believed there was probable cause to proceed with the prosecution. Specifically, he interviewed Mr. Paulino, along with other witnesses, and further viewed the surveillance video that had been recovered prior to plaintiff's arraignment (as well as some that he recovered after). Even if Mr. Paulino's testimony is credited in full, whatever he told defendants he told ADA Shortt. Knowing all of that, ADA Shortt felt there was probable cause to proceed with the prosecution.

In sum, considering the theory plaintiff presented on summation, along with the evidentiary record at trial, there was probable cause to prosecute plaintiff. To the extent the jury found otherwise, the only way they could have done so under the circumstances presented at trial were to credit the arguments from plaintiff's counsel, unsupported by evidence, that defendants Lee and Arias fully communicated with each other prior to arraignment about the basis for plaintiff's arrest and all communications had with Mr. Paulino. Removing that speculative argument from the equation, no reasonable jury could find that plaintiff proved his claim that he was maliciously prosecuted. As such, judgment as a matter of law should be entered in defendants' favor on plaintiff's malicious prosecution claim.

## POINT IV

## DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

Qualified immunity shields government officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The scope of qualified immunity is broad, and it protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). A qualified immunity defense is established where

"(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Tierney v. Davidson, 133 F.3d 189, 196 (2d Cir.1998). The doctrine of qualified immunity recognizes that "reasonable mistakes can be made as to the legal constraints on particular . . . conduct." Saucier v. Katz, 533 U.S. 194, 205 (2001). Qualified immunity applies if the officer's mistake as to what the law requires is reasonable. Id. It does not apply if, on an objective basis, it is obvious that no reasonably competent officer would have taken the actions of the alleged violation. Malley, 475 U.S. at 341.

"In determining whether an officer is entitled to qualified immunity for a false arrest claim in the absence of probable cause, we examine whether there was 'arguable probable cause.'" Amore v. Novarro, 624 F.3d 522, 536 (2d Cir. 2010). A police officer has arguable probable cause if it was objectively reasonable to believe that probable cause existed. Figueroa v. Mazza, 825 F.3d 89, 100 (2d Cir. 2016). "The standard for qualified immunity from a malicious prosecution claim is the same as that for false arrest." Ullah v. Office of Dist. Attorney, 07 Civ. 2687 (DAB) (GWG), 2009 U.S. Dist. LEXIS 61607, at *4 (S.D.N.Y. July 20, 2009). In fact, if arguable probable cause exists for the arrest, then it also exists with respect to the initiation of the prosecution unless the arresting officer learned facts at some point after the arrest that would negate probable cause. See McKay v. City of New York, 13 Civ. 2948 (JGK), 2014 U.S. Dist. LEXIS 101898, at *29 (S.D.N.Y. July 24, 2014) (because defendant had arguable probable cause to arrest the plaintiff for trespass, he therefore had arguable probable cause to initiate a prosecution for trespass against the plaintiff unless he learned facts at some point after the arrest that would negate any objectively reasonable basis for probable cause).

As noted, in **POINT III**, <u>supra</u>, three different people viewed some portion of the evidence against plaintiff and independently determined there was probable cause to prosecute him.  For defendant Lee, he was aware of the circumstances surrounding the initial stop of plaintiff as well as the events that lead to his reasonable belief that plaintiff was identified on scene.  For defendant Arias, he knew plaintiff had been arrested in connection with the armed robbery for some reason, had a chance to see plaintiff before he found the surveillance video and then based upon the similarities between plaintiff and the man in the hat concluded that the correct person had been arrested.  For ADA Shortt, he independently interviewed defendant Lee, Mr. Paulino and several other witnesses to the crime.  He also had the benefit of viewing the surveillance video.  All three reached the same conclusion that in their belief, there was probable cause to prosecute plaintiff.  Thus, even if this Court were to determine that probable cause to prosecute was lacking, it cannot be said based upon the evidentiary record at trial that no reasonable officer would believe there was probable cause to prosecute.

Returning to the summation from plaintiff's counsel, his arguments about the conduct of the defendants fall directly within they type of behavior that warrants qualified immunity.  Specifically, plaintiff's counsel described defendants' conduct as follows:

- "There was a basis to stop Marcos Herrera because he was in the location that was consistent with fleeing a location that where a robbery had taken place.  That he was stopped is not the problem.

  The problem is that at some point a decision was made to arrest him because Mariano Paulino supposedly identified him.  Mariano Paulino told you he did not.  He understands the context, think of it this way:  It's 2 in the morning.  It's raining, it's dark.  Officer Lee tells you he needed his flashlight out to see.  There's just been a robbery.  You see the video.  People are fleeing out of the basement.  It's hectic.  It's crazy.  You can imagine.

