UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MARCOS A. HERRERA-AMADOR,

                    Plaintiff,

        -against-

Police Officer KEVIN LEE, Shield No. 7655, and
Detective KEVIN ARIAS, Shield No. 152,

                    Defendants.

**MEMORANDUM & ORDER**
**16-CV-5915 (NGG) (VMS)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Marcos Herrera-Amador brought this action under 42 U.S.C. § 1983 against New York City Police Department ("NYPD") Police Officer Kevin Lee and Detective Kevin Arias (collectively, "Defendants"), alleging malicious prosecution in violation of his constitutional rights. At trial, the jury found that Defendants had caused Herrera-Amador to be maliciously prosecuted and found that Herrera-Amador was entitled to $1 million in damages—$300,000 in compensatory damages and $700,000 in punitive damages. (Final Jury Verdict Form (Dkt. 121).) Defendants now move this court pursuant to Federal Rule of Civil Procedure 50 to enter judgment as a matter of law in their favor, or in the alternative, for a new trial or remittitur under Rule 59. (Notice of Post-trial Motions (Dkt. 139).)

For the reasons discussed below, Defendants' Rule 50 Motion is GRANTED in part and DENIED in part, and their Rule 59 Motion is GRANTED in part and DENIED in part.

## I.   BACKGROUND

### A.   Overview and Pre-Trial Proceedings

The court assumes familiarity with the factual background and procedural history of this case and reviews it only as relevant to the present motion. (*See* Report and Recommendation ("R&R")

1

(Dkt. 61) at 3-18; Mem. & Order Adopting R&R (Dkt. 68) at 2-4.) Herrera-Amador's § 1983 arises from his arrest in the early morning of September 3, 2013, after three armed assailants robbed a social club. The essence of Herrera-Amador's claim is that Defendant Lee swore that a robbery victim, Mariano Paulino, identified Herrera-Amador as one of the robbers at the scene of his arrest when this identification did not in fact occur. Defendant Arias also interviewed Paulino but failed to disclose to the prosecution the fact that Paulino could not identify Herrera-Amador. The identification was essential to establish probable cause, so Defendants' misstatements and omissions caused Herrera-Amador to be prosecuted when probable cause did not exist, in violation of his Fourth Amendment rights.

In Magistrate Judge Vera M. Scanlon's R&R, which the court adopted in full, Magistrate Judge Scanlon identified two factual disputes that precluded summary judgment. First, the parties disputed that Paulino had identified Herrera-Amador at the scene of the arrest. (*See* R&R at 6-7.) This dispute was important because Paulino's testimony formed the basis for the criminal complaint that initiated Herrera-Amador's prosecution. (*See* Criminal Complaint (Dkt. 52-9); Trial Tr. 531:4-12 (describing how criminal complaint initiates prosecution).)[1] Second, there was a dispute about whether Defendant Arias had viewed and retrieved the surveillance video outside the social club before Herrera-Amador was arraigned. (*See* R&R at 13-14 ("[T]he parties very vigorously dispute whether any one or more of these security videos had been collected or considered prior to Plaintiff's arraignment.") The timing of the video was relevant because

---

[1] The trial transcripts are split between four docket entries. Transcript citations from page 1 to 27 are found in Docket Entry 128; page 28 to 244 in Docket Entry 129; page 245 to 464 in Docket Entry 142; and page 465 to 672 in Docket Entry 130.

it could demonstrate probable cause independent of any disputed identification.

## B. Facts Presented at Trial

At trial, Herrera-Amador and Paulino gave testimony that conflicted with Defendant Lee's account of Herrera-Amador's arrest. According to Herrera-Amador, he was at the social club at the bar when he heard a commotion and someone yelled to run. (*See* Trial Tr. at 434:22-435:1.) So he ran. (*Id.* at 435:2-3.) He followed people that were running up the stairs. (*Id.* at 435:4-14.) Once outside, it was raining heavily, so Herrera-Amador waited under an awning. (*Id.* at 436:2-3, 437:20-24.) He saw headlights of what he thought was a cab and he walked towards the street to try to flag it down. (*Id.* at 438:1-4.) It was not a cab, but an unmarked police car. (*Id.* at 438:6-8.) Defendant Lee exited the car and handcuffed Herrera-Amador to a fence. (*Id.* at 438:6-441:14.) Herrera-Amador had no recollection of anyone identifying him at the scene of his arrest. (*Id.* at 442:11-13.)

Defendant Lee recalled the night differently. After receiving a call that an armed robbery had occurred at 47-22 Junction Boulevard and that suspects had fled out the back, Defendant Lee and nonparty Sergeant Matthies went to the back of the building. (*Id.* at 56:16-57:12.) Reasoning that anyone exiting the backdoor would surface on Alstyne Avenue, Matthies and Defendant Lee drove on Alstyne Avenue, looking for anyone that appeared to be fleeing. (*Id.* at 58:1-8.) While driving, Defendant Lee saw Herrera-Amador jumping over a fence at 94-66 Alstyne Avenue. (*Id.* at 60:12-21, 69:17-70:17.) Matthies and Defendant Lee promptly exited the vehicle, frisked Herrera-Amador, and handcuffed him to the fence. (*Id.* at 70:21-74:7.) Shortly thereafter, at the house next door, Defendant Lee saw another person jumping a fence, this time with a duffel bag full of cash, jewelry, cellphones, and a firearm. (*Id.* at 75:8-78:11, 80:22-83:5.) By this time, a crowd of the social club robbery victims had gathered.

(*Id.* at 84:7-11.) As Defendant Lee brought Herrera-Amador to the police car, members of the crowd, including Mariano Paulino, shouted that Herrera-Amador and the other person found were the robbers. (*Id.* at 85:1-5, 86:22-87:7, 91:15-92:1.)