  The officers, think of their state of mind for a minute; they've been told there's a gunpoint robbery by three men, no, no, no, no they

were told five men, maybe seven men, right?  They were told, and if you want to be clear about this, the exhibit is Exhibit G that is the event chronology.  You are free to look at it.  Five to seven males, no description given other than Hispanic males.  I don't know what that means, but that's the description they got.  So they're nervous.  That's why the guns are out.  People are running around.  You see the victims of the crime on the sidewalk running back and forth and they're upset.  So it's not a controlled, calm situation.

Mariano Paulino identified one person.  They got everybody back to the stationhouse.  Lee has it wrong.  He's got guys in custody.  He says Paulino identified all of them.  Maybe it was a miscommunication, maybe not, but it really doesn't matter.  They are under arrest and they go back to the stationhouse.

To give you an idea of how crazy it is, the police were under – were given information five to seven people, they had three and they just never looked for anybody else.  Why, I don't know, but they just committed to the three they arrested."  See Trial Transcript, Francolla's Decl., Ex. A, at pp. 590 – 591.

- "Ladies and gentlemen, what happened that night is clear: The officer screwed up.  Kevin Lee overreached for whatever reason and refused to back up off of that, refused to take accountability.  When he's talking with Kevin Arias, as you know they must have, he has to become aware that at a bare minimum this identification is shaky.  Maybe it wasn't Marcos Herrera.  They had every opportunity to do that and they didn't."  Id. at p. 597.

- On September 3, 2013, a crime was committed and in the chaotic aftermath of that crime, Marco Herrera was arrested and the craziness of the officers running around and back and forth to figure out who's who and what's what.  Mariano Paulino said, that's him, that's him, point at Juan Alonzo.  Were three others.  They were all at the same place, same general location and all three go to the stationhouse, a ton of witnesses go up to the stationhouse.  At some point that day Mariano Paulino is clear, I can identify one and the officers don't know.  They had every obligation to talk to other witnesses, to confirm, to go back and talk to Mariano Paulino some more.  Maybe have somebody else talk to him, to record the statement, maybe write out a statement so Mariano could sign it.  There are a number of things to rely on and they did none of it.  Id. at pp. 600 – 601.

29

- Ladies and gentlemen, Marcos Herrera lost 11 months of his life because of this.  It's not just shoddy police work or carelessness.  This is real life.  Police officers are given real power and real authority that comes with real consequences and when they don't remember that, when they don't do their job, when they cut corners, when they refuse to acknowledge, people suffer.  Id. at p. 602.

- I want to talk for a moment about this issue about Kevin Lee and the ID and the sort of rhetorical question Mr. Francolla threw out, why would Kevin lee make up the ID at the scene.  It's not really what we're saying.  What we're saying is, maybe he did think there was an ID.  It was hectic, it was crazy, people are all over the place.

    Mr. Paulino gave a description of what happened where he and Brian pointing, no, that guy, that's the guy.  And it's entirely possible that that little episode could have been misunderstood or misinterpreted at that point and given an idea of two people.  Who knows.  Id. at pp.  630 – 631.

- They had an obligation to sort out this problem at the stationhouse.  Whether they knew they had a problem at the scene, I don't know, it doesn't matter, they knew it at the stationhouse, and they did nothing.  They did knowing.  They just moved forward, buzzed it up and moved forward.  That's what we're saying.  Id. at p. 632.

These snippets are not even the entirety of plaintiff's arguments in this regard.  All of them, in conjunction with the evidentiary record, make it abundantly clear that, at a minimum, reasonable officers could disagree about whether there was probable cause to prosecute plaintiff.  It certainly cannot be said, nor was it said by plaintiff's counsel at trial, that no reasonable officer could believe there was probable cause under these circumstances.  For all these reasons, defendants are entitled to qualified immunity.

**POINT V**

**NO REASONABLE JUROR CAN BELIEVE THAT PLAINTIFF WAS NOT PART OF THE ARMED ROBBERY**

Central to plaintiff's claim is in this matter is his denial that he was involved in the armed robbery. Not only did plaintiff deny any involvement in the armed robbery, he provided the jury with an explanation for how he exited the illegal gambling club at the outset of the armed robbery – up the stairs and through the front door. As noted, supra, the surveillance video directly contradicted that assertion. Plaintiff is never seen exiting the front of the illegal gambling club in the approximate hour both before and after the armed robbery took place. Plaintiff further managed to exit the front of the gambling club without encountering the three robbers nor getting robbed. The only possible explanation for the jury concluding otherwise was that they accepted the invitation from plaintiff's counsel to speculate that there was a third point of entry/exit that no witness testimony, including that of the plaintiff, or other evidence, established existed. The absence of such evidence, in conjunction with the numerous similarities between plaintiff and the man in the hat shown perpetrating the robbery in the surveillance video, warrant only one conclusion – that plaintiff was in fact involved in the armed robbery.