Paulino disputed Defendant Lee's account that he was the one to identify Herrera-Amador as one of the robbers. (*Id.* at 382:17-384:1.) According to Paulino, he was sitting in the back of the club when the robbery occurred and was only able to identify one of the robbers, later identified as nonparty Juan Alanzo. (*Id.* at 373:18-374:6, 401:12-14, 417:25-418:23.) By the time Paulino exited the club, other club members had already gathered. (*Id.* at 377:25-378:11.) Paulino testified that he saw police escorting Alanzo in handcuffs, at which point he identified Alanzo as one of the robbers. (*Id.* at 380:22-24.)

On the morning of September 3, 2013, Defendant Arias was assigned to "enhance" Defendant Lee's arrest and gather more information about the crime that had occurred. (*See id.* at 258:8-259:7.) As part of this effort, he interviewed Paulino, he set up a lineup to identify one of the other robbery suspects, and he sought out surveillance video from the location of the robbery. (*See id.* at 270:2-8, 288:2-3, 291:21-293:25, 295:7-296:24, 306:12-310:8.)

Defendant Arias testified that he independently interviewed Paulino and, among other questions, asked whether he could identify the perpetrators. (*See id.* at 279:15-280:4.) Defendant Arias stated that Paulino was only able to identify one of the perpetrators in a lineup, (*see id.* at 297:11-13 ("Q: . . . did [Paulino] tell you that he only got a good look at one guy? A: To the best of my recollection, yes, sir."), though he further testified that Paulino described the two other robbers in general terms. (*See id.* at 296:19-22 (describing the two other assailants as short and tall).)

### C.   Rule 50 Motion

After Herrera-Amador presented his case-in-chief, Defendants moved under Fed. R. Civ. P. 50(a) for judgment as a matter of law in their favor on the grounds that there was probable cause to believe that Herrera-Amador had committed robbery. (*See* Trial Tr. at 573:8-575:20.) The court denied the motion. (*See id.* at 578:11.) The jury subsequently found Defendants liable for causing Herrera-Amador to be maliciously prosecuted. (*See* Final Jury Verdict Form.) After the jury's verdict, Defendants timely renewed their Rule 50 motion and now seek judgment as a matter of law on the basis that there was probable cause. (*See* Post-Trial Mot. (Dkt. 139-1) at 17-26, 31-32.) They raise the additional defense that they are entitled to qualified immunity. (*See id.* at 26-30.)

## II.  DISCUSSION

### A.   Rule 50 Motion for Judgment as a Matter of Law

#### 1.   Legal Standard

When resolving a Rule 50 motion for judgment as a matter of law, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* "Incontrovertible evidence relied on by the moving party, such as a relevant videotape whose accuracy is unchallenged, should be credited by the court on such a motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party." *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007) (citing *Scott v. Harris*, 550 U.S. 372, 378-80 (2007)). On genuine factual disputes, however, the court cannot "substitute

its judgment for that of the jury." *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 367 (2d Cir. 1988).

### 2. Elements of Malicious Prosecution

A claim of malicious prosecution requires a plaintiff to show: "(1) that the defendant commenced or continued a criminal proceeding against him; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice." *Droz v. McCadden*, 580 F.3d 106, 109 (2d Cir. 2009). Defendants only dispute that Defendant Arias initiated the prosecution and that there was no probable cause, (*see* Post-Trial Mot. at 17-26), and so the court does not address the jury's factual findings that the proceeding terminated in Herrera-Amador's favor and that the proceeding was instituted with malice.

Because there is sufficient evidence on the record for each of the elements such that a reasonable jury could find that Herrera-Amador was maliciously prosecuted, Defendant Lee's renewed motion for judgment as a matter of law is denied. However, the record shows that no reasonable jury could find that Defendant Arias initiated the prosecution. Defendant Arias's Rule 50 motion is granted, and the claim is therefore dismissed as to Defendant Arias.

### a. Initiation of Criminal Proceedings

For a defendant to initiate a criminal proceeding for the purposes of a malicious prosecution claim, he or she must "play[] an active role in the prosecution." *Mitchell v. Victoria Home*, 434 F. Supp. 2d 219, 227 (S.D.N.Y. 2006). A police officer is deemed to have commenced a criminal proceeding when he or she "could reasonably foresee that [his or her] misconduct would contribute to an independent decision that results in a deprivation of liberty." *Higazy v. Templeton*, 505 F.3d 161, 177 (2d Cir. 2007). Active participation can include having the plaintiff arraigned, filling

out complaining and corroborating affidavits, signing felony complaints or "creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor." *Costello v. Milano*, 20 F. Supp. 3d 406, 415 (S.D.N.Y. 2014) (collecting cases); *see also Brome v. City of New York*, No. 02-CV-7184 (WHP), 2004 WL 502645, at *5 (S.D.N.Y. Mar. 15, 2004) ("[A]lthough there is a presumption that a prosecutor exercises independent judgment in deciding whether to initiate and continue a criminal proceeding, an arresting officer may be held liable for malicious prosecution when a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors.").

The conduct relevant for Defendant Arias's liability for initiating Herrera-Amador's malicious prosecution is the content of Defendant Arias's interview with Paulino and the extent to which his failure to disclose the contents of the interview tainted the Queens District Attorney's Office's subsequent decision to prosecute Herrera-Amador. Herrera-Amador's claim against Defendant Arias was premised upon the fact that Defendant Arias learned information during his interview with Paulino that negated probable cause prior to the initiation of Herrera-Amador's prosecution. (*See* R&R at 29.)

Defendant Arias argues that his omission was insufficient to initiate proceedings because "ADA Shortt's intervening actions severed the chain of causation between defendants' alleged conduct and plaintiff's claim of malicious prosecution." (Post-trial Mot. at 20.) This is incorrect—ADA Shortt's actions are irrelevant for Herrera-Amador's malicious prosecution claim because the question is whether probable cause existed at the initiation of criminal proceedings, and ADA Shortt was not assigned Herrera-Amador's case until after he was arraigned. (*See* Trial Tr. at 531:20-532:4.) Any action by ADA Shortt would therefore occur

after the constitutional violation occurred and is not relevant for determining liability.