While the court must "give deference to all credibility determinations and reasonable inferences of the jury" the Court may set aside a verdict when there is "such a complete absence of evidence supporting it that the jury's finding could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it]." Brady, 531 F.3d at 133 (internal quotation marks and citation omitted). Defendants submit that in light of the uncontroverted evidence established at trial, the only explanation for the jury's verdict is sheer surmise and

31

conjecture.  For that reason, the verdict should be directed in favor of defendants.    At a minimum, a new trial is warranted pursuant to Rule 59, since the jury has reached a seriously erroneous result by virtue of their verdict which was a miscarriage of justice.  Tesser, 190 F. Supp. 2d at 440 (citation omitted).

**POINT VI**

**THE JURY'S DAMAGE AWARDS MUST BE
SET ASIDE AS UNSUPPORTED BY THE
RECORD AND THE LAW, OR, REMITTED**

In this case the jury awarded damages totaling $1,000,000.  That award included total compensatory damages of $300,000 and $700,000 in punitive damages ($200,000 awarded against defendant Lee and $500,000 awarded against defendant Arias).  In substantial part, the damages awarded are not supported by the record and are not permissible under the law.   The damages awarded are intrinsically excessive, and should "shock the judicial conscience" of this Court.  As a matter of law, they are excessive.  Therefore, the amount of damages must be substantially reduced.

Pursuant to Rule 59(e) of the Federal Rules, a court can grant a motion to alter or amend a judgment "to correct a clear error of law or prevent manifest injustice."  Guzman v. Jay, 303 F.R.D. 186, 197 (S.D.N.Y. 2014) (quoting Munafo v. Metropolitan Transp. Auth., 381 F.3d 99, 105 (2d Cir. 2004)).  The Court has discretion to overturn a jury verdict "for excessiveness and order[] a new trial without qualification."  Kirsch v. Fleet St., Ltd., 148 F.3d 149, 165 (2d Cir. 1998) (citing Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 433(1996) (quoting Byrd v. Blue Ridge Rural Electric Cooperative, Inc., 356 U.S. 525, 540 (1958))).  The trial court is also empowered to "enter a conditional order of remittitur, compelling a plaintiff to choose between reduction of an excessive verdict and a new trial."  Kirsch, 148 F.3d at 165.  Remittitur "is the process by which a court compels a plaintiff to choose between reduction of an excessive

verdict and a new trial." Earl v. Bouchard Transp. Co., 917 F.2d 1320, 1328 (2d Cir. 1990)

quoting Shu-Tao Lin v. McDonnell Douglas Corp., 742 F.2d 45, 49 (2d Cir. 1984). In

calculating a remittitur of an excessive jury award, a district court should remit the jury's award

to the maximum amount that would be upheld by the district as not excessive. See Earl, 917

F.2d at 1330.

"While calculating damages is traditionally the province of the jury, the Second

Circuit has held that an award can be amended or set aside as 'excessive'" in three

circumstances:

> (1) where the court identifies an error that resulted in the improper
> inclusion of a quantifiable amount, (2) where, although a particular
> error cannot be identified, the award is intrinsically excessive, i.e.,
> in excess of the amount any reasonable jury could have awarded,
> and (3) where the courts finds the amount of award shock[s] the
> judicial conscience and constitute[s] a denial of justice.

Guzman, 303 F.R.D. at 196-97 (internal quotation marks omitted) (quoting Kirsch, 148 F. 3d at

165).

When the court can identify a specific error in the jury's calculation of damages,

"the court may set aside the resulting award even if its amount does not 'shock the conscience.'"

Kirsch, 148 F.3d, at 165.

> Where there is no particular discernable error, [the Second Circuit
> has] generally held that a jury's damage award may not be set
> aside as excessive unless the award is so high as to shock the
> judicial conscience and constitute a denial of justice. A verdict
> shocks the judicial conscience only if it surpasses an upper limit,
> and whether that has been surpassed is not a question of fact with
> respect to which reasonable persons may differ, but a question of
> law. In making this determination, courts canvass the amounts
> awarded in comparable cases and determine whether the award
> falls within the reasonable range. The key is comparability:
> whether the counterpart cases involve analogous facts, similar
> measures of damages, and are otherwise fairly congruent. Further,
> in making a determination as to excessiveness, the court is free to

weigh the evidence and need not view it in the light most favorable
to the verdict winner.