Indeed, as a general matter, police officers cannot shield themselves from liability for misconduct when their initial actions taint the subsequent decisions made by other members of the criminal justice system. *See Zahrey v. Coffey*, 221 F.3d 342, 351-52 (2d Cir. 2000) ("[I]t is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an "independent" decision that results in a deprivation of liberty"). Prosecutorial decisions based on false or misleading information from police cannot truly be thought of as independent because they are not made with a complete and truthful view of the available information. *Id.* The focus is therefore not on whether a prosecutor made an independent decision after the police officer's misconduct; it is on whether the police officer's misconduct foreseeably tainted the subsequent decisions that initiated the prosecution.

At trial, Assistant District Attorney ("ADA") Timothy Shortt walked the jury through the Queens County District Attorney Intake Bureau Crime Report ("Crime Report") for the case, which, as relevant for this motion, provided a record of the materials that the assigned ADA considered when deciding whether to prosecute Herrera-Amador. (*See* Trial Tr. at 497:22-506:3; Posttrial Mot. Exh. F ("Crime Report") (Dkt. 139-8).)[2] The Crime Report is one of the documents created prior to arraignment, which is the point at which a suspect is converted into a criminal defendant. (*See* Trial Tr. at 501:24-502:2.) In this case, ADA Gregory Radwan was assigned to prepare the document. (*See* Trial Tr. at 499:10-500:3; Crime Report at 1.) The Crime Report

---

[2] ADA Shortt discussed the Crime Report which at trial was entered into evidence as Plaintiff's Trial Exhibit 12.

indicates that ADA Radwan independently interviewed Paulino. (*See* Trial Tr. at 504:20-24, 505:6-9; Crime Report at 15.)

Thus, while ADA Shortt's actions are not relevant as to Defendant Arias's role in initiating Herrera-Amador's prosecution, ADA Radwan's actions prior to Herrera-Amador's arraignment are. Viewing the facts in the light most favorable to Herrera-Amador, there is no genuine dispute that ADA Radwan independently interviewed Paulino prior to Herrera-Amador's arraignment. (*See* Crime Report at 15.) ADA Radwan had the same access to Paulino's exculpatory information as Defendant Arias did, so Defendant Arias's omission could not have tainted ADA Radwan's subsequent independent decision to initiate criminal proceedings against Herrera-Amador. A jury therefore could not reasonably find that Defendant Arias caused Herrera-Amador to be maliciously prosecuted.[3] Defendant Arias's motion for judgment as a matter of law is therefore GRANTED.

> ### b.   *Probable Cause*

"[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003). For probable cause to be a defense, it must exist at the time the prosecution was initiated. *See Nash v. Cnty. Of Nassau*, No. 16-CV- 2148 (JFB), 2019 WL 1367159, at *7 (E.D.N.Y. Mar. 26, 2019). Evaluating the facts in the light most favorable to the nonmoving party, the court cannot find as a matter of law that there was probable cause to prosecute Herrera-Amador at the time of his arraignment.

---

[3] The same logic does not apply to Defendant Lee, who was the deponent for the criminal complaint. (*See* Criminal Complaint.) *See also Costello*, 20 F. Supp. 3d at 415.

Defendants argue that the surveillance video at the front and back doors of the social club contradict Herrera-Amador's testimony that he was not one of the assailants and that he fled out the front door when the robbery occurred. (*See* Post-trial Mot. at 31.) While the jury can credit Herrera-Amador's account and discredit Defendant Lee's account, the court on this motion must credit video evidence if it "so utterly discredits [Herrera-Amador's] version that no reasonable juror could fail to believe the version advanced by [Defendant Lee]." *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007).

In evidence are three surveillance videos of the front door before the robbery, one facing to the left[4] and two facing to the right, one of which is in black and white, the other in color. (*See* Pre-Robbery Front Door Left Video, Defs. Exh. A-1; Pre-Robbery Front Door Right B&W Video, Defs. Exh. A-2; Pre-Robbery Front Door Right Color Video, Defs. Exh. A-5.) There is also footage of the front door—from the color camera facing to the right—and of the back door. (*See* Post-Robbery Front Door Video, Defs. Exh. A-3; Post-Robbery Back Door Video, Defs. Exh. A-4.) There is continuous footage of the front entrance between approximately 1:00 a.m. to 3:00 a.m. from the color surveillance footage. (*See* Pre-Robbery Front Door Right Color Video; Post-Robbery Front Door Video.) At 1:57:32 a.m.,[5] three men—the robbers—descend to the basement and enter the social club. (Pre-Robbery Front Door Right Color Video at 57:35.) No one exits from the front entrance until the police arrive at 2:06:27 a.m. (Post-Robbery Front Door Video at 6:28.) Yet when the police arrive, two

---

[4] From the perspective of someone standing in front of the store facing the street.

[5] The timestamps between the different cameras are not consistent. (*Compare* Pre-Robbery Front Door Right Color Video (three men descend staircase at 1:57:32 a.m.) *with* Pre-Robbery Front Door Left Video (three men descend staircase at 1:59:40 a.m.) *and* Pre-Robbery Front Door Right B&W Video (same).)

men are already outside, pointing out the entrance to police officers. (*Id.*) The club patrons start streaming out at 2:07:11 a.m., pointing to the back entrance where they believe the robbers fled towards. (*Id.* at 7:11.) As Defendants correctly note, Herrera-Amador does not appear to be part of the group that leaves from the front entrance. (*See* Post-trial Mot. at 31.)

Paulino testified that once the robbers arrived, a group of patrons fled. (*See* Trial Tr. 370:19-24.) He further testified that his friend Brian was already outside when Paulino arrived to where the crowd had congregated, and that Brian had stated that he came out of a different entrance. (*Id.* at 378:2-9, 379:1-8.) The surveillance footage of the back entrance shows no one exiting from the back door starting from 1:59:58 a.m. until the robbers flee at 2:06:38 a.m. (Post-Robbery Back Door Video at 6:39.) Viewing the surveillance footage and Paulino's testimony in the light most favorable to Herrera-Amador, a club patron could have fled through a third exit or through the back door prior to 1:59:58 a.m. when the back door surveillance video begins—a reasonable juror may view the footage and still credit Herrera-Amador's testimony. The court cannot rely on the video to come to a different outcome.

But Defendants' reliance on the video footage is misplaced for a more fundamental reason. For probable cause to be a defense to a malicious prosecution claim, Defendants must demonstrate that they had probable cause at the arraignment, the time the prosecution was initiated. *See Nash*, 2019 WL 1367159, at *7. Defendants did not have all five videos when Herrera-Amador was arraigned; they only had one.[6]

---

[6] Defendant Arias testified that he viewed surveillance video on September 3, 2013. (*See* Trial Tr. at 307:11-308:10.) At summary judgment, the court ruled that a factfinder was not required to credit his testimony because

The one video that Defendants had showed three men casing and then entering the basement social club. The men first arrive at 1:56:25 a.m. and stand around looking at the entrance before walking by. (Pre-Robbery Front Door Left Video at 55:56.) They walk past the club again at 1:57:40 a.m., (*id.* at 57:10), before finally returning to and entering the social club at 1:59:36 a.m. (*Id.* at 59:06.) They descend the stairs, one of the three men puts on a mask, and they then enter. (*Id.* at 59:17.) There is no genuine dispute that these three men are the robbers.

Defendants argue that this video establishes that they had probable cause because one of the three men has the same style of pants—with pant legs rolled up to below the knee—and shoes as Herrera-Amador does in his mugshot. (*See* Trial Tr. at 613:6-7 (discussing video footage generally); *compare* Defs. Tr. Exh. C (Herrera-Amador's mugshot) *with* Pre-Robbery Front Door Left Video at 59:06.) But the man in the video is wearing a different shirt and is wearing a baseball hat that blocks any view of his face. (*See* Pre-Robbery Front Door Left Video at 59:06.) And crucially, this video does not show Herrera-Amador's tattoo, a key identifier. (*See* Trial Tr. 205:7-8 (Defendant Lee testifying that "with the tattoo exposed in the same picture there, I could say

---

there were not contemporaneously created documents that showed the existence of a video. (*See* R&R at 10-11.) At trial, ADA Shortt discussed the Crime Report, which showed that a video was on file when Herrera-Amador was arraigned. (*See* Trial Tr. at 501:17-18; 532:16-19; Crime Report at 3.) ADA Shortt could not recall if there was more than one video on file when he received the case file, and believed it was the video in which the three men walk towards the camera and then go down the stairs walking away from the camera. (*See* Trial Tr. at 533:11-534:7.) This description matches the left-facing surveillance video of the front entrance. (*See generally* Pre-Robbery Front Door Left Video.) Viewing the evidence in the light most favorable to Herrera-Amador, the court credits defense witnesses only insofar as they had access to Pre-Robbery Front Door Left Video prior to Herrera-Amador's arraignment.

that's the same person.").) The video does not provide "incontro-
vertible evidence" that discredits Herrera-Amador's version.
*Zellner*, 494 F.3d at 371. The court cannot conclude as a matter
of law that the video identifies Herrera-Amador as one of the rob-
bers such that Defendants had probable cause to initiate his
prosecution, and therefore denies Defendant Lee's motion for
judgment as a matter of law.

### 3.   Qualified Immunity

Defendants next seek judgment as a matter of law on the grounds
that they were entitled to qualified immunity.

Police officers are entitled to qualified immunity for malicious
prosecution claims when they have "arguable" probable cause.
*Cerrone v. Brown*, 246 F.3d 194, 202-03 (2d Cir. 2001). Arguable
probable cause exists if "either (a) it was objectively reasonable
for the officer to believe that probable cause existed, or (b) offic-
ers of reasonable competence could disagree on whether the
probable cause test was met." *Simpson v. City of New York*, 793
F.3d 259, 268 (2d Cir. 2015). Even if probable cause was lacking,
Defendants argue, their belief that Herrera-Amador had been
identified as one of the robbers was reasonable based on the cha-
otic nature of the scene of arrest and the existence of surveillance
video showing similarities between the robber and the suspect.
(Post-trial Mot. at 26-30.)

This argument fails, however, because it was not properly raised
during trial. "The posttrial motion is limited to those grounds that
were specifically raised in the prior motion for [judgment as a
matter of law]; the movant is not permitted to add new grounds
after trial." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136
F.3d 276, 286 (2d Cir. 1998). The purpose of the procedure cre-
ated in Rule 50—where a motion made after trial pursuant to
Rule 50(b) is a renewal of motion made during trial pursuant to
Rule 50(a)—is to provide notice to the opposing party and allow

13

an opportunity to correct any defects in proof before submitting the case to the jury. *Id.*

Defendants moved for judgment as a matter of law in their favor pursuant to Rule 50(a) at the close of Herrera-Amador's case-in-chief. (*See* Trial Tr. at 573:8-575:20.) In their initial Rule 50 motion, Defendants did not specifically move for judgment as a matter of law on the grounds that they were entitled to qualified immunity. (*See id.*) After the unfavorable verdict, Defendants renewed their motion under Rule 50(b), this time including qualified immunity. Defendants have therefore waived their qualified immunity defense. *See Toliver v. New York City Dep't of Corr.*, 202 F. Supp. 3d 328, 336-37 (S.D.N.Y. 2016) ("[B]ecause Defendants did not specifically include a qualified immunity argument in their pre-verdict request for judgment as a matter of law, they are precluded from including such an argument in their post-verdict motion."); *Provost v. City of Newburgh*, 262 F.3d 146, 161 (2d Cir. 2001).

Some courts have excused failure to follow the proper procedure under Rule 50 when they submit special interrogatories on factual issues relevant to qualified immunity. *See Harewood v. Braithwaite*, 64 F. Supp. 3d 384, 395 n.11 (E.D.N.Y. 2014). In such circumstances, there may be no explicit Rule 50(a) motion raised, but the existence of the special interrogatories provides sufficient notice to plaintiffs that the defendants anticipate invoking a qualified immunity defense.

This exception does not help Defendant Lee. Prior to trial, the court *sua sponte* directed Defendants to submit a proposed special verdict form for questions of fact relevant to the issue of qualified immunity if they intended to submit such a form to the jury. (*See* July 28, 2023 Text Order.) Defendants did not do so. At trial the court again asked Defendants if they were planning on providing a special verdict form. (*See* Trial Tr. at 116:4-8.) Counsel for defendants responded that they "consciously did not

submit questions . . . It was not an oversight." (*Id.* at 116:25-117:3.) There is no indication from the colloquy between the court and defense counsel that Defendants intended to maintain their qualified immunity defense. Defendants' failure to move under Rule 50(a) for judgment as a matter of law based on qualified immunity is not excused, and Defendants have therefore waived the qualified immunity defense in their renewed motion under Rule 50(b).

### B.  Rule 59(a)(1)(A) Motion for a New Trial

Defendants move for a new trial pursuant to Rule 59(a)(1)(A) on the grounds that the record shows that Herrera-Amador was involved in the armed robbery that was the basis for his prosecution. (*See* Post-trial Mot. at 31-32.) "In contrast to a motion for judgment as a matter of law, a motion for a new trial pursuant to Fed. R. Civ. P. 59 may be granted by the district court, although there is evidence to support the jury's verdict, so long as the district court determines that, in its independent judgment, the jury has reached a seriously erroneous result or its verdict is a miscarriage of justice." *Nimely v. City of New York*, 414 F.3d 381, 392 (2d Cir. 2005). Defendants move for a new trial on the grounds that even if a directed verdict is not warranted, "[a]t a minimum . . . the jury has reached a seriously erroneous result by virtue of their verdict which was a miscarriage of justice." (Post-trial Mot. at 31-32.) Defendants contend that given the surveillance videos that provide overwhelming evidence that Herrera-Amador committed the robbery that he was later arrested for, "the only explanation for the jury's verdict" in favor of Herrera-Amador "is sheer surmise and conjecture," and this erroneous result requires a new trial. (*Id.*) Defendants do not argue that the "miscarriage of justice" was the result of any erroneous evidentiary rulings or serious errors during the trial, *cf. Graham v. City of New York*, 128 F. Supp. 3d 681, 704-05 (E.D.N.Y. 2015);

they argue only that the jury came to an erroneous result based on the properly admitted evidence that the jury examined.

A new trial is not warranted for three reasons. First, as discussed above, *see supra* II.A.2.b., the video evidence did not conclusively contradict Herrera-Amador's account of what happened. The fact that there were two men outside when the police arrive—and these two men were not seen on the surveillance video leaving the club—creates a question of fact about how many entrances there were, and it allowed the jury to discount the importance of later video evidence that does not show Herrera-Amador leaving. Second, the focus for the purposes of malicious prosecution is the existence of probable cause at the time the prosecution was initiated. The jury was not required to believe that Defendant Arias collected all five of the surveillance videos—the totality of which purportedly discredits Herrera-Amador's testimony—before Herrera-Amador's arraignment. This is especially so given ADA Shortt's testimony that he returned to the scene of the robbery to collect more surveillance video. (*See* Trial Tr. at 537:5-6.) Finally, as discussed below, *see infra* II.C.1., Herrera-Amador's potential involvement in the robbery more properly goes towards damages. Defendants' Rule 59(a) motion for a new trial is therefore denied.

## C.   Rule 59(e) Motion to Alter the Judgment

The jury found Defendants liable and awarded Herrera-Amador $1 million in damages: $300,000 in compensatory damages, for which both defendants were jointly liable; $200,000 in punitive damages against Defendant Lee; and $500,000 in punitive damages against Defendant Arias. (Final Jury Verdict Form.) Because the court granted Defendant Arias's Rule 50 motion for judgment as a matter of law, only Defendant Lee's liability, as found by the jury, is further considered.

Defendants seek remittitur for both the compensatory and punitive damages awards on the grounds that they are excessive. (*See*

Post-trial Mot. at 32-38.) An order of remittitur "compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1328 (2d Cir. 1990). Though the standard for excessiveness is nominally the same for both compensatory and punitive damages—both are deemed excessive if the award is so high as to "shock the judicial conscience," *see Earl*, 917 F.2d at 1327 (applying the "shock the judicial conscience" standard for compensatory damages); *Payne v. Jones*, 711 F.3d 85, 96 (2d Cir. 2013) (applying the "shock the judicial conscience" standard for punitive damages)—courts are more deferential to the jury's verdict for compensatory damages than they are for punitive damages.

In the compensatory damages context, the Second Circuit has adopted the "least intrusive standard" for remittitur, which holds "a district court should remit the jury's award only to the maximum amount that would be upheld by the district court as not excessive." *Earl*, 917 F.2d 1330. This standard, "is the most faithful to the jury's verdict" and informs the plaintiff of the maximum award the court would permit the jury to return in a particular case. *Id.* As compared to more aggressive judicial assessments of what damage amount is appropriate that may more frequently require new trials, this method best conserves judicial resources while minimizing judicial interference into what is otherwise within the jury's prerogative as the factfinder. *See id.* at 1328. The corollary is that courts should uphold jury verdicts that may otherwise seem excessive. *See, e.g., Earl v. Bouchard Transp. Co.*, 735 F. Supp. 1167, 1177 (E.D.N.Y. 1990) (Weinstein, J.) ("This sum seems excessive, but it allows maximum effect to the jury's exceptionally sympathetic verdict for the plaintiff."); *Glover v. Costco Wholesale Corp.*, 153 F. App'x 774, 775 (2d Cir. 2005) (applying *Earl* to affirm district court's remittitur.)

The Second Circuit has indicated that it is more ready to police excessive punitive damages. Judicial review of punitive damages

awards provides an important safeguard against verdicts that are potentially so excessive as to indicate that the jury was improperly driven by passion or partiality. *See Honda Motor Co. v. Oberg*, 512 U.S. 415, 421-25 (1994) (reviewing history); *Payne v. Jones*, 711 F.3d 85, 93 (2d Cir. 2013) ("Even if there is no such thing as a *correct* amount of punitive damages, a legal system has an obligation to ensure that such awards for intangibles be fair, reasonable, predictable, and proportionate."). The Supreme Court, in a decision addressing the constitutional limits of punitive damages, provided three "guideposts" that indicate an award is excessive: (1) the reprehensibility of the conduct, (2) the ratio of punitive damages to actual harm, and (3) comparable civil or criminal sanctions available. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574-75 (1996). The Second Circuit interpreted *Gore* to support, in the context of punitive damages, an "increased judicial readiness to curtail any excessiveness." *Payne*, 711 F.3d at 97.

The distinct treatment of judicial review of compensatory and punitive damages makes sense given their respective purposes. Compensatory damages exist to make a plaintiff whole. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003). When the tort involves non-pecuniary harms, such as the deprivation of liberty in the context of a malicious prosecution, the jury's role as factfinder is in essence to determine the dollar amount that would make the plaintiff as well off as if he or she had never been deprived of liberty. (*See* Trial Tr. at 656:5-24 (jury charge for compensatory damages).) But dollars are imperfect compensation for lost time and lost freedom. It is precisely because placing a dollar value on liberty is so difficult "the law has traditionally deferred to the decision of a jury of laymen drawn from the community at large, and not to the 'seasoned judgment' of the trial judge." *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1330 (2d Cir. 1990).

18

Punitive damages, on the other hand, exist "to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 n. 9 (1986). In a § 1983 action, the jury may assess punitive damages when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). While judges may struggle to properly place a dollar amount on, for example, the award that makes someone whole after spending eleven months in prison as a result of malicious prosecution, it is much more institutionally capable, as compared with a jury, to address punishment for and deterrence of rights violations, and to consider the effects of damages awards more broadly. *See Payne v. Jones*, 711 F.3d 85, 94 (2d Cir. 2013).[7]

Finally, as a practical matter, courts should be cautious when considering remittitur of compensatory damages, as it diminishes the role of juries to determine the cost of non-pecuniary harms, particularly since the value that society may place on said harms can change over time. Remittitur is a one-way ratchet—there is no additur for when a judge believes that a jury's verdict fails to fully compensate a plaintiff. *See Gasperini*, 518 U.S. at 433. This practice, if widespread, risks effectively creating a categorical upper bound on what awards juries can impose for certain injuries and, if overused, would substitute the court's judgment for the jury's on a system-wide basis.

---

[7] This is particularly true for suits against governments (or against individuals indemnified by governments) that are less deterred by tort liability. *See generally* Daryl Levinson, Making Governments Pay: Markets, Politics, and the Allocation of Constitutional Costs, 62 U. Chi. L. Rev. 345 (2000) (arguing that governments facing tort liability respond to political rather than economic pressures and so punitive damages awards have a limited deterrent effect).

With these considerations in mind, the court turns to Defendants' arguments for remittitur for compensatory and punitive damages.

     1.   Compensatory Damages

The jury awarded Herrera-Amador $300,000 for the eleven months in which he was deprived of liberty due to his prosecution. (*See* Final Jury Verdict Form; *see also* Trial Tr. at 582:13-14, 601:21-22, 602:3-4 (emphasizing eleven months of incarceration in summation); *id.* at 656:18-24 (jury charge).) Defendants concede that this amount falls within a reasonable range for cases where the plaintiff was deprived of liberty as a result of malicious prosecution. (*See* Post-trial Mot. at 34.) *See also Santiago v. Fischer*, No. 12-CV-2137 (KAM), 2023 WL 2974201, at *18 (E.D.N.Y. Apr. 16, 2023) (collecting cases). Defendants nevertheless seek remittitur of the compensatory damages on the grounds that the facts of this case are distinct because there is video evidence showing that Herrera-Amador was involved in the robbery for which he was arrested and prosecuted.

Crucially for this case, and the reason that the court does not rule in Defendants' favor for judgment as a matter of law, is the fact that Defendants did not have all five of the videos prior to initiating Herrera-Amador's prosecution. As discussed above, the one video that Defendant Arias recovered prior to Herrera-Amador's arraignment did not show Herrera-Amador's tattoo or his facial hair—it showed only a man with similar pants and shoes as Herrera-Amador was wearing when he was arrested and was not sufficient to establish probable cause as a matter of law. But at some point in the prosecution, ADA Shortt returned to the social club and collected the remaining video footage. Though probable cause is a defense to malicious prosecution, *Savino*, 331 F.3d at 75, it must exist at the time the prosecution is initiated. *See Guillen v. City of New York*, 625 F. Supp. 3d 139, 155 (S.D.N.Y. 2022). The court found that it did not.

However, once ADA Shortt had all five surveillance videos, there was probable cause to prosecute Herrera-Amador. Viewing the five surveillance videos that show different angles of the front and back doors before and after the robbery, the court finds that they are sufficient to establish probable cause that he participated in the robbery. The pre-robbery videos show three men, one of whom is wearing a mask and carrying a duffel bag, entering the social club. (*See* Pre-Robbery Front Door Left Video at 59:03; Pre-Robbery Front Door Right B&W Video at 59:00; Pre-Robbery Front Door Right Color Video at 57:28.) The three pre-robbery videos of the front door show one of the men wearing the same shoes and jeans rolled up to the knee that Herrera-Amador was photographed wearing in his mugshot. (*See id.*; *see also* Defs. Tr. Exh. C.) This man, though wearing a hat in the video, has the same facial hair as Herrera-Amador, and, crucially, has a tattoo on the same place on his left forearm. (*Compare* Pre-Robbery Front Door Right B&W Video at 59:00 *and* Pre-Robbery Front Door Right Color Video at 57:30 *with* Defs. Tr. Exh. C.) The surveillance video shows the same three men fleeing minutes later out a back door that leads to the area where Defendant Lee arrested Herrera-Amador and two nonparties. (*See* Post-Robbery Back Door Video at 6:38.) The hat-wearing man's shoes—those that are similar to those in Herrera-Amador's mugshot—are clear in the video. (*Compare id.* at 6:42 *with* Defs. Tr. Exh. C.) The men arrested minutes after Herrera-Amador had incriminating evidence—bags full of cash, jewelry, cellphones, and weapons, though Herrera-Amador had nothing incriminating on his person. (Trial Tr. at 75:8-78:11, 80:22-83:5.) The surveillance footage of the front door after the robbery shows that Herrera-Amador did not leave the premises with the rest of the social club members after the robbery. (*See generally* Post-Robbery Front

Door Video.)[8] The location of arrest combined with the five different surveillance videos were sufficient to establish probable cause.

Once ADA Shortt obtained the full panoply of surveillance videos, there was probable cause to initiate a prosecution. This is relevant to damages because at that point, Herrera-Amador's deprivation of liberty would have been the result of his probable involvement in criminal activity, not from malicious prosecution. The court therefore remits the compensatory damages to only cover the time during which Herrera-Amador faced prosecution before ADA Shortt obtained the videos.

Given the current record, however, this is easier said than done. It is unclear when ADA Shortt obtained all five videos. At some point, ADA Shortt went to the location of the robbery, 47-22 Junction Boulevard, to look for more video. (Trial Tr. at 537:2-6.) Paulino testified that, about a month after the robbery, ADA Shortt showed him a video of three men going down the stairs, walking towards the camera. (Trial Tr. at 391:9-14, 393:2-394:1-3.) This differs from the video that ADA Shortt testified was on file with the case when he received it. (*See* Trial Tr. at 533:14-534:5 (testifying that the video he received was men walking away from the camera down the stairs)). The court therefore concludes it is thus very likely that by that point, about a month later, the Queens District Attorney's Office had the videos and

---

[8] In rejecting Defendants' motion for judgment as a matter of law, the court noted that the video did not incontrovertibly discredit Herrera-Amador's account that he went up the stairs because two men were already outside. *See supra* II.A.2.b. The burden for establishing probable cause is lower: for an officer to have probable cause, he or she must be able to establish that there is reasonable ground for belief that the person is guilty of a crime. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). Herrera-Amador's potential statements that he exited the social club with patrons when the robbers arrived would not be sufficient to vitiate probable cause. *See Panetta v. Crowley*, 460 F.3d 388, 395-96 (2d Cir. 2006).

probable cause to prosecute Herrera-Amador. But because of the imprecision of Paulino's testimony and the court's application of the least intrusive standard for remitting Herrera-Amador's damages award, the court finds that ADA Shortt had the five videos by December 2013 at the latest, when the two nonparty robbery suspects were indicted before a grand jury. (*See* Tr. of Deposition of ADA Shortt (Dkt. 111-2) at 42:8-25 (referencing showing Paulino the video prior to the grand jury); Defs. July 25, 2023 Letter (Dkt. 111) (noting December 2013 indictment of Herrera-Amador's co-arrestees).) Because approximately three months elapsed between Herrera-Amador's arraignment and the indictment of Herrera-Amador's co-arrestees, Herrera-Amador was deprived of liberty due to his malicious prosecution for three months before the Queens District Attorney's Office had probable cause to prosecute.

The court therefore remits Herrera-Amador's damages award to compensate Herrera-Amador for three months of lost liberty, rather than the eleven months that the jury considered. Calculating the jury's award for lost liberty on a per month basis, Herrera-Amador was compensated approximately $27,000 per month, for a total of $81,000.[9] This amount "allows maximum effect to the jury's exceptionally sympathetic verdict for the plaintiff" that took into account the surveillance videos and still awarded Herrera-Amador $300,000 in compensatory damages. *Earl*, 735 F. Supp. at 1177.

2.  Punitive Damages

Defendants next ask the court to vacate the punitive damage awards because no reasonable juror could find that Herrera-

---

[9] The jury found Defendants Lee and Arias to be jointly liable for Herrera-Amador's compensatory damages. However, because the court granted Defendant Arias's Rule 50 motion for judgment as a matter of law, only Defendant Lee is liable for the now-reduced compensatory damages award.

Amador was entitled to punitive damages. (*See* Post-trial Mot. at 32, 35-38.)[10] Though framed as a Rule 59(e) motion to amend the judgment, Defendants effectively argue that they are entitled vacatur of the jury's punitive damages award as a matter of law. (*See id.* (arguing that punitive damages should be vacated because there is no legal basis for punitive damages, not that the punitive damages should be remitted because the amount was excessive).) Rule 50 is the proper mechanism to challenge the legal basis of punitive damages. *Cf. Zsa Zsa Jewels, Inc. v. BMW of N. Am., LLC*, No. 15-CV-6519 (KAM), 2023 WL 3455057, at *7 n.4 (E.D.N.Y. May 15, 2023) (resolving challenge to entitlement of punitive damages through a Rule 50 motion). Defendants did not raise the issue of punitive damages during their Rule 50(a) motion during trial. (*See* Trial Tr. at 573:8-575:20.) If a party procedurally defaults on a Rule 50 motion, the district court may not issue judgment as a matter of law in the party's favor unless doing so is required to prevent manifest injustice. *Lore v. City of Syracuse*, 670 F.3d 127, 153 (2d Cir. 2012). In light of the court's responsibility to police excessive punitive damage awards, the court grants Defendant Lee's motion for vacatur of the punitive damages award as necessary to prevent a manifest injustice.[11]

---

[10] Defendants ask the court to vacate the punitive damages awards for both defendants. Because the court entered judgment as a matter of law in Defendant Arias's favor, Defendant Arias is not liable for either compensatory or punitive damages. The Rule 59(e) motion for vacatur of punitive damages therefore relates only to Defendant Lee's liability.

[11] Because the court remitted Herrera-Amador's compensatory damages award as well, Herrera-Amador must decide between accepting that reduced damages award or having a new trial. The vacatur of the punitive damages award could be interpreted as a remittitur to zero, which Herrera-Amador may accept or face a new trial. Though "a party may not use Rule 59 to cure a failure to comply with Rule[] 50," *Zsa Zsa Jewels*, 2023 WL 3455057, at *13, given the facts of this case and the court's role in policing excessive punitive damages awards, a Rule 59 motion for complete remittitur and a Rule 50 motion have the same outcome.

"The purpose of punitive damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 n. 9 (1986). In a § 1983 action, the jury may assess punitive damages when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983).

The facts of Herrera-Amador's arrest do not meet this standard. Counsel for Herrera-Amador summed up well Defendant Lee's perspective at the scene of the robbery:

> The defendants – to understand the context, think of it this way: It's 2 in the morning. It's raining, it's dark. Officer Lee tells you he needed his flashlight out to see. There's just been a robbery. You see the video. People are fleeing out of the basement. It's hectic. It's crazy. You can imagine.

> The officers, think of their state of mind for a minute; they've been told there's a gunpoint robbery by three men, no, no, no, no they were told five men, maybe seven men, right? They were told, and if you want to be clear about this, the exhibit is Exhibit G that is the event chronology. You are free to look at it. Five to seven males, no description given other than Hispanic males. I don't know what that means, but that's the description they got. So they're nervous. That's why the guns are out. People are running around. You see the victims of the crime on the sidewalk running back and forth and they're upset. So it's not a controlled, calm situation.

> Mariano Paulino identified one person. They get everybody back to the stationhouse. Lee has it

25

> wrong. He's got guys in custody. He says Paulino
> identified all of them. Maybe it was a miscommu-
> nication, maybe not, but it really doesn't matter.
> (Trial Tr. at 590:5-591:2.)

The circumstances of Herrera-Amador's arrest do not demon-
strate a callous or reckless indifference to Herrera-Amador's
federally protected rights. The scene was chaotic, and Defendant
Lee was in the process of taking control of an active crime scene.
Though a possible miscommunication or misunderstanding of
whom a witness has identified can cause a violation of federal
rights, it is insufficient to warrant entitlement to punitive dam-
ages.

Of course, the malicious prosecution did not begin when Herrera-
Amador was arrested. It started the following day when he was
arraigned. In the meantime, Defendant Lee, as the arresting of-
ficer, and Defendant Arias, as the enhancing detective, had the
opportunity and obligation to clear up the erroneous identifica-
tion, which was "an important factor" in the Queens District
Attorney's Office's decision to prosecute Herrera-Amador. (*See*
Trial Tr. at 546:15-20.)

Though Defendants did not clarify who Paulino did and did not
identify after speaking with him at the stationhouse, Defendant
Arias did go to the site of the robbery and review surveillance
footage.[12] In this footage, he saw three men that he believed
matched the description and timing of the robbers. (*See* Trial Tr.
348:21-349:5.) Though the video, which shows a man of similar
stature wearing similar pants and shoes as Herrera-Amador the
night he was arrested, was insufficient to establish probable
cause to prosecute Herrera-Amador, police officers of reasonable

---

[12] For the reasons discussed above, *see supra* note 6, the court assumes
Defendant Arias only reviewed Pre-Robbery Front Door Left Video.

competence could have disagreed on that fact.[13] Defendant Arias saw Herrera-Amador and his co-arrestees in the precinct's holding cell and then the same morning reviewed the surveillance footage that showed three men with similar profiles entering the basement to commit the robbery. (*See id.* at 349:8-21.) Viewing the video evidence, it was reasonable for Defendant Arias to believe that these were the robbers, and that Herrera-Amador was more likely than not guilty of a crime. (*See* Pre-Robbery Front Door Left Video at 59:03.) Defendant Arias concedes that he should have been more rigorous in his investigation, (*see id.* at 351:5-14), and the court agrees. But the undisputed facts do not demonstrate a reckless disregard for Herrera-Amador's federally protected rights. Punitive damages are therefore not warranted, and the jury's punitive damages award is VACATED.

---

[13] Under the collective knowledge doctrine, when "law enforcement authorities are cooperating in an investigation, as here, the knowledge of one is presumed shared by all." *Illinois v. Andreas,* 463 U.S. 765, 771 n. 5 (1983).

### III. CONCLUSION

For the foregoing reasons, Defendants' Rule 50 motion for judgment as a matter of law is GRANTED as to Defendant Arias and is DENIED as to Defendant Lee. Defendant Lee is now solely liable for the compensatory damages award.

Defendants' Rule 59(a) motion for a new trial is DENIED. Defendants' Rule 59(e) motion for remittitur is GRANTED; compensatory damages are reduced to $81,000 and punitive damages are reduced to $0. Herrera-Amador is DIRECTED to choose between a new trial and acceptance of a reduced damages award of $81,000.

SO ORDERED.

Dated:     Brooklyn, New York
           May 22, 2024

                                    s/Nicholas G. Garaufis
                                    NICHOLAS G. GARAUFIS
                                    United States District Judge