Newton v. City of N. Y., 171 F. Supp. 3d 156, 164-165 (S.D.N.Y. 2016) (internal quotations and

citations omitted).

**A.     The Jury's Award Of Compensatory Damages Must Be Remitted**

While defendants acknowledge that, in a vacuum, case law in this Circuit supports

an award of $300,000 in compensatory damages for a plaintiff who spent 11 months

incarcerated, the specific facts of this case, should any aspect of the liability verdict stand,

warrant far less.  Specifically, as noted in **POINT V**, supra, the uncontroverted evidence makes

clear that plaintiff was actually involved in the armed robbery.  Even if the jury had a basis to

find in his favor notwithstanding (as plaintiff's counsel explained to them in his summation they

could – "we do not need to prove that Marcos Herrera is innocent" (Trial Transcript, Francolla's

Decl., Ex. A, at p. 583), the fact of his involvement certainly warrants a reduction in the amount

awarded.

For comparison sake, defendants refer the Court to Smalls v. Collins, 14-CV-

02326 (CBA) (RML).  In Smalls, on May 20, 2019, a jury found the two individual defendants

liable for violating plaintiff's fair trial rights by fabricating evidence and as a result, awarded

plaintiff $60,000 in compensatory damages, with no award of punitive damages, for having spent

two years, one month, and fourteen days in jail.   Smalls v. Collins, 10 F.4th 117, 126-127.

Plaintiff was arrested after a similarly chaotic chain of events to those herein.  Those events

involved officers investigating someone who fired a gun inside of a housing development; a foot

chase of four individuals (three of whom were brothers) through said housing development into a

building; a chase up the stairs of said building to the roof during which two of the four

individuals were arrested en route to the top; a recovery of a gun on the roof; a discovery of the

other two individuals hiding in the vicinity who were both ultimately arrested; and an observation that plaintiff and his brother had passed the gun between each other. Id. at 126-7. The plaintiff in Smalls had been convicted of *inter alia*, weapons possession only for his conviction to get overturned on appeal after it was determined that police lacked reasonable suspicion to pursue him. Id. at 125-6.

While plaintiff claimed during his civil trial that he had absolutely no involvement in the events that lead to his arrest and prosecution, the jury clearly did not credit that testimony in light of the amount of compensatory damages they awarded including the absence of any award of punitive damages. Id. at 126-127. At best, plaintiff's counsel was able to establish that the officers may have confused the extent of plaintiff's involvement vis-à-vis his brothers and the clothes they were all ultimately found in. Id. Here, there is no credible evidence to support crediting plaintiff's denial. Thus, the Court should remit the award consistent with the amount awarded in Smalls.

**B.    The Jury's Award Of Punitive Damages Must Be Vacated**

Based on plaintiff's theory of liability presented on summation, defendants submit that no reasonable juror could find that he satisfied his burden of proving he was entitled to punitive damages – let alone proved he was entitled to the extensive amount awarded. In support of this contention, defendants refer the Court to Collado v. City of New York, 396 F. Supp. 3d 265, 269. In Collado, the jury found that the defendant committed deadly excessive force during a chain of events – like those herein – that could only be described as chaotic and hectic. Id. at 281-282. The jury awarded the Estate of the decedent a total of $14,325,000, $10,000,000 of which were awarded as punitive damages. After post-trial motions were filed, the Honorable Denny Chin, United States Circuit Judge sitting by designation, upheld the liability verdict and

the amount of compensatory damages awarded, but vacated the award of punitive damages in full.  In so doing, he reasoned as follows:

> "The jury awarded punitive damages of $10 million. This award is vacated, for I do not believe that punitive damages are warranted in the circumstances presented here.
>
> There is no clear, objective standard that exists to justify the award of one amount, as opposed to another, to punish a tortfeasor for misconduct. Payne v. Jones, 711 F.3d 85, 93 (2d Cir. 2013). 'A jury may 'assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it invokes reckless or callous indifference to the federally protected rights of others.'' DiSorbo v. Hoy, 343 F.3d 172, 186 (2d Cir. 2003) (quoting Smith v. Wade, 461 U.S. 30, 56, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983)); accord McFadden, 710 F.2d at 913 ('[P]unitive damages are available under section 1983 to advance the statute's purpose of securing the protection of constitutional rights. An award of punitive damages punishes a defendant who has acted intentionally or recklessly to deny a plaintiff his protected rights.').
>
> Even construing the evidence in the light most favorable to Mrs. Collado, I do not believe, nor could a reasonable jury find, that Connolly acted with evil motive or intent or with reckless or callous indifference to Collado's federally protected rights. After struggling with a drug dealer to exhaustion, to a point where apparently he was 'begging, 'Please, please, please'' (Second Trial Tr. at 101), Connolly suddenly found himself confronted by not just one but two individuals, both of whom were substantially bigger than him and both of whom were using force on him. Moreover, instead of pulling off Batista -- who was on top -- Collado started pulling Connolly, including, according to one witness, by the neck. (Id. at 331). Without knowing Collado's intentions, Connolly thus found himself in what objectively was a perilous situation.
>
> Mrs. Collado's counsel told the jury in summation, referring to Connolly, that 'we're not saying that he's a bad man, that he's an evil man, that he's this despicable person. That's not what we're saying. He panicked.' (Id. at 392). That may indeed be what happened. But while panicking may be a basis for the finding of excessive force, it is not a basis for the imposition of punitive damages. The jury's award of punitive damages is hereby vacated.

Id. at 281-282.

Although the allegations and claims are different in this matter than those present in Collado, the framing of the argument for finding liability by the respective plaintiff's counsels were quite similar. In Collado, plaintiff's counsel did not argue that the shooting of the decedent was in cold blood or absent any understandable explanation, rather, they argued that, while excessive, the act was carried out in a perilous environment where the officer in question panicked. Here, plaintiff's counsel specifically pushed back on what defense counsel had presumed their argument against defendants to be – that they framed plaintiff:

> I want to talk for a moment about this issue about Kevin Lee and the ID and the sort of rhetorical question Mr. Francolla threw out, why would Kevin lee make up the ID at the scene. It's not really what we're saying. What we're saying is, maybe he did think there was an ID. It was hectic, it was crazy, people are all over the place.
>
> Mr. Paulino gave a description of what happened where he and Brian pointing, no, that guy, that's the guy. And it's entirely possible that that little episode could have been misunderstood or misinterpreted at that point and given an idea of two people. Who knows.

Trial Transcript, Francolla's Decl., Ex. A, at pp. 630 – 631. That argument, evaluated under the different legal and factual contexts this case involved, sounds quite similar to the argument from plaintiff's counsel in Collado. Defendants submit that the same rationale that warranted vacatur in Collado warrants vacatur herein. The facts in Smalls, described in subpart A herein, where no punitive damages were warranted, further support this result.

It is well established that there are procedural and substantive constitutional limitations on punitive damage awards arising out of the Due Process Clause of the Fourteenth Amendment. See, e.g. State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. *416 (2003); Philip Morris USA v. Williams, 549 U.S. 346, 352 ("Unless a State insists upon proper standards that

will cabin the jury's discretionary authority, its punitive damages system may… threaten 'arbitrary punishments,' i.e., punishments that reflect not an 'application of law' but 'a decisionmaker's caprice.'").  Courts reviewing punitive damages awards must consider (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. Id. at * 418 (quoting BMW of N. Am. V. Gore, 517 U.S. 559, 575 (1996). "It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." Id. at *417.

Even accepting the jury's conclusion that defendants lacked probable cause to prosecute him, there is nothing in the record to suggest that they acted out of malice or with reckless disregard for plaintiff's rights.  Plaintiff argued that defendants should have done their respective jobs better in a chaotic environment, not that they intentionally did them worse out of malice towards plaintiff or with reckless disregard for his rights.  Considering the totality of the evidence introduced at trial, in conjunction with plaintiff's ultimate theory of liability on summation, the jury's punitive damage award here shocks the judicial conscience.  Defendants would therefore suffer a manifest injustice if the Court did not exercise its duty to ensure a "fair, reasonable, predictable and proportionate" award and vacate it entirely.  At a minimum, the award should be significantly remitted.

**<u>CONCLUSION</u>**

For the foregoing reasons, defendants respectfully request that the Court grant their motions in their entirety, together with such other and further relief as the Court deems just.

Dated:      New York, New York
            September 29, 2023

                              HON. SYLVIA O. HINDS-RADIX
                              Corporation Counsel of the City of New York
                              *Attorney for Defendants Lee and Arias*
                              New York, New York 10007
                              (212) 356-3527

                              By:    /S/
                                     _____
                                     Brian Francolla
                                     *Senior Counsel*
                                     Special Federal Litigation

TO:    <u>VIA E.C.F.</u>
       All counsel of